FILED

Nov 7  2 ɪ9 PM '03

U. S. DISTRICT COURT
NEW HAVEN, CONN.

FILED

2003 SEP 15 P 3: 17

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRENDA J. LEWIS,                    :      CIVIL ACTION CASE NO.
    *Plaintiff,*                  :

v.                                  :      302 CV 2304 (JCH)
                                MRK

STATE OF CONNECTICUT,               :
    DEPARTMENT OF CORRECTION        :
and                                 :
THERESA C. LANTZ;  Official Capacity Only :
DONALD T. KRUK;                     :
PETER J. MURPHY; and                :
ERIK SOUSA;                         :
Individually and in their Official Capacities, :
    *Defendants*                  :      SEPTEMBER 15, 2003

## THIRD AMENDED COMPLAINT

### PARTIES

    1.    Plaintiff BRENDA J. LEWIS ("Lewis" or the "Plaintiff"), was at all times relevant to this Complaint, an African American female employee of the Connecticut Department of Correction ("DOC" or the "State Defendant") who worked as a Correction Officer at the Hartford Correctional Center, 177 Weston Street, Hartford, CT 06120 (the "Facility"). (As of the date of this Third Amended Complaint, Plaintiff remains employed by the DOC, but has been relocated to another facility.)

    2.    The DOC is an executive agency of the State of Connecticut with its principal office located at 24 Wolcott Hill Road, Wethersfield, Connecticut 06109.

    3.    Defendant THERESA C. LANTZ (individually and in her official capacity for Title VII purposes only, "Lantz") is presently a cabinet-level State officer, responsible to the State's Chief Executive, the Governor of Connecticut. She is the present Commissioner of the

DOC.  As such, Defendant Lantz is the administrative head of the DOC, responsible for administering, coordinating and controlling the operations of the DOC and for the overall supervision and direction of all of its institutions, facilities, and activities, to include without limitation those at the Facility.  Commissioner Lantz is specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the DOC, generally, and the Facility in particular; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of DOC and Facility employees; and (c) ensuring that the DOC, generally, and the Facility in particular are free from racial and/or gender discrimination.

4.     Defendant DONALD T. KRUK (individually, "Kruk") was, at times relevant to this Complaint, the Director of the DOC Affirmative Action Unit.  (Upon information and belief, effective August 7, 2002, Defendant Kruk was reassigned to a different position in the DOC.)  As such, this defendant is or was responsible for the establishment and enforcement of policies and practices concerning the fair and equal treatment of DOC employees, to include those employed at the Facility, and is or was specifically responsible for investigating, responding to, punishing and preventing claims of racial and gender discrimination at the DOC.  As the individual vested at the time of the events in this Complaint with responsibility and authority for certain aspects of the DOC's affirmative action policies and practices, he was therefore in a position to remedy such discrimination and retaliation.  Kruk is a proper defendant in this action.

5.     Defendant PETER J. MURPHY (individually, "Murphy") was, at times relevant to this Complaint, the Facility Warden at the Facility.  Upon information and belief, effective as

of an uncertain date, Defendant Murphy was reassigned to a position as Deputy Warden at the Enfield Correctional Institute.    As previous Facility Warden, he was responsible for administering, coordinating, supervising and controlling the operations of the Facility, and was specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the Facility; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of Facility employees; (c) investigating, responding to, punishing and preventing claims of racial and gender discrimination at the Facility; and (d) ensuring that the Facility is free from racial and gender discrimination.  Inasmuch as Defendant Murphy has or had responsibility and authority for any aspect of the DOC's affirmative action policies and practices and is or was in a position to remedy such discrimination and retaliation, he is a proper defendant in this action.

6.    Defendant ERIK SOUSA (individually, "Sousa") is, or was at all relevant times to this Complaint, a Lieutenant at the Facility.    As such, he is and was responsible for administering, coordinating, supervising and controlling certain operations of the Facility, and is and was specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the Facility; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of Facility employees; and (c) ensuring that the Facility is free from racial and gender discrimination.

In addition, Plaintiff alleges that Sousa was directly responsible for initiating specific acts of racial and/or gender discrimination and retaliation alleged herein and that he acted wantonly,

recklessly or maliciously in connection with such acts. Defendant Sousa is therefore a proper defendant in this action.

## JURISDICTION

7.     This case is brought against the State Defendant pursuant to 28 U.S.C. § 2201 (declaratory relief) and 42 U.S.C. §§ 1981a, and 2000e *et seq.* (Title VII of the 1964 Civil Rights Act, as amended); against all Individual Defendants except Defendant Lantz pursuant to 42 U.S.C. § 1983 (deprivation under color of law of a federally enforceable right to the benefits, privileges, terms and conditions of employment guaranteed by 42 U.S.C. § 1981); and against the Defendant Sousa pursuant to a Connecticut State common law claim for the tort of false imprisonment. Jurisdiction is based upon 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights) and 1367 (supplemental jurisdiction).

8.     Title VII has validly abrogated the defense of Eleventh Amendment immunity as to the State Defendant for all purposes. The Individual Defendants, in their personal capacity, are not protected by Eleventh Amendment constitutional immunity or by common law sovereign immunity against claims for damages under § 1983, nor in their official capacity from injunctive relief. Individual Defendant Sousa is not protected by the statutory immunity provided state employees by § 4-165 of the Connecticut General Statutes, as amended, for acts that are "wanton, reckless or malicious." The Court may hear the common law claim by an exercise of its right of supplemental jurisdiction.

9.     Plaintiff will demonstrate that she exhausted her administrative remedies.

4

## VENUE

10.     Venue is based upon 28 U.S.C. §§ 1391 (b)(1) and (2).  All of the Defendants reside in the District of Connecticut, and all of the events or omissions giving rise to the claims herein arose in the District of Connecticut.

## NATURE OF THE LAWSUIT

11.     Plaintiff was employed as a Correction Officer ("CO") with the DOC on or about August 18, 1989, and at all times relevant to this Complaint has served at the Facility on the third shift.

12.     Plaintiff has a long and satisfactory work record with no incidents of faulty performance or conduct prior to incidents complained of herein.

13.     At all times relevant to this Complaint, Plaintiff reported, among other superiors, to Defendant Sousa.

14.     Notwithstanding complaints and grievances of the Plaintiff to other Individual Defendants, she has been continuously subjected to a hostile work environment by the intentionally discriminatory and retaliatory practices of Sousa.

15.     These practices culminated in the events of March 9, 2001, when the Plaintiff made an appropriate request for medical relief and was denied such relief for a full hour by Sousa, for no non-discriminatory reason, to the effect that Plaintiff suffered an acute myocardial infarction (heart attack) while detained unlawfully at the Facility.

16.    Subsequent to Plaintiff's compliance with departmental grievance procedures, she has continued to be harassed by the actions of Sousa in retaliation for her complaints against him.

17.    These discriminatory employment practices were presented first in the form of internal incident reports and grievances to Plaintiff's union.  Due to unsuccessful efforts to resolve the matter at that level, and based on Plaintiff's lack of familiarity with the statutory procedures, Plaintiff did not submit her complaint to the Connecticut Commission on Human Rights and Opportunities ("CHRO") until November 30, 2001.  By statute, CHRO lacks jurisdiction to investigate such a complaint unless it is brought within 180 days of the incident complained of.  CHRO provided Plaintiff final notice that her case had been dismissed as untimely on February 4, 2002.

18.    These discriminatory employment practices were presented in the form of a charge to the Boston Area Office of the federal Equal Employment Opportunity Commission ("EEOC") on January 28, 2002, as Charge No. 16aa200439, and were retained for further investigation by notice to the Plaintiff dated July 23, 2002.

19.    Efforts to mediate this dispute on September 6, 2002 were unsuccessful and Plaintiff was issued a notice of right to sue by the EEOC on the Title VII claims dated September 30, 2002.  The original Complaint in this action was filed with the U.S. District Court, District of Connecticut, on December 27, 2002.

**FACTS**

20.    On the night of March 8, 2001, at approximately 11:55 P.M., Plaintiff stood in her work area to prepare for taking a periodic count of inmates. She immediately felt dizzy and nauseous and broke into a sweat.

21.    At 12:04 A.M., March 9, Plaintiff contacted Sousa by an internal telephone call to the Lieutenant's station to inform him that the upper portion of her body was aching and she was having trouble breathing. She expressly requested to be relieved for medical attention. Another CO, named Morelli, overheard this conversation.

22.    Sousa agreed to send a relief. According to the log sheets for that shift, there were at least four extra staff available to provide such relief.

23.    Approximately 25 minutes later, as the pain became increasingly unbearable, Plaintiff was agitated and alarmed and again contacted Sousa's office. A Lieutenant Dorozko answered and Plaintiff inquired as to why no relief had been sent. Dorozko indicated that Sousa had not mentioned anything about a request for relief before leaving the Facility at the end of his shift.

24.    Plaintiff was finally relieved at 1:00 A.M. Sousa had intentionally caused Plaintiff's relief to be further delayed by assigning the relief officer additional superfluous duties. Upon information and belief, accounts from personnel in the central control office and the relief officer will support this sequence of events.

25.    Upon being relieved of her duties, Plaintiff attempted but failed to make her way to the Facility's medical department in the main building. Upon entry to the building, Plaintiff

was overcome by dizziness and tightening of her chest and collapsed in the lobby area. An ambulance was called and Plaintiff was transported to St. Francis Hospital, Hartford, where it was determined she had suffered acute inferior myocardial infarction (a heart attack).

26.    Plaintiff submitted an internal grievance against Sousa on April 20, 2001.

27.    Upon returning to regular duties on May 16, 2001, Plaintiff was subjected to retaliation by Sousa and an increasingly hostile work environment.

28.    The original incident and all subsequent incidents have been reported to appropriate supervisory personnel, through the various means of internal incident reports and/or union grievances.

29.    Upon information and belief, Lieutenant Sousa has never received any form of discipline for his discriminatory and retaliatory practices toward of Plaintiff.

30.    Plaintiff has complained that the initial incident on March 9, 2001, constituted a discriminatory employment practice and that the subsequent incidents complained of below constitute either additional discriminatory acts and/or retaliatory acts against the Plaintiff for engaging in the protected activity of making complaints about such discriminatory acts, all of which constitute unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. §§ 2000e *et seq.*; and deprivation of federally enforceable rights to the benefits, privileges, terms and conditions of employment guaranteed by 42 U.S.C. § 1981 under color of law, as remediable under 42 U.S.C. § 1983.

31.    Such additional, subsequent discriminatory and retaliatory conduct includes the following actions on the respective dates:

June 20, 2001: at roll call, Defendant Sousa assigned Plaintiff to the Lobby Control position for a 56-day period.   This assignment was in direct contradiction of communications from Plaintiff's physician, Dr. Robert B. Cohen, and the Facility Personnel Officer, Nora Ryan, to the effect that Plaintiff was to be assigned to a less strenuous "recuperative post."   Plaintiff's assignment to the Lobby Control position cannot be defended as mission essential since Plaintiff lacks the requisite computer skills for the post and there were other officers available who possess those skills.   More importantly, she expressed concern about her ability to cope effectively with the stress of being expected to perform duties for which she had no knowledge or training, having just returned from medical leave due to a life-threatening cardiovascular incident.   Sousa's response to this objection was derisive laughter.   Lt. Sousa knew or had reason to know of Plaintiff's limitations and placed her in this dilemma deliberately for no other apparent purpose than to create a situation that was very stressful, and therefore potentially harmful, for Plaintiff.

March 29, 2002:   Sousa complained to Plaintiff about not signing the back of the logbook, notwithstanding that she demonstrated she had appropriately signed it.   Sousa's false charge was for the purpose of creating a pretext to bring a complaint against Plaintiff.

April 22, 2002:   At approximately 5:50 to 5:55 a.m., Sousa made a tour of Plaintiff's work unit and entered into her "bubble," the cubicle where she was assigned. After an unpleasant exchange during which Sousa was unnecessarily rude, sarcastic and hostile in

9

violation of departmental policies, Plaintiff and Sousa engaged in a conversation regarding the original incident complained of, relating back to March 9, 2001. Plaintiff asked Sousa why he had lied about what happened when asked about it at the Step III Grievance hearing. Sousa cursed at Plaintiff. They began arguing, at which point Plaintiff asked Sousa to leave and turned her back away from Sousa. After leaving, Sousa returned and accused Plaintiff of "assaulting" him by hitting him with the door as he left. Plaintiff denies any such action and alleges that Sousa invented this incident for the purpose of creating a pretext for disciplinary action against Plaintiff. Mary Hartnett, R.N., found "No marks or bruises noted" when she examined Sousa in Medical. Sousa, without authorization from his supervisor, Captain VanOudenhove, called the State Police to investigate this incident. Another captain and a Connecticut State Police Trooper reviewed the South Block Unit videotape, which did not substantiate Sousa's account of this incident. After numerous checks during the alleged time frame of the incident, the investigating captain stated in his report that there was no visual evidence of the alleged incident. It was determined that charges for assault were unsubstantiated. This incident was thoroughly investigated as a possible incident of workplace violence and the "Central Intelligence Unit" prepared an inconclusive report on June 12, 2002. Upon Plaintiff's information and belief, no disciplinary action was taken against Sousa for this apparent fabrication, notwithstanding that it was duly reported to responsible officials.

July 24, 2002:  Plaintiff was denied overtime and the call record book was marked "no contact" during the second shift.  Plaintiff denies that anyone attempted to contact her for the above stated shift and that she was available and willing to work the shift. She has requested that the phone log be checked to verify that anyone attempted to contact her. She has yet to hear back on that report.  Upon Plaintiff's' information and belief Sousa deliberately chose not to give her the opportunity to work this shift for retaliatory reasons.

August 13, 2002:  On her first day back on the Post 3&4 Control, after being assigned elsewhere for a couple of years, Plaintiff heard a buzzer go off but, upon checking the panel, she saw that no light was on.  While trying to determine what the buzzer indicated, she received a call from an officer that someone was at the gate.  She buzzed Sousa and another officer through the "931 door" and the "922 door."  Sousa asked her if there was any reason the buzzer wasn't working, or if she was having trouble with the button. Sousa then told Plaintiff that he wanted an incident report completed as to why he and another officer had to wait.  Plaintiff contends that when she had worked this post before, all the equipment worked. This being her first day back, she was not aware of it being broken.  Sousa's exaggerated report of this incident was apparently in retaliation for her previous grievances against him and a pretext for discipline against Plaintiff.

32.     The described incidents were so severe and pervasive as to render the Facility a hostile working environment as to Plaintiff.

33.     Defendant Sousa's actions were reckless, wanton and malicious.

34.     According to the DOC's Administrative Directive 2.1, the DOC's Affirmative Action Unit, and specifically defendant Kruk, were at times relevant to this Amended Complaint responsible for, among other things, investigating and resolving complaints of race and gender discrimination, for training all DOC employees concerning racial and gender discrimination, and for reviewing all personnel actions to determine if there has been an adverse or unfair impact upon employees of protected status within the DOC.

35.     Administrative Directive 2.22 further provides that "The DOC shall provide its employees with a workplace free of intimidation, harassment, threats and/or violent acts," that "All managers and supervisors are expected to enforce this policy fairly and uniformly," and that "Any manager or supervisor who receives a report of workplace violence [defined as including "intimidating and threatening behaviors" and "verbal abuse"] shall immediately contact the Unit Administrator [i.e., Warden Murphy] who shall notify the human resources office to evaluate, investigate and take appropriate action."

36.     Defendants Kruk and Murphy have failed utterly, uniformly and repeatedly to meaningfully enforce or comply with these Administrative Directive requirements.

37.     According to the DOC's Administrative Directives 2.1 and 2.2, the Defendants are and have been responsible for:

     a.     Ensuring that the DOC is free of any form of discriminatory practice;

12

b.    Taking prompt corrective action when such practices occur;

c.    Monitoring working conditions so that any instance of such practices are promptly detected;

d.    Providing for resolution of any complaint made; and

e.    Reporting any allegation of such practices through the chain of command, i.e. to the Affirmative Action Unit and, ultimately, to Defendant Lantz.

38.    Defendants Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to meaningfully enforce or comply with these Administrative Directive requirements.

39.    The DOC's Administrative Directive 2.2 further provides that "No employee shall be intimidated, threatened, coerced, discriminated or otherwise restrained or retaliated against because of filing a complaint, opposing any discriminating practice, testifying or participating in any manner in an investigation or proceeding."

40.    As to matters affecting the Plaintiff, Defendants Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

41.    The DOC's Administrative Directive 2.2 further provides that each employee of the DOC shall "Treat other employees in a nondiscriminatory manner" and shall "Refrain from harassing or insulting behavior."

42.    As to matters affecting the Plaintiff, Defendants Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

13

43.    The DOC's Administrative Directive 2.17 provides that "The following behavior shall be strictly prohibited: 1.  Any act that jeopardizes the security of the unit, health, safety or welfare of the public, staff or inmates....  10.  Engage in abusive or obscene language, threats and/or intimidating behavior....  16.  Engage in behavior which is sexually, emotionally, or physically abusive toward the public, staff or inmates."

44.    As to incidents of employment discrimination and retaliation affecting the Plaintiff, Defendants Sousa, Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

45.    The DOC's Administrative Directive 2.6 provides that "The Department of Correction shall exercise consistent and equitable discipline in accordance with progressive disciplinary practices," that "Each supervisor shall be responsible for maintaining proper discipline within the supervisor's work unit," and that "Offensive or abusive conduct toward ... co-workers" "shall normally result in dismissal."

46.    As to incidents of employment discrimination and retaliation affecting the Plaintiff, Defendants Sousa, Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

47.    During his tenure at the Facility, Defendant Sousa has had multiple complaints of racial discrimination alleged against him by Correction Officers at the Facility other than Plaintiff.

14

48.     On information and belief, during his tenure at the Facility, Defendant Sousa has never acted so as to deprive white or male officers of the privileges, benefits and immunities of their employment.

49.     However, rather than terminate or meaningfully discipline Sousa, Defendants Kruk and Murphy have protected and defended his conduct.

**COUNT ONE: DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201 (AS TO ALL DEFENDANTS)**

50.     Plaintiff realleges and incorporates herein by reference each and every allegation of paragraphs 1 through 49 as though restated entirely in this paragraph 50.

51.     There is an actual controversy between the Plaintiff and Defendants concerning the existence, nature, scope and severity of racial and gender discrimination, intimidation and retaliation perpetrated and condoned by the Defendants.

52.     The Plaintiff is entitled to a declaration of her rights and remedies.

**COUNT TWO:   TITLE VII CLAIMS (AGAINST DEFENDANT LANTZ IN HER OFFICIAL CAPACITY ONLY AND STATE DEFENDANT AS "EMPLOYER")**

53.     Plaintiff realleges and incorporates herein by reference each and every allegation of paragraphs 1 through 49 as though restated entirely in this paragraph 53.

54.     By virtue of its conduct described herein, the State Defendant, acting as "Employer" for purposes of Title VII and by and through Defendant Lantz acting in her official capacity as agent of such Employer, has violated the Plaintiff's right to equal employment opportunity in at least the following particular ways:

   a.  They have engaged in discriminatory employment practices;

15

b.  They have participated in the creation of a hostile work environment; and

c.  They have engaged in retaliatory conduct;

All in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act amendments of 1991, at 42 U.S.C. §§ 2000e *et seq.*

55.  Plaintiff has been and continues to be harmed by such wrongful acts.

**COUNT THREE:   DEPRIVATION OF RIGHT TO EQUAL ENJOYMENT OF BENEFITS, PRIVILEGES, TERMS AND CONDITIONS OF EMPLOYMENT AS PROTECTED BY 42 U.S.C. § 1981 AND REMEDIABLE UNDER 42 U.S.C. § 1983 (AS TO INDIVIDUAL DEFENDANTS KRUK, MURPHY AND SOUSA ACTING IN THEIR PERSONAL CAPACITY FOR THE PURPOSE OF DAMAGE CLAIMS AND ACTING IN THEIR OFFICIAL CAPACITY FOR THE PURPOSE OF INJUNCTIVE RELIEF)**

56.  Plaintiff realleges and incorporates herein by reference each and every allegation of paragraphs 1 through 49 as though restated entirely in this paragraph 56.

57.  Except as otherwise stated herein, the Individual Defendants Kruk, Murphy and Sousa were acting in the course and scope of their employment.

58.  At all times mentioned herein, such Individual Defendants were acting under color of state law.

59.  Defendant Sousa was directly and personally involved as the initiator of such violations.

60.  Individual Defendants Kruk and Murphy knew or had reason to know that Sousa violated the rights of the Plaintiff.

61.  Individual Defendants Kruk and Murphy knew or had reason to know that Sousa's treatment of the Plaintiff, including racial and/or gender discrimination and retaliation

16

alleged herein, were sufficiently severe, pervasive and extensive to render the work environment hostile to the Plaintiff.

62.     Individual Defendants Kruk and Murphy could have taken action to investigate, address, prevent and punish the violations of the Plaintiff's rights, but they knowingly and deliberately failed or refused to do so.

63.     By their acts and omissions, Individual Defendants Sousa, Kruk and Murphy knowingly and intentionally perpetrated or disregarded repeated, pervasive and ongoing violations of the Plaintiff's rights, and knowingly and intentionally failed to protect the Plaintiff from harm, thus subjecting the Plaintiff to violation of her § 1981 rights to equal benefits, privileges, terms and conditions of employment.

64.     Such Individual Defendants were personally involved in and responsible for the violation of the Plaintiff's statutory right to the benefits, privileges, terms and conditions of employment in that:

a.     They participated directly or indirectly in such violations;

b.     After being informed of the violations, they failed to remedy the wrongs;

c.     They created policies, practices and customs, and they allowed the continuance of policies, practices and customs, under which such practices occurred;

d.     They were grossly negligent and deliberately indifferent in supervising, training and disciplining subordinates who committed the wrongful acts described herein;

e.     They exhibited deliberate indifference to the Plaintiff by failing to act on information indicating that such wrongful acts were occurring; and

17

f.    They acted with reckless or callous indifference to the Plaintiff's human dignity and statutory rights.

65.    As a direct and proximate result of the acts and omissions of such Individual Defendants, the Plaintiff has suffered physical and emotional pain and suffering, mental anguish, humiliation, distress, fear, embarrassment, inconvenience, nervousness, feelings of exhaustion, loss of enjoyment of life, adverse effects on her relationships with others and other mental, physical and emotional injuries.

66.    As a further direct and proximate result of the acts and omissions of such Individual Defendants, the Plaintiff suffered financial and other injuries, including reduced compensation during extended medical leave, forced use of sick time, forced use of vacation time, lost work opportunities, and the costs of medical treatment and counseling.

## COUNT FOUR: STATE COMMON LAW TORT OF FALSE IMPRISONMENT (AS TO DEFENDANT SOUSA ONLY)

67.    Plaintiff realleges and incorporates herein by reference each and every allegation of paragraphs 1 through 49 as though restated entirely in this paragraph 67.

68.    By his conduct on the night of March 8, 2001 and into the morning of March 9, 2001, Defendant Sousa, acting individually, committed the tort of false imprisonment against the Plaintiff when, despite her legitimate request for medical relief, and knowing the serious consequences she could face for leaving her post without relief from another officer, intentionally, wantonly, recklessly and maliciously delayed and prevented such relief, with the purpose of imposing a confinement against her will.

18

69.    Plaintiff has suffered grievous physical, emotional, psychological and financial harms as the proximate and foreseeable consequence of these actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1.    For an order declaring that the Defendants' acts and omissions described herein constitute prohibited racial and gender discrimination and retaliation, and violate the Plaintiff's statutory rights to equal employment opportunity provided by Title VII of the Civil Rights Act of 1964, as amended, and by 42 U.S.C. §§ 1981 and 1983;

2.    For temporary, preliminary and permanent injunctions enjoining the Defendants in their official capacities, their successors, agents, employees and all persons working in concert or participation with them, from continuing to discriminate and retaliate against the Plaintiff and from continuing to violate the Plaintiffs' statutory rights to equal employment opportunity;

3.    For temporary, preliminary and permanent injunctions enjoining the Defendants in their official capacities, their successors, agents, employees and all persons working in concert or participation with them, to immediately take all steps necessary to prevent and remedy racial and gender discrimination, intimidation and retaliation committed by themselves and/or by any and all employees of the DOC including, but not limited to:

a.    An injunction compelling the Defendants immediately to create, publicize and enforce a meaningful anti-discrimination policy that is clear and comprehensive

19

enough to give guidance to all employees, supervisors and managers of what is expected of them in the workplace.  Among other things, the policy should contain: a statement that offenders "shall" be held accountable for acts of employment discrimination and disciplined appropriately; a statement that supervisors and managers "shall" be held accountable for stopping and reporting discriminatory practices; a statement that appropriate disciplinary action "shall" be taken against supervisors and managers who fail to enforce the policy; a statement that acts of retaliation against persons who report discrimination are themselves separate violations of discrimination law which "shall" be considered as additional acts of misconduct and investigated and disciplined accordingly; a definition and examples of behaviors that can be easily comprehended; a description of the level of discipline that "shall" be imposed for violations of the policy; the process of reporting complaints, with an emphasis on the multiple places for filing complaints, such as any DOC supervisor, the Commissioner, applicable law enforcement agencies, the CHRO and the EEOC; mandatory timelines for investigating and resolving complaints of discrimination; a statement that complainants "shall" be notified of their rights, applicable statutes of limitations and filing deadlines; and the names and telephone numbers of persons to contact if employees have questions about the policy;

       b.     An injunction compelling the Defendants immediately to post prominently and distribute widely the anti-discrimination policy so that all employees are aware of the prohibition and the procedures for complaining about it.  A real and truthful zero tolerance statement from the DOC should accompany the policy, as well as a statement

20

from the Commissioner that he and the other Defendants are under a court order to meaningfully enforce the policy in every respect and that they can and should be reported for their failure to do so. Each employee of the DOC should be given a copy of the policy and should sign a statement that they have read it and understand its contents. This statement shall be used later if officers or supervisors accused of violating the policy claim to not have known that their behavior was illegal. All DOC employees should be compelled to read and sign the policy every year during the performance evaluation process;

c.     An injunction compelling the Defendants immediately to establish, publicize and enforce appropriate and mandatory discipline requirements, up to and including dismissal, for all persons found to have committed discrimination, harassment, retaliation or intimidation;

d.     An injunction compelling the Defendants immediately to establish, publicize and enforce a comprehensive and mandatory anti-retaliation policy, the breach of which shall subject offenders to discipline equal to or greater than the discipline required for direct acts of racial and gender discrimination. The policy shall be clear and comprehensive enough to give guidance to all employees, supervisors and managers of what is expected of them in the workplace. Among other things, the policy should contain: a statement that offenders "shall" be held accountable for acts of retaliation and disciplined appropriately; a statement that supervisors and managers "shall" be held accountable for stopping and reporting retaliation; a statement that appropriate

21

disciplinary action "will" be taken against supervisors and managers who fail to enforce the policy; and a definition and examples of retaliatory behaviors that can be easily comprehended;

      e.     An injunction compelling the Defendants immediately to establish, publicize and enforce rules and policies that will ensure the immediate and meaningful protection of discrimination victims upon the making of a discrimination complaint. At a minimum, such rules and policies shall mandate that, upon such a complaint, and until the complaint has been finally resolved, the alleged victim shall not be forced to continue to work in the same facility as the alleged discriminatory actor, and that, unless the victim agrees voluntarily to take a temporary paid administrative leave, the alleged discriminatory actor shall be transferred to a post where he shall have no contact with the complainant or shall him or herself be placed on administrative leave; and

      f.     An injunction compelling the Defendants to collect, compile and evaluate accurate and comprehensive records and data concerning all incidents of discrimination and retaliation at the DOC, including names of complainants, names of discriminatory actors, names of supervisors, locations, types of behavior, time to investigate, results of investigations, and discipline or remedies imposed;

      4.     For actual, compensatory and punitive damages according to proof from the State Defendant, to the extent provided by the 1991 amendments to Title VII;

22

5.     For compensatory damages according to proof from the Individual Defendants in their personal capacities for the violation of rights protected by § 1981, to the extent provided by § 1983;

6.     For such compensatory and punitive damages from the Individual Defendant Sousa as are available under the provisions of the laws of the State of Connecticut;

7.     For costs and reasonable attorneys fees; and

8.     For such further relief as the Court deems just and proper.

## AMOUNT IN DEMAND

Plaintiff's amount in demand, subject to proof in this case and in addition to equitable relief stated herein, is $1,000,000.00.

## JURY DEMAND

Plaintiff respectfully requests that this case be tried to a jury.

Dated (as amended):  September 15, 2003

FOR THE PLAINTIFF
BRENDA J. LEWIS

Lowell L. Peterson
Community Law Practice, Inc.
2065-A Main Street
Hartford, CT 06120
(Tel.) 860-728-3788
(Fax) 860-728-3755
lpeterson@clpllc.com
Federal Bar # ct-22165

23