UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRENDA J. LEWIS,<br>*Plaintiff*, | : | CIVIL ACTION CASE NO. |
| v. | : | |
| | : | 302 CV 2304 (MRK) |
| STATE OF CONNECTICUT,<br>   DEPARTMENT OF CORRECTION<br>and<br>THERESA C. LANTZ;  Official Capacity Only<br>DONALD T. KRUK;<br>PETER J. MURPHY; and<br>ERIK SOUSA;<br>Individually and in their Official Capacities,<br>*Defendants* | :<br>:<br>:<br>:<br>:<br>:<br>:<br>: | <br><br><br><br><br><br><br>JANUARY 2, 2004 |

## FOURTH AMENDED COMPLAINT

### PARTIES

1.   Plaintiff BRENDA J. LEWIS ("Lewis" or the "Plaintiff"), was at all times relevant to this Complaint, an African American female employee of the Connecticut Department of Correction ("DOC" or the "State Defendant") who worked as a Correction Officer at the Hartford Correctional Center, 177 Weston Street, Hartford, CT 06120 (the "Facility"). (As of the date of this Third Amended Complaint, Plaintiff remains employed by the DOC, but has been relocated to another facility.)

2.   The DOC is an executive agency of the State of Connecticut with its principal office located at 24 Wolcott Hill Road, Wethersfield, Connecticut 06109.

3.   Defendant THERESA C. LANTZ (in her official capacity for Title VII purposes only, "Lantz") is presently a cabinet-level State officer, responsible to the State's Chief Executive, the Governor of Connecticut. She is the present Commissioner of the DOC. As such,

Defendant Lantz is the administrative head of the DOC, responsible for administering, coordinating and controlling the operations of the DOC and for the overall supervision and direction of all of its institutions, facilities, and activities, to include without limitation those at the Facility. Commissioner Lantz is specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the DOC, generally, and the Facility in particular; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of DOC and Facility employees; and (c) ensuring that the DOC, generally, and the Facility in particular are free from racial discrimination.

4. Defendant DONALD T. KRUK (individually, "Kruk") was, at times relevant to this Complaint, the Director of the DOC Affirmative Action Unit. (Upon information and belief, effective August 7, 2002, Defendant Kruk was reassigned to a different position in the DOC.) As such, this defendant is or was responsible for the establishment and enforcement of policies and practices concerning the fair and equal treatment of DOC employees, to include those employed at the Facility, and is or was specifically responsible for investigating, responding to, punishing and preventing claims of racial discrimination at the DOC. As the individual vested at the time of the events in this Complaint with responsibility and authority for certain aspects of the DOC's affirmative action policies and practices, he was therefore in a position to remedy such discrimination and retaliation. Kruk is a proper defendant in this action.

5. Defendant PETER J. MURPHY (individually, "Murphy") was, at times relevant to this Complaint, the Facility Warden at the Facility. Upon information and belief, effective as of an uncertain date, Defendant Murphy was reassigned to a position as Deputy Warden at the

Enfield Correctional Institute. As previous Facility Warden, he was responsible for administering, coordinating, supervising and controlling the operations of the Facility, and was specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the Facility; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of Facility employees; (c) investigating, responding to, punishing and preventing claims of racial discrimination at the Facility; and (d) ensuring that the Facility is free from racial discrimination. Inasmuch as Defendant Murphy has or had responsibility and authority for any aspect of the DOC's affirmative action policies and practices and is or was in a position to remedy such discrimination and retaliation, he is a proper defendant in this action.

6.     Defendant ERIK SOUSA (individually, "Sousa") is, or was at all relevant times to this Complaint, a Lieutenant at the Facility. As such, he is and was responsible for administering, coordinating, supervising and controlling certain operations of the Facility, and is and was specifically responsible, either directly or in a supervisory capacity, for: (a) the supervision, training, discipline and control of persons working for the Facility; (b) the establishment and enforcement of policies and practices concerning the fair and equal treatment of Facility employees; and (c) ensuring that the Facility is free from racial discrimination.

In addition, Plaintiff alleges that Sousa was directly responsible for initiating specific acts of racial discrimination and retaliation alleged herein and that he acted wantonly, recklessly or maliciously in connection with such acts. Defendant Sousa is therefore a proper defendant in this action.

## JURISDICTION

7. This case is brought against the State Defendant pursuant to 28 U.S.C. § 2201 (declaratory relief) and 42 U.S.C. §§ 1981a, and 2000e *et seq.* (Title VII of the 1964 Civil Rights Act, as amended); against all Individual Defendants pursuant to 42 U.S.C. § 1983 (deprivation under color of law of a federally enforceable right to the benefits, privileges, terms and conditions of employment guaranteed by 42 U.S.C. § 1981); and against the Defendant Sousa pursuant to a Connecticut State common law claim for the tort of false imprisonment. Jurisdiction is based upon 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights) and 1367 (supplemental jurisdiction).

8. Title VII has validly abrogated the defense of Eleventh Amendment immunity as to the State Defendant for all purposes. The Individual Defendants, in their personal capacity, are not protected by Eleventh Amendment constitutional immunity or by common law sovereign immunity against claims for damages under § 1983, nor in their official capacity from injunctive relief. Individual Defendant Sousa is not protected by the statutory immunity provided state employees by § 4-165 of the Connecticut General Statutes, as amended, for acts that are "wanton, reckless or malicious." The Court may hear the common law claim by an exercise of its right of supplemental jurisdiction.

9. Plaintiff will demonstrate that she exhausted her administrative remedies.

## VENUE

10. Venue is based upon 28 U.S.C. §§ 1391 (b)(1) and (2). All of the Defendants reside in the District of Connecticut, and all of the events or omissions giving rise to the claims herein arose in the District of Connecticut.

## NATURE OF THE LAWSUIT

11. Plaintiff was employed as a Correction Officer ("CO") with the DOC on or about August 18, 1989, and at all times relevant to this Complaint has served at the Facility on the third shift.

12. Plaintiff has a long and satisfactory work record with no incidents of faulty performance or conduct prior to incidents complained of herein.

13. At all times relevant to this Complaint, Plaintiff reported, among other superiors, to Defendant Sousa.

14. Notwithstanding complaints and grievances of the Plaintiff to other Individual Defendants, she has been continuously subjected to a hostile work environment by the intentionally discriminatory and retaliatory practices of Sousa.

15. These practices culminated in the events of March 9, 2001, when the Plaintiff made an appropriate request for medical relief and was denied such relief for a full hour by Sousa, for no non-discriminatory reason, to the effect that Plaintiff suffered an acute myocardial infarction (heart attack) while detained unlawfully at the Facility.

16. Subsequent to Plaintiff's compliance with departmental grievance procedures, she has continued to be harassed by the actions of Sousa in retaliation for her complaints against him.

17. These discriminatory employment practices were presented first in the form of internal incident reports and grievances to Plaintiff's union. Due to unsuccessful efforts to resolve the matter at that level, and based on Plaintiff's lack of familiarity with the statutory procedures, Plaintiff did not submit her complaint to the Connecticut Commission on Human

Rights and Opportunities ("CHRO") until November 30, 2001. By statute, CHRO lacks jurisdiction to investigate such a complaint unless it is brought within 180 days of the incident complained of. CHRO provided Plaintiff final notice that her case had been dismissed as untimely on February 4, 2002.

18. These discriminatory employment practices were presented in the form of a charge to the Boston Area Office of the federal Equal Employment Opportunity Commission ("EEOC") on January 28, 2002, as Charge No. 16aa200439, and were retained for further investigation by notice to the Plaintiff dated July 23, 2002.

19. Efforts to mediate this dispute on September 6, 2002 were unsuccessful and Plaintiff was issued a notice of right to sue by the EEOC on the Title VII claims dated September 30, 2002. The original Complaint in this action was filed with the U.S. District Court, District of Connecticut, on December 27, 2002.

## FACTS

20. On the night of March 8, 2001, at approximately 11:55 P.M., Plaintiff stood in her work area to prepare for taking a periodic count of inmates. She immediately felt dizzy and nauseous and broke into a sweat.

21. At 12:04 A.M., March 9, Plaintiff contacted Sousa by an internal telephone call to the Lieutenant's station to inform him that the upper portion of her body was aching and she was having trouble breathing. She expressly requested to be relieved for medical attention. Another CO, named Morelli, overheard this conversation.

22. Sousa agreed to send a relief. According to the log sheets for that shift, there were at least four extra staff available to provide such relief.

23. Approximately 25 minutes later, as the pain became increasingly unbearable, Plaintiff was agitated and alarmed and again contacted Sousa's office. A Lieutenant Dorozko answered and Plaintiff inquired as to why no relief had been sent. Dorozko indicated that Sousa had not mentioned anything about a request for relief before leaving the Facility at the end of his shift.

24. Plaintiff was finally relieved at 1:00 A.M. Sousa had intentionally caused Plaintiff's relief to be further delayed by assigning the relief officer additional superfluous duties. Upon information and belief, accounts from personnel in the central control office and the relief officer will support this sequence of events.

25. Upon being relieved of her duties, Plaintiff attempted but failed to make her way to the Facility's medical department in the main building. Upon entry to the building, Plaintiff was overcome by dizziness and tightening of her chest and collapsed in the lobby area. An ambulance was called and Plaintiff was transported to St. Francis Hospital, Hartford, where it was determined she had suffered acute inferior myocardial infarction (a heart attack).

26. Plaintiff submitted an internal grievance against Sousa on April 20, 2001.

27. Upon returning to regular duties on May 16, 2001, Plaintiff was subjected to retaliation by Sousa and an increasingly hostile work environment.

28. The original incident and all subsequent incidents have been reported to appropriate supervisory personnel, through the various means of internal incident reports and/or union grievances.

29. Upon information and belief, Lieutenant Sousa has never received any form of discipline for his discriminatory and retaliatory practices toward of Plaintiff.

30.     Plaintiff has complained that the initial incident on March 9, 2001, constituted a discriminatory employment practice and that the subsequent incidents complained of below constitute either additional discriminatory acts and/or retaliatory acts against the Plaintiff for engaging in the protected activity of making complaints about such discriminatory acts, all of which constitute unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964, § 701 *et seq.*, 42 U.S.C. §§ 2000e *et seq.*; and deprivation of federally enforceable rights to the benefits, privileges, terms and conditions of employment guaranteed by 42 U.S.C. § 1981 under color of law, as remediable under 42 U.S.C. § 1983.

31.     Such additional, subsequent discriminatory and retaliatory conduct includes the following actions on the respective dates:

June 20, 2001: at roll call, Defendant Sousa assigned Plaintiff to the Lobby Control position for a 56-day period. This assignment was in direct contradiction of communications from Plaintiff's physician, Dr. Robert B. Cohen, and the Facility Personnel Officer, Nora Ryan, to the effect that Plaintiff was to be assigned to a less strenuous "recuperative post." Plaintiff's assignment to the Lobby Control position cannot be defended as mission essential since Plaintiff lacks the requisite computer skills for the post and there were other officers available who possess those skills. More importantly, she expressed concern about her ability to cope effectively with the stress of being expected to perform duties for which she had no knowledge or training, having just returned from medical leave due to a life-threatening cardiovascular incident. Sousa's response to this objection was derisive laughter. Lt. Sousa knew or had reason to know of Plaintiff's limitations and placed her in this dilemma deliberately for no other apparent

8

purpose than to create a situation that was very stressful, and therefore potentially harmful, for Plaintiff.

March 29, 2002: Sousa complained to Plaintiff about not signing the back of the logbook, notwithstanding that she demonstrated she had appropriately signed it. Sousa's false charge was for the purpose of creating a pretext to bring a complaint against Plaintiff.

April 22, 2002: At approximately 5:50 to 5:55 a.m., Sousa made a tour of Plaintiff's work unit and entered into her "bubble," the cubicle where she was assigned. After an unpleasant exchange during which Sousa was unnecessarily rude, sarcastic and hostile in violation of departmental policies, Plaintiff and Sousa engaged in a conversation regarding the original incident complained of, relating back to March 9, 2001. Plaintiff asked Sousa why he had lied about what happened when asked about it at the Step III Grievance hearing. Sousa cursed at Plaintiff. They began arguing, at which point Plaintiff asked Sousa to leave and turned her back away from Sousa. After leaving, Sousa returned and accused Plaintiff of "assaulting" him by hitting him with the door as he left. Plaintiff denies any such action and alleges that Sousa invented this incident for the purpose of creating a pretext for disciplinary action against Plaintiff. Mary Hartnett, R.N., found "No marks or bruises noted" when she examined Sousa in Medical. Sousa, without authorization from his supervisor, Captain VanOudenhove, called the State Police to investigate this incident. Another captain and a Connecticut State Police Trooper reviewed the South Block Unit videotape, which did not substantiate Sousa's account of this incident. After numerous checks during the alleged time frame of the

incident, the investigating captain stated in his report that there was no visual evidence of the alleged incident. It was determined that charges for assault were unsubstantiated. This incident was thoroughly investigated as a possible incident of workplace violence and the "Central Intelligence Unit" prepared an inconclusive report on June 12, 2002. Upon Plaintiff's information and belief, no disciplinary action was taken against Sousa for this apparent fabrication, notwithstanding that it was duly reported to responsible officials.

July 24, 2002: Plaintiff was denied overtime and the call record book was marked "no contact" during the second shift. Plaintiff denies that anyone attempted to contact her for the above stated shift and that she was available and willing to work the shift. She has requested that the phone log be checked to verify that anyone attempted to contact her. She has yet to hear back on that report. Upon Plaintiff's information and belief Sousa deliberately chose not to give her the opportunity to work this shift for retaliatory reasons.

August 13, 2002: On her first day back on the Post 3&4 Control, after being assigned elsewhere for a couple of years, Plaintiff heard a buzzer go off but, upon checking the panel, she saw that no light was on. While trying to determine what the buzzer indicated, she received a call from an officer that someone was at the gate. She buzzed Sousa and another officer through the "931 door" and the "922 door." Sousa asked her if there was any reason the buzzer wasn't working, or if she was having trouble with the button. Sousa then told Plaintiff that he wanted an incident report completed as to why he and another officer had to wait. Plaintiff contends that when she had worked this post before,

10

all the equipment worked. This being her first day back, she was not aware of it being broken. Sousa's exaggerated report of this incident was apparently in retaliation for her previous grievances against him and a pretext for discipline against Plaintiff.

32. The described incidents were so severe and pervasive as to render the Facility a hostile working environment as to Plaintiff.

33. Defendant Sousa's actions were reckless, wanton and malicious.

34. According to the DOC's Administrative Directive 2.1, the DOC's Affirmative Action Unit, and specifically defendant Kruk, were at times relevant to this Amended Complaint responsible for, among other things, investigating and resolving complaints of racial discrimination, for training all DOC employees concerning racial discrimination, and for reviewing all personnel actions to determine if there has been an adverse or unfair impact upon employees of protected status within the DOC.

35. Administrative Directive 2.22 further provides that "The DOC shall provide its employees with a workplace free of intimidation, harassment, threats and/or violent acts," that "All managers and supervisors are expected to enforce this policy fairly and uniformly," and that "Any manager or supervisor who receives a report of workplace violence [defined as including "intimidating and threatening behaviors" and "verbal abuse"] shall immediately contact the Unit Administrator [i.e., Warden Murphy] who shall notify the human resources office to evaluate, investigate and take appropriate action."

36. Defendants Kruk and Murphy have failed utterly, uniformly and repeatedly to meaningfully enforce or comply with these Administrative Directive requirements.

37. According to the DOC's Administrative Directives 2.1 and 2.2, the Defendants are and have been responsible for:

    a. Ensuring that the DOC is free of any form of discriminatory practice;

    b. Taking prompt corrective action when such practices occur;

12

      c.      Monitoring working conditions so that any instance of such practices are promptly detected;

      d.      Providing for resolution of any complaint made; and

      e.      Reporting any allegation of such practices through the chain of command, i.e. to the Affirmative Action Unit and, ultimately, to Defendant Lantz, in her official capacity as Commissioner of Correction.

38.    Defendants Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to meaningfully enforce or comply with these Administrative Directive requirements.

39.    The DOC's Administrative Directive 2.2 further provides that "No employee shall be intimidated, threatened, coerced, discriminated or otherwise restrained or retaliated against because of filing a complaint, opposing any discriminating practice, testifying or participating in any manner in an investigation or proceeding."

40.    As to matters affecting the Plaintiff, Defendants Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

41.    The DOC's Administrative Directive 2.2 further provides that each employee of the DOC shall "Treat other employees in a nondiscriminatory manner" and shall "Refrain from harassing or insulting behavior."

42.    As to matters affecting the Plaintiff, Defendants Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

43. The DOC's Administrative Directive 2.17 provides that "The following behavior shall be strictly prohibited: 1. Any act that jeopardizes the security of the unit, health, safety or welfare of the public, staff or inmates.... 10. Engage in abusive or obscene language, threats and/or intimidating behavior.... 16. Engage in behavior which is sexually, emotionally, or physically abusive toward the public, staff or inmates."

44. As to incidents of employment discrimination and retaliation affecting the Plaintiff, Defendants Sousa, Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

45. The DOC's Administrative Directive 2.6 provides that "The Department of Correction shall exercise consistent and equitable discipline in accordance with progressive disciplinary practices," that "Each supervisor shall be responsible for maintaining proper discipline within the supervisor's work unit," and that "Offensive or abusive conduct toward ... co-workers" "shall normally result in dismissal."

46. As to incidents of employment discrimination and retaliation affecting the Plaintiff, Defendants Sousa, Kruk and Murphy have failed intentionally, utterly, uniformly and repeatedly to enforce or comply with these Administrative Directive requirements.

47. During his tenure at the Facility, Defendant Sousa has had multiple complaints of racial discrimination alleged against him by Correction Officers at the Facility other than Plaintiff.

48. On information and belief, during his tenure at the Facility, Defendant Sousa has never acted so as to deprive white or male officers of the privileges, benefits and immunities of their employment.

14