**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

BRENDA LEWIS,                          :        CIVIL NO. 3:02CV2304(MRK)
      *Plaintiff,*                  :
                                            :

STATE OF CONNECTICUT,
DEPARTMENT OF CORRECTION,
ET AL.,                                :
      *Defendants.*                :        June 15, 2004

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### Standard of Review

A motion for summary judgment is granted when there is no genuine issue or dispute as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp.v. Catrett, 477 U.S. 317, 322 (1986); Larkin v. Town of West Hartford, 891 F. Supp. 719, 723 (D. Conn. 1995), aff'd w/o opinion 101 F.3d 109 (2d Cir. 1996). A dispute over a material fact exists if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The moving party need not "support its motion with affidavits or other similar materials negating the opponent's claim." Beckman v. U.S. Postal, 79 F. Supp. 2d 394, 399 (S.D.N.Y. 2000). The movant's burden is satisfied if it can point to an absence of evidence to support an essential element of the non-moving party's claim. Goenega v. March of Dimes, 51 F.3d 14, 18 (2d Cir. 1995) citing Celotex, 477 U.S. at 322-23; Jancewicz v. SNET, 54 F. Supp. 2d 134, 135 (D. Conn. 1999). "Summary judgment must be entered against 'a party who fails…to establish the

existence of an element essential to [its] case, and on which it will bear the burden of proof at trial.'" Larkin, 891 F. Supp. at 723, quoting Celotex, 477 U.S. at 322. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. Celotex Corp., 477 U.S. at 327; Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995). Or as stated elsewhere, the non-moving party must provide "concrete evidence upon which a reasonable juror could return a verdict in his favor." Anderson 477 U.S. at 256 (emphasis added); see also Gordon v. Fenniman, 1998 WL 126062 (S.D.N.Y. 1998); Dister v. Continental Group, 859 F.2d 1108, 1114, 1116 (2d Cir. 1988) quoting Anderson, 477 U.S. at 247.

Rule 56(c) "provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment:  the requirement is there be no genuine issue of material fact." Anderson, 477 U.S. at 247-48.

The District of Connecticut has held:

> In deciding whether there is a genuine issue of material fact, the court must draw all reasonable inferences in favor of the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed2d 202 (1986).  Not every factual dispute will defeat a motion for summary judgment; a factual issue must be both "genuine" and "material." Id. at 247-48, 106 S. Ct. at 2509-10 (emphasis omitted).  A factual issue is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. at 248, 106 S. Ct. at 2510.  A factual issue is not "material" unless it "might affect the outcome of the suit under the governing law." Id.

Larkin, 891 F. Supp. at 723-24.

To defeat the motion, the nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Electric Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).  A party may not 'rely on mere speculation or conjecture as to the true nature of facts to overcome a motion for summary judgment.'" McCloskey v. Union Carbide Corp., 815 F. Supp. 78, 81 (D. Conn. 1993) quoting Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 12 (2d Cir. 1986) cert. denied, 480 U.S. 932 (1987). The "party opposing a motion for summary judgment simply cannot make a secret of his evidence until the trial for in doing so he risks the possibility that there will be no trial….To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."  Meri v. Dacon, 759 F.2d 989, 998 (2d Cir.) cert. denied, 474 U.S. 829 (1985).  Accord, D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998) ("non-moving party may not rely on mere concusory allegations nor speculation, but instead must offer some hard evidence.")  Mere assertions and conclusions of the party opposing summary judgment are not enough to defend a well-pleading motion.  Lamontagne v. E.I. Dupont de Nemours & Co., 834 F. Supp. 575, 580 (D. Conn. 1993), aff'd 41 F.3d 846 (2d Cir. 1994).  Summary judgment is appropriate where the "plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000).

The United States Supreme Court has stated that summary judgment is a favored remedy:

> Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather…must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury,

<u>but also for the rights of persons opposing such claims and defenses to demonstrate…, prior to trial, that the claims and defenses have no factual basis.</u>

<u>Celotex Corp</u>., 477 U.S. at 327 (emphasis added.)

## Facts

The defendants' Statement of Undisputed Facts, submitted pursuant to Local Rule 56(a), is incorporated herein by reference, as setting forth the facts in this case.  To summarize, the plaintiff claims that Lt. Sousa caused a delay in providing her relief based on her race to the effect that she suffered a heart attack while at work in the early hours of March 9, 2001.  The plaintiff further claims that Lt. Sousa then created a racially hostile work environment and retaliated against her by his subsequent conduct on the following dates:  June 20, 2001 (Lobby Control recuperative post assignment); March 29, 2002 (logbook signing); April 22, 2002 (South Block Bubble altercation); July 24, 2002 (missed overtime opportunity); and August 13, 2002 (buzzer door delay).  The plaintiff also claims without specificity that the plaintiff was subject to disparate treatment when compared to others.  Each of these claims shall be dealt with in this brief.

The defendants will show that her initial EEOC charge (filed Jan. 28, 2002) is untimely and that she failed to exhaust her administrative remedies with regard to her amended EEOC charge (dated Sept. 30, 2002) because her right to sue notice was also dated Sept. 30, 2002 and was, therefore, limited to her initial charge only.  Thus, the court should dismiss this case in its entirety for lack of jurisdiction.  In addition, the defendants will demonstrate that there is no evidence that actions by Lt. Sousa or any other DOC employee[1] occurred because of plaintiff's race and that as a matter of law the plaintiff has

---

[1] The defendants in this action are the State of Connecticut DOC, Commissioner Lantz (official capacity only), Kruk, Murphy and Sousa (official and individual capacities).

failed to raise a triable genuine issue of material fact in support of her claim of a hostile work environment, retaliation, or disparate treatment under Title VII,  a claim under 42 U.S.C. § 1981 and § 1983, and a claim of false imprisonment.  As a result, the defendants respectfully request that their motion for summary judgment be granted and they seek dismissal of the complaint in its entirety.  The particular incidents at issue are more fully set forth as follows.

    A.  March 9, 2001 (delay in relief)

    On March 9, 2001 the plaintiff, Correction Officer Brenda Lewis, reported to work her scheduled third shift at Hartford Correctional Center by arriving at roll call around 11:45 p.m.   She was assigned with Correction Officer Morelli to Dorm 2 as Officer 1 and Officer 2, respectively.  Around 12:04 a.m. she began not feeling well and called Lt. Sousa to ask for relief.  Lt. Sousa asked her if she wanted to go to medical and she said that she just wanted to get some air.  Lt. Sousa then immediately called Center Control and asked Correction Officer Robinson to get relief for Officer Lewis.  C/O Robinson arranged for C/O Hebert to relieve C/O Lewis.  Around 12:25 a.m., C/O Lewis called the Lieutenant's Office again and reported that she had not yet received relief. When she spoke with  Lt. Anna Dorozko, C/O Lewis only reported that she wasn't feeling well.  She did not mention chest pains, trouble breathing, or that the top of her body was achy.  Lt. Dorozko told C/O Lewis that she hadn't known about her prior request and that she would get relief to her.  C/O Hebert arrived as her relief around 1:00 a.m.  Sousa Aff., ¶ 7, Dorozko Aff., ¶ 4; Hebert Deposition, p. 32:22-25.

B.  June 20, 2001 (recuperative post assignment)

Upon her return to work after recovering from her heart attack, the plaintiff was assigned a recuperative post, which was approved in writing by her physician after he reviewed the physical and cognitive tasks involved.  A recuperative post is used for no longer than 90 days to facilitate an employee's return to work after injury or illness.  It removes the employee from inmate contact.  The employee remains in the same title and position performing job responsibilities within the same position.  On June 20, 2001, the plaintiff was assigned by Captain Madden to work the Lobby Control recuperative post.  She complained about not knowing how to do the computer work on that job.  Lt. Sousa played no role in assigning the plaintiff to that post.  Captain Madden sent C/O Trainor to train C/O Lewis on the use of the computer on that day**.**  Warden Murphy saw C/O Trainor training C/O Lewis at that station.  Sousa Aff., ¶ 8; Madden Aff., ¶¶ 6-7; Murphy Aff., ¶ 7.

C.     March 29, 2002 – (signing of logbook)

Although he does not recall this incident, Lt. Sousa would have been carrying out Warden Murphy's instruction if he had asked whether C/O Lewis had signed the logbook.  The signature of staff is required the first time a new post is assumed and whenever a new log book is put in place.  Murphy Aff., ¶ 8; Sousa Aff., ¶ 9.

D.     April 22, 2002 – (altercation at South Block Bubble)

While Lt. Sousa was touring in the South Block Unit where C/O Lewis was working, she initiated the subject of her treatment on March 9, 2001 and called Lt. Sousa a liar about what he reported at the related Step III grievance that she said to him during their March 9, 2001 phone conversation.  After she grew agitated and the discussion

escalated, she slammed the door into his back as he was leaving.  An internal agency and police investigation resulted in inconclusive findings.  Both officers were counseled for their behavior.  Sousa Aff., ¶¶ 10-11; Ryan Aff., ¶ 12.

> E.     July 24, 2002 – (missed overtime opportunity)

The plaintiff claims that Lt. Sousa intentionally did not call her for overtime work.  Lt. Sousa called the phone number on the overtime call list.  The decision at Step III of her labor grievance determined that an outdated number was on the overtime list and that the plaintiff should have kept it up to date.  Her grievance was denied. Plaintiff's collective bargaining agreement provides for an annual equalization of overtime opportunities.  Sousa Aff., ¶ 13; Ryan Aff., ¶ 14.

> F.     August 13, 2002 – (buzzer delayed opening)

The plaintiff was able to view Lt. Sousa and Officer Medina trying to enter a door.  She delayed in opening the door after the buzzer was heard for about five minutes. The plaintiff admits that Lt. Sousa's request to write up an incident report was reasonable.  Lewis Deposition, pp. 131:8-22,  132:1-3; Sousa Aff., ¶ 14.

## ARGUMENT

**I.     THE PLAINTIFF'S INITIAL DISPARATE TREATMENT CLAIM RELATED TO MARCH 9, 2001 WAS UNTIMELY AND SHE FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES WITH REGARD TO HER SEPTEMBER 30, 2002 AMENDED EEOC CHARGE.  THEREFORE, THE COURT LACKS JURISDICTION AND SHOULD DISMISS HER LAWSUIT.**

> A.     Plaintiff's January 28, 2002 EEOC Charge Was Untimely.

In par. 30 of the Fourth Amended Complaint, the plaintiff claims that her March 9, 2001 delay in receiving relief was disparate treatment based on her race.  The plaintiff filed an EEOC charge on January 28, 2002, which was limited in scope to this claim.

Kruk Aff., ¶ 5.  However, a Title VII claim based on a discrete act must be filed within 300 days of the discriminatory act.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109-10, 122 S.Ct. 2061, 2072-73 (2002).  The difference between the two dates is 325 days, and thus, not timely.  Since the March 9, 2001 incident cannot support a claim of disparate treatment due to the untimely EEOC charge, EEOC cannot entertain an amendment on Sept. 30, 2002 because there was no valid charge to amend.  See Butts v. City of N.Y. Dept. of Housing Preservation and Development, 990 F.2d 1397, 1403 (2d Cir. 1993) ("Most of the allegations in her EEOC charge are time-barred and thus cannot serve as predicates for allegations in the complaint said to be reasonably related.").

      B.     Plaintiff Failed To Exhaust Her EEOC Remedies Related
                  To Her September 30, 2002 EEOC Amended Charge.

The plaintiff wrote a letter to EEOC requesting a right to sue notice and attaching an amended charge dated Sept. 30, 2002.  Kruk Affidavit,  ¶ 5.  On the same day, the EEOC had issued a right to sue notice dated Sept. 30, 2002.  Kruk Aff., ¶ 5.  Therefore, EEOC's right to sue notice was necessarily limited to the initial Jan. 28, 2002 filing which was limited to the March 9, 2001 claim of disparate treatment.  At the time of issuing the right to sue notice, EEOC obviously had no knowledge of the additional claimed incidents outlined in the Sept. 30, 2002 amendment, and thus, had no time to investigate or seek conciliation in regard to such additional incidents.  Furthermore, upon receipt of the amended charge, EEOC did not reopen its investigation related to the amended charge and it informed the respondent that it need not file an answer.  Kruk Aff. ¶ 5, Exhibit F.   Therefore, the plaintiff has failed to exhaust her administrative remedies with regard to all incidents alleged in her Sept. 30, 2002 amendment, and the court lacks jurisdiction to consider those claims.

Even assuming arguendo that the initial EEOC charge were timely, the court should not consider plaintiff's additional federal complaint claims of additional discriminatory acts, retaliatory acts, and hostile work environment[2] based on acts from June 20, 2001 through August 13, 2002 because the three prong test set out in <u>Butts</u> is not satisfied. The Second Circuit has designated only three circumstances in which claims that were not alleged in an EEOC charge may be sufficiently related to the allegations in the original charge of discrimination that it would make it permissible for the court to adjudicate the claims. All three exceptions derive from the doctrine that the claim be "reasonably related" to the allegations raised in the EEOC charge. <u>Butts</u>, 990 F.3d at 1402. These exceptions include: (1) loosely pleaded charge filled out by employee for claims that would have fallen into the scope of the EEOC investigation, (2) a retaliation claim when there is a "close connection of the retaliatory act to both the initial discriminatory conduct and the filing of the charge itself," and (3) allegations of discriminatory conduct carried out in the same manner alleged in the EEOC charge. <u>Butts</u>, 990 F.2d at 1403.

The incidents alleged by plaintiff to have occurred after March 9, 2001 are completely separate and distinct acts from the March 9, 2001 disparate treatment claim set out in her initial EEOC charge. They are not acts which would fall within the scope of EEOC's investigation regarding the original charge, and in fact, they did not fall within the scope of EEOC's investigation. Kruk Aff., ¶ 5 and Exhs. B, D, E, F. Thus, they cannot justify allowing the plaintiff to add them to the court's consideration in this case regardless of how plaintiff characterizes her legal claims. There is no close

---

[2] The Sept. 30, 2002 amendment does not even claim a hostile environment, but only additional discriminatory or retaliatory acts. See Kruk Aff., Exhibit D, Sept. 30, 2002 amended charge, p. 5.

connection between the acts pled as retaliatory, the original March 9, 2001 delay, and the

EEOC charge dated Jan. 28, 2002.  The June 20, 2001 recuperative post assignment had

nothing to do with Lt. Sousa who is the target of the plaintiff's blame regarding the

March 9, 2001 incident and it occurred more than 10 months before the EEOC charge

was filed.  The subsequent acts starting with March 29, 2002 and ending with August 13,

2002 also do not demonstrate a close connection between the original act and the Jan.

28th EEOC charge.  The earliest of these occurred more than one year after the original

act.  See infra, retaliation section on no temporal causation.  Lastly, the third prong also

cannot be satisfied.  None of the subsequent acts occurred in the same manner.  The

plaintiff claims that discrimination occurred in responding to her March 9, 2001 request

for relief.  That situation was a highly unusual one where a miscommunication on her

part caused a delay, and the delay was effectuated through several officers with no one

officer in particular causing the delay.  None of the subsequent acts occurred in response

to effectuating relief and all involved carrying out normal policies and practices of DOC.

Because the plaintiff cannot satisfy the three bases set out in Butts, the defendants

request that the Title VII claims be dismissed for failure to exhaust her administrative

remedies. See also Richards v. State of Connecticut, Department of Correction, et al.,

3:02CV884 (DJS),. June 12, 2003 (Squatrito, J) (court denied request to amend to add

new Title VII claim where plaintiff had not received right to sue letter) (attached hereto);

Cheung v. New York Office of Mental Health, 1989 U.S. Dist. Lexis 14067, 50 Fair

Empl. Prac. Cas. 868 (W.D.N.Y. 1989) (dismissing retaliation claim not raised before

EEOC as not reasonably related); Brown v. Puget Sound Elec. Apprenticeship &

Training Trust, 732 F.2d 726, 729-30 (9th Cir. 1984).  But see Shah v. N.Y. State Dept. of

Civil Service, et al., 168 F.3d 610 (2d Cir. 1999) (retaliation claim by employer was reasonably related).

In McGuire v. USPS, the court stated that "allegations of new acts of discrimination, offered as the essential basis for the requested judicial review are not appropriate." 749 F. Supp. 1275, 1287 (S.D.N.Y. 1990) [internal citations omitted.] In Chinn v. City University of N.Y. School of Law, 963 F. Supp. 218 (E.D.N.Y. 1997), the court held that the plaintiff may not sue on a different cause than that raised before EEOC when new allegations exceed the scope of a reasonable EEOC investigation, which is the case when new factual allegations support the new theory of discrimination.

## II. ASSUMING ARGUENDO THE COURT CONSIDERS PLAINTIFF'S DISPARATE TREATMENT CLAIMS, THE PLAINTIFF CANNOT ESTABLISH A PRIMA FACIE CASE.

With regard to any and all of the plaintiff's alleged incidents of disparate treatment, she cannot establish that she suffered an adverse employment action or that there were facts from which an inference of racial discrimination could be drawn.

The plaintiff suffered no adverse employment action in regard to the above cited incidents. Such action must be a "materially adverse change in the terms and conditions of employment…more disruptive than a mere inconvenience or an alteration of job responsibilities." Patrolmen's Benevolent Association of City of New York v. Guiliani, 310 F.3d 43, 51 (2d Cir. 2002); Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000). In this case, the plaintiff received no discipline. Ryan Aff., ¶ 13. Courts have not expanded the definition of adverse employment action to include "events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee – anything which might jeopardize employment in the future." Mattern v.

Eastman Kodak Co., 104 F.3d 702, 708 (5th Cir.), cert. denied 522 U.S. 932 (1997).

Rather, actions such as a termination or demotion evidenced by a decrease in wages or

salary, a less distinguished title, a material loss of benefits or significant diminished

material responsibilities can constitute an adverse employment action.  Patrolmen's

Benevolent Assoc., 310 F.3d at 51.

The delay in providing the plaintiff relief on March 9, 2001 does not constitute an

adverse employment action.  It is simply an unfortunate act based on a

miscommunication.

The recuperative post assignment also cannot constitute an adverse employment

action.  The temporary recuperative reassignment is nothing more than an assignment

within the job responsibilities of her position approved by her doctor upon returning from

medical leave.  There is no reduction in rank, title or pay and it does not constitute a

transfer to a different position.  Ryan Aff.,  ¶ 10.  A recuperative post assignment can

only exist for 90 days.  Ryan Aff., ¶ 10.  Even a lateral transfer, which this was not, that

does not result in reduction in pay or benefits cannot constitute an adverse action unless it

alters the terms and conditions of employment in a materially adverse way.  Galabaya,

202 F.3d at 640; Accord, Mormol Costco Wholesale Corp., 2004 U.S. App. LEXIS 6472

*12 (2d Cir. 2004) citing Savino v. C.P. Hall Co., 199 F.3d 925, 932 n. 8 (7th Cir. 1999)

(reassignment to comparable office is neither sufficiently adverse nor significant.);

Trevor Staff v. Pall Corporation, 233 F. Supp. 2d 516 (S.D.N.Y. 2002) (transfer to

another division within company did not materially affect terms and conditions of

employment).

To the extent Lt. Sousa may have asked Officer Lewis if she had signed the logbook one time (3/29/02), that is part of his duties, Sousa Aff., ¶ 9; Murphy Aff., ¶ 9, and therefore, cannot constitute an adverse employment action.

It is settled law in this circuit that counseling letters, reprimands, and threats of reprimands DO NOT constitute materially adverse employment actions.  Bennett v. Watson Wynatt & Co., 136  F. Supp. 2d 236, 248 (S.D.N.Y. 2001);  Stembridge v. City of New York, 88 F. Supp. 2d 276, 283 (S.D.N.Y 2000).  Therefore, the counseling received by the plaintiff, Lewis Deposition, p. 130, related to the South Block Bubble altercation cannot establish an adverse employment action.  In addition, since Lt. Sousa (white male) also received a counseling, Sousa Aff., ¶ 12, the plaintiff (black female) cannot claim that such action is race-based.  Moreover, counseling is not considered discipline.  Ryan Aff. ¶ 12.

With regard to the missed overtime opportunity (7/24/02), an outdated phone number entry explained why the plaintiff had not received a call.  Sousa Aff., ¶ 13; Ryan Aff., ¶ 12.  In addition, the collective bargaining agreement, Art. 15, provides for an annual equalization of overtime to prevent accidental disparities.  Ryan Aff., ¶ 15.  Thus, there was no adverse employment action taken against her in that regard.

Similar to the logbook request, a request to write an incident report for why the buzzer delayed entry (8/13/02) does not rise to the level of an adverse employment action because it is a legitimate business action that did not impact adversely on the plaintiff's employment.  The plaintiff admits that it was reasonable for Lt. Sousa to ask her to write an incident report; she just perceived his tone to be sarcastic.  Lewis Deposition, p. 131-132.  It should also be noted that the plaintiff did not sue Warden Levester in this

litigation matter.  Warden Levester replaced Warden Murphy and was Warden of

Hartford CC from June 28, 2002 – October 2002 which covered the time period of the

7/24/02 overtime call and 8/13/02 buzzer door delay incidents.  Warden Levester is a

Black Male.  Ryan Aff., ¶ 6.

     Not every action that makes an employee unhappy is an actionable adverse action.

Pimentel v. City of New York, 2002 U.S. Dist. LEXIS 8454, (S.D.N.Y. 2002).  In the

Second Circuit, a plaintiff must plead and prove that she suffered a materially adverse

change in the terms and conditions of employment.  Galabya., 202 F.3d at 640.  The

change must be more disruptive than inconvenience or an alteration of duties.  An

adverse material action includes termination, demotion, decrease in salary, less

distinguished title, a material loss of benefits or significantly diminished responsibilities.

Id.

     The plaintiff has also failed to establish that non-blacks were treated differently

than herself on account of her race.  She has not identified anyone in particular that was

similarly situated and treated differently.  This failing precluded the plaintiff in Alfano v.

Costello, 294 F.3d 365, 373 (2d Cir. 2002) from a recovery based on a disparate

treatment theory.  It should have the same effect with regard to our plaintiff.  Accord,

Volovsek v. Wisconsin Dept of Agriculture, Trade and Consumer Protection, 344 F.3 680

(7th Cir. 2003) (plaintiff failed to identify similarly situated people who were treated

differently, and therefore failed to state a prima facie case of disparate treatment and

retaliation).

III.    ASSUMING ARGUENDO THAT THE COURT REACHES THIS
       CLAIM, THE DEFENDANTS DID NOT CREATE A RACIALLY
       HOSTILE WORK ENVIRONMENT.

A.    The Plaintiff Cannot Establish Any Of The Prongs Of The
      Prima Facie Case Of A Racially Hostile Work Environment.

To establish a prima facie case of race discrimination based on a hostile work

environment, the plaintiff must plead and prove that: (1) that she was subjected to verbal

or physical conduct of a racial nature; (2) the conduct was severe or pervasive enough to

create a hostile work environment; (3) the conduct was directed at her because of her

race; and (4) there is a basis for employer liability.  Alfano, 294 F.3d at 373-375; Perry v.

Ethan Allen., Inc., 115 F.3d 143, 149 (2d Cir. 1997).

To be actionable as a hostile work environment, racial harassment must be

"sufficiently severe or pervasive 'to alter the conditions [of the victim's] employment and

create an abusive working environment.'"  Meritor Savings Bank, FSB v. Vinson, 477

U.S. 57, 67 (1986) quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir. 1982).  The

conduct must be both objectively and subjectively abusive.  Harris v. Forklift Systems,

510 U.S. 17, 21-22 (1993).  A court must look to all the circumstances including (1) the

frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically

threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably

interferes with an employee's work performance.  See Id. at 23; Cruz v. Coach Stores,

Inc., 202 F.3d 560, 570 (2d Cir. 2000).  The plaintiff cannot satisfy her burden to

establish a hostile work environment based on her allegations in the Fourth Amended

Complaint.  There is no evidence that the plaintiff was subjected to verbal or physical

conduct of a racial nature, and therefore, cannot establish the first prong of the prima

facie case.  In the present case, the plaintiff does not allege that she was subjected to ridicule, insult or humiliation through comments, writings, or jokes that refer to her race in regard to any of the incidents she has set forth.  She does not allege that she was formally disciplined for any of the incidents either.

Nor can she establish that the conduct relating to the 6 alleged incidents was severe or pervasive, or that it occurred frequently enough to establish an objectively hostile work environment. See Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (12 incidents taken separately or together could not support inference of hostile work environment); Stembridge v. City of New York, 88 F. Supp.2d 276 (S.D.N.Y. 2000) (seven instances over three years insufficient) citing Carter v. Cornell University, 976.F. Supp. 224, 232 (S.D.N.Y. 1997) aff'd 159 F.3d 1345 (2d Cir. 1998) (six comments over three years did not constitute a hostile or abusive work environment.)  The six incidents alleged by plaintiff (March 9, 2001, June 20, 2001, March 29, 2002, April 22, 2002, July 24, 2002, and August 13, 2002) are not severe or pervasive enough to constitute a hostile work environment.  Each of these incidents were facially race-neutral occurrences under circumstances which no reasonable fact-finder could conclude were based on race.  See Alfano, 294 F.3d at 378.  Even assuming arguendo evidence of a dislike of a plaintiff personally exists, that does not constitute an indication that the plaintiff is disliked because of her race.  Id.

In addition, the plaintiff has not presented any evidence indicating that the alleged occurrences interfered with her work performance.  Nor has she ever claimed such. Mormol v. Costco, 2004 U.S. App. LEXIS 6472 *15 (2d Cir. 2004)

None of the incidents alleged can objectively be viewed as creating a hostile work environment. They are neither severe nor pervasive enough. With regard to the March 9, 2001 delay no one knew, *not even the plaintiff*, that she was about to have a heart attack. She did not convey that she was seriously ill to either Lt. Sousa, Lt. Dorozko, or her co-worker C/O Morelli. Each of these persons have stated that they did not understand from speaking with the plaintiff the extent of her not feeling well. Sousa Aff., ¶ 7; Morelli Deposition, pp. 13:5-8, 40:20-41:3; Dorozko Aff. ¶ 4. It is especially significant to note that C/O Morelli who was the only person who was actually witnessing plaintiff's symptoms as he worked with her and waited with her 90-95% of the time within the hour of midnight to 1 a.m.,[3] stated in his deposition that he had no idea that she was that ill, or that she needed him to take medical action.

So there was no sign, she was just telling me. She was sweaty, she wasn't – like to myself, I wouldn't say that, you know, I would need to, you know, take medical action, she just wasn't feeling good….

Morelli Deposition, March 31, 2004, p. 13:5-8.

C/O Morelli was shocked to learn that C/O Lewis had had a heart attack; if had known he would have called for help himself.

I found out afterwards, I don't know how long afterwards, that it was a heart attack, because I was a little shocked myself because being on post with her and knowing that it was a heart attack you know, I couldn't, you know, I feel that, you know, maybe I could have done more for her, but I didn't know that what's happened to her, I just know she felt a little warm and she wasn't feeling good.

Id. at pp. 40:20-25 through 41:1-3.

He also stated that the plaintiff had never indicated that her symptoms were worsening during the time she was waiting for relief. Id. at pp. 42:16-25 through 43:1-15. Surely, C/O Morelli's response was one of a reasonable person, thereby

---

[3] Morelli Deposition 3/31/04, p. 26:5-9.

demonstrating that there was no objective demonstration of racial discrimination in the treatment by Lt. Sousa who spoke only briefly with her. The plaintiff, herself, was not aware of the seriousness of her condition. Furthermore, the plaintiff only complains about the twenty-one minute delay allegedly caused by Lt. Sousa, and does not complain about the additional thirty-five minute delay that ensued after speaking with Lt. Dorozko. One is left with the sense that plaintiff does not like Lt. Sousa personally, and therefore, attempts to discredit him.

The next incident involved her June 20, 2001 assignment to a recuperative post approved by her physician, an opportunity which is given to all employees returning from a major illness regardless of race. Ryan Aff., ¶ 11. This can only be viewed as objectively reasonable. Moreover, the allegation concerning her recuperative post assignment on June 20, 2001 has nothing to do with Lt. Sousa, as it was Captain Madden who assigned her to that post with her doctor's approval. Madden Aff., ¶ 5; Lewis Deposition, p. 103-104. The alleged request on March 29, 2002 to sign the logbook acknowledging the reading of post orders is consistent with agency practices and instruction and cannot be viewed as harassment based on race. See Alfano, 294 F.3d at 376 (requirement to fill out paperwork was consistent with normal practice and did not impose a burden on her). Likewise, the August 13, 2002 request to file an incident report to look into a possible control panel malfunction must be viewed as reasonable by an ordinary and prudent person. Indeed, even the plaintiff admitted that Lt. Sousa had every reason to request that she write up the report, she just didn't like the way he asked. Lewis Deposition, p. 131. The April 22, 2002 South Block Bubble altercation does not provide a reasonable person any inference that its occurrence was based on race, especially in

light of the fact that the plaintiff was the one who initiated the subject which led to the

heated discussion by asking Lt. Sousa why he lied about something that occurred more

than a year earlier.  The fact that the plaintiff missed an overtime opportunity because she

had not updated the list with her correct phone number cannot be viewed objectively as

drawing an inference of severe racial harassment.  Ryan Aff., ¶¶ 14-15.  These six

incidents, viewed separately or together, cannot objectively establish the elements of

"severe or pervasive" treatment necessary to establish a triable issue of fact related to

plaintiff's hostile environment claim.

Lastly, the plaintiff has failed to meet her burden to produce evidence that she

was discriminated against because of her protected status, i.e., race.  Alfano, 294 F.3d at

374 (2d Cir. 2002) citing Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); cf.

Richardson v. New York State Dept. of Correctional Service, 180 F.3d 426, 440 (2d Cir.

1999).  Accord, Lyon v. Jones, 260 F. Supp. 2d 507 (D. Conn. April 23, 2003), Hall, J.,

motion for reconsideration denied (D. Conn. May 14, 2003), aff'd 2004 U.S. App.LEXIS

5911 (2d Cir. 2004).  There is no evidence at all from which a jury could draw the

inference that the actions alleged occurred because she was black.  The plaintiff, herself,

did not characterize the March 9, 2001 incident as racially motivated until November 30,

2001, (9 months later) when she filed an untimely CHRO action.[4]  She did not file a

complaint with the Affirmative Action Unit within DSS, which she knew to be the

appropriate DSS entity to investigate allegations of racial discrimination.  Kruk Aff., ¶ 8;

Lewis Deposition, pp. 134:16-135:14, p. 136:8-11, p. 144:5-19 (plaintiff only expected

Kruk to learn of her allegations against Lt. Sousa as of filing Nov. 30, 2001 CHRO

---

[4] The plaintiff returned to work on May 12, 2001.  Ryan Aff., ¶ 11.

complaint).  Furthermore, she did not characterize the subsequent actions alleged in ¶ 31 of the Fourth Amended Complaint as racially discriminatory, which she now claims to have been both retaliatory and creating a hostile work environment, until she amended her EEOC complaint on Sept. 30, 2002.  Some of these incidents ranged back as much as 15 months earlier.[5]

It is important to distinguish between the plaintiff's general allegations that her work environment was "hostile" and true racial harassment.  Title VII does not protect employees from hostile conduct that is not based on their protected status.  In short, the conduct must be race based.  Alfano, 294 F.3d at 374; Farpella-Crosby v. Horizon Health Case, 97 F.3d 803, 806 (5th Cir. 1996).  This point cannot be over emphasized because the simple fact that the plaintiff perceived that her supervisor was hostile to her is not enough to state a claim.  There can be many reasons why people do not get along in the workplace that do not implicate unlawful conduct.

In Alfano, the Second Circuit cautioned that:

It is easy to claim animus in employment discrimination cases. . . . Everyone can be characterized by sex, race, ethnicity or disability; and many bosses are harsh, unjust and rude.  It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

Id. at  377.

In sum, the acts alleged in the Fourth Amended Complaint (¶ 31) are insufficient to sustain a racially hostile work environment claim.

---

[5] June 20, 2001, March 29, 2002, April 22, 2002, July 24, 2002, August 13, 2002.

B.    <u>Lt. Sousa Had Only Limited Supervisory Authority Such That His Actions Cannot Be Imputed To The Employer</u>.

The Second Circuit in <u>Mack v. Otis Elevator Co</u>., 326 F.3d 116, 126 (2d Cir. 2003) presented a definition of supervisor that is broader than most of the other circuit courts.  Compare <u>Hall v. Bodine Elec. Co</u>, 276 F.3d 345, 355 (7th Cir. 2002); <u>Joens v. Morrell and Co</u>., 354 F.3d 938 (8th Cir. 2004); <u>Mikels v. City of Durham</u>, 183 F.3d 323, 333-34 (4th cir. 1999).  Whereas the majority of circuits require only that the "alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties," <u>Id</u>., the Second Circuit focuses on "whether the authority given by the employer to the employee enabled or materially augmented the ability of the latter to create a hostile work environment for his or her subordinates," that is, if the alleged harasser has the "actual authority to…direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks." <u>Mack</u>, 326 F.3d at 126-127.  Because Lt. Sousa generally worked the first or second shift and the plaintiff worked the third shift, the times their workday overlapped were rare.  Sousa Aff., ¶ 4-5.  Such infrequent contact cannot translate into Lt. Sousa being her supervisor for purposes of holding the employer vicariously liable for a hostile work environment.[6]  The plaintiff admits that Lt. Dorozka is a third shift supervisor, not Lt. Sousa.  Lewis Deposition, pp. 46, 67-68   Lt. Sousa has never signed an evaluation for the plaintiff, nor does he generally make her assignments.

---

[6] In <u>Mack</u>, the individual found to be a supervisor "was the senior employee regularly on site and that, as the mechanic in charge, he had and exercised the authority to make and oversee the daily work assignments of the mechanics and the mechanics' helpers at 200 Park, including Mack."  326 F.3d at 127.  This is in stark contrast to Lt. Sousa's responsibilities over the plaintiff.

Sousa Aff., ¶ 5.  He has no authority to hire, fire, demote, promote, transfer, or discipline the plaintiff.  He does not direct her daily activities since he does not work with her often. The most he can do is ask that she write up an incident report for him to pass on to his superiors during the infrequent times their work shifts overlap.  Sousa Aff., ¶ 4.  See Mikels v. City of Durham, N.C., 183 F.3d 323, 334 (4th Cir. 1999) (where harasser was superior in rank only, had no authority to take tangible employment actions against the officer, only occasionally had authority to direct the officer's operational conduct while on duty, and where the police officer had the continuing protective power of higher management, harasser was not deemed supervisor merely because of agency relationship.)

      C.      There Was No Adverse Tangible Employment Action.

The plaintiff has not alleged that she was disciplined or otherwise received any adverse tangible employment action as defined by the Supreme Court in Burlington Inds., Inc. v. Ellerth, 524 U.S. 742, 753 (1998) and the Second Circuit in Mormol, 2004 U.S. App. LEXIS 6472 (2d Cir. 2004).  A tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.  For the same reasons stated in Argument IB (incorporated herein by reference) above demonstrating that the plaintiff suffered no adverse employment action, the plaintiff has suffered no tangible employment action.

D.    The Employer Exercised Reasonable Care To Prevent and Correct
Any Racial Harassment And The Plaintiff Unreasonably Failed To Take
Advantage Of The Agency's Anti-Harassment Procedures.

When no tangible employment action is taken, an employer may successfully

defend against liability by demonstrating that (1) it exercised reasonable care to prevent

and correct promptly any sexually harassing behavior, and that (2) the plaintiff employee

unreasonably failed to take advantage of any preventive or corrective opportunities

provided by the employer or to avoid harm otherwise. Farragher v. City of Boca Raton,

524 U.S. 775 (1998); Ellerth, 524 U.S. 742 (1998). The existence of an employer's anti-

harassment policy is an important factor to be considered. Ellerth, 524 U.S. at 807;

Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 295 (2d Cir. 1999) citing see

also Fierro v. Saks Fifth Ave., 13 F. Supp.2d 481, 491 (S.D.N.Y. 1998) (noting that the

existence of anti-harassment policy with complaint procedure is "an important, if not

dispositive, consideration."). DOC has had an anti-harassment policy in effect since

before defendant Kruk took over as Director of Affirmative Action in August 1997 which

includes a procedure for filing, investigating and resolving discrimination complaints.

Kruk Aff., ¶ 7; Kruk Deposition, April 13, 2004, pp. 49, 51. DOC implements these

procedures through its Affirmative Action Unit in an endeavor to investigate and remedy

problems reported by its employees. Kruk Aff., ¶7.[7] It is both reasonably designed and

effectual. New employees hired are introduced to this policy as part of their orientation

package and it is posted at every facility on employee informational bulletin boards.

Employees are reminded of this policy annually by way of notice issued with a paycheck.

Kruk Aff., ¶ 7. The plaintiff knew about the proper procedures to report discrimination

_____

[7] Whether an employer's corrective response to discrimination is reasonable can be
decided by the court on summary judgment.. Berry v. Delta Airlines, 260 F.3d 803, (7th
Cir. 2001).

claims, as she had received such information at orientation and annually with reminders

in her paycheck.  Kruk Aff., ¶ 7.  Yet, Brenda Lewis never filed a grievance with the

Affirmative Action Office of DOC or contacted the Commissioner with regard to any of

her alleged incidents of discrimination.  Kruk Aff., ¶ 8; Kruk Deposition, April 13, 2004,

p. 69:9-21; Lewis Deposition, Jan. 21, 2004, pp. 133–139. The only reason she offered as

to why she did not file a complaint with the Affirmative Action Unit, is because she did

not feel it was effective.  Lewis Deposition, 1/21/04, p. 136.  The plaintiff's fears that her

claims would not be taken seriously are not based on credible fears.  In <u>Caridad</u>, the

Second Circuit held that the plaintiff's hesitancy to report and use the employer's process

were insufficient to preclude summary judgment for the employer.  191 F.3d at 295,

citing <u>Faragher,</u> 524 U.S. at 807 ("a demonstration of such [unreasonable] failure [to use

employer's complaint procedure] will normally suffice to satisfy the mployer's burden

under the second element of the defense.").  The plaintiff fails to present evidence

sufficient to raise a genuine issue of material fact in regard to these affirmative defenses.

Thus, summary judgment should be granted for the defendants because DOC discharged

its duty under Title VII.[8]

### IV.  ASSUMING ARGUENDO THE COURT REACHES THIS CLAIMM, THE PLAINTIFF FAILS TO ESTABLISH THE ELEMENTS OF A RETALIATION CLAIM.

"To establish a prima facie case of retaliation under Title VII a plaintiff

must show (1) that she was engaged in protected activity by opposing a practice made

unlawful by Title VII; (2) that the employer was aware of that activity; (3) that she

---

[8] Commissioner Lantz should be dismissed from this Title VII count as she is sued in her official capacity only and is thus superfluous.  Only the employer, Department of Correction is the necessary defendant for all Title VII purposes.  Individual supervisory liability is not cognizable under Title VII.  <u>Tomka v. Seiler</u>, 66 F.3d 1313-15 (2d Cir. 1995).

suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." <u>Galdieri-Ambrosini v. National Realty & Development Corp.</u>, 136 F.3d 276, 292 (2d. Cir. 1998). "Upon such a showing, the defendant must demonstrate legitimate reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." <u>Van Kant v. KLM Royal Dutch Airlines</u>, 80 F.3d 708, 714 (2d Cir. 1996); <u>Grant v. Hazelett Strip-Casting Corp.</u>, 880 F.2d 1564, 1569-71 (2d Cir. 1989).

The plaintiff's first complaint based on conduct protected by Title VII occurred with her untimely CHRO filing on November 30, 2001 as she did not complain about discrimination to the Affirmative Action Office of DOC at any prior time.  Plaintiff's untimely CHRO complaint was the first time DOC became aware that the plaintiff thought her delay in relief was based on her race.[9]  Kruk Aff., ¶ 4.  Therefore, only those actions that occurred after the Nov. 30, 2001 date can be analyzed in regard to a retaliation claim. Those actions include the March 29, 2002 request to sign the logbook, the April 22, 2002 South Block altercation; the July 24, 2002 overtime opportunity, and the August 13, 2002 buzzer door incident.

For the same reasons stated in the first section, Argument IB, there is no triable issue of a material fact related to a disparate treatment claim because the plaintiff has not suffered an adverse employment action.

There is no causal connection between these four incidents (ranging from March 29, 2001 through August 13, 2002)  and the filing of her untimely Nov. 30, 2001 CHRO

---

[9] The labor grievance was not based on the contractual racial discrimination clause, Art. 3, sec. 1, but rather the more general harassment or disparate treatment clause, Art. 3, sec. 5.  Furthermore, the union told the Step III agency advocate that they did not believe the delay was intentional.  Millholen Affidavit, ¶ 6.

action.  They occurred too far removed to have any temporal relevance to the November

30, 2001 filing.  The United States Supreme court has cited with approval cases

dismissing retaliation claims where three and four months transpired between protected

activity and adverse employment action, and requiring that their temporal proximity to be

"very close."  <u>Clark County School District v. Breeden</u>, 532 U.S. 268, 273 (April 23,

2001) <u>per curiam, reh'g denied</u> 533 U.S. 912 (June 11, 2001) citing <u>Neal v. Ferguson</u>

<u>Constr. Co.</u>, 237 F.3d 1248, 1253 (10th Cir. 2001).  See e.g., <u>Richmond v. Oneok, Inc</u>.,

120 F.3d 205, 209 (10th Cir. 1997) (3 month period insufficient); <u>Hughes v. Derwinksi</u>,

967 F.2d 1168, 1174-75 (7th Cir. 1992) (4 month period insufficient).  Accord, <u>Hollander</u>

<u>v. American Cyanamid Co.</u>, 895 F.2d 80, 84-85 (2d Cir. 1990) (3.5 month interval,

without other evidence, is insufficient to demonstrate causation); <u>Anderson v. Coors</u>

<u>Brewing Co</u>., 181 F.3d 1171, 1179 (10th Cir. 1999) (3 month period alone insufficient);

<u>Garone v. UPS</u>, 2001 U.S. Dist. LEXIS 12175 (E.D.N.Y. 2001) (no causation found in 3

month interval); <u>Cooper v. Morgenthau</u>, 2001 U.S. Dist. LEXIS 10904 (S.D.N.Y. 2001)

(collection of cases finding temporal proximity of three and four months insufficient to

establish retaliation); <u>Pontincelli v. Zurich Am. Ins. Co.</u>, 16 F. Supp.2d 414, 436

(S.D.N.Y 1998) (2.5 months between protected activity and retaliation insufficient to

establish causation).

In the present case, the plaintiff does not claim that she was demoted, reduced in

rank, dismissed, disciplined that resulted in a reduction in duties or status, or suspended.

Her claims do not amount to actionable retaliation under Title VII.  Personality and

management disputes are beyond the scope of Title VII. <u>Figueroa v. City of New York</u>,

2002 U.S. Dist. LEXIS 18340; 2002 WL 31163880 at *3 (S.D.N.Y. 2002); <u>Fisher v.</u>

Vassar Coll., 114 F.3d 1332, 1337 (2d Cir. 1997) (employer may take adverse

employment action for any reason that is nondiscriminatory but unbecoming or small

minded, such as back scratching, log-rolling . . . spite or personal hostility).  The facts do

not establish a claim for retaliation under Title VII.

###    V.    Plaintiff Is Not Entitled To Punitive Damages.

A.  Under Title VII

Assuming, arguendo, that the court determines that the plaintiff has been

discriminated against under Title VII, any claim for punitive damages must be dismissed.

In the relief request section of the plaintiff's complaint, there is a request for punitive

damages.  The Civil Rights Act of 1991, 42 U.S.C. § 1981a, "was passed by Congress in

1991 to expand the remedies available to Title VII plaintiff's adding compensatory and

punitive damages to the equitable and injunctive relief available under Title VII alone."

Ettinger v. State University of New York College of Optometry, 1998 U.S. Dist. LEXIS

2289, 1998 WL 91089 at 7 (S.D.N.Y. 1998), citing H.R. Rep. No. 40(I), 102d Cong., 1st

Sess., 65, 71 (1991), 1991 U.S.C.C.A.N. 549; see 42 U.S.C. § 1981a(a)(1).  Nevertheless,

section 1981a(b)(1) specifically exempts government entities from punitive damages as

follows:

> (1) Determination of punitive damages
> A complaining party may recover punitive damages under this section against a
> respondent (other than a government, government agency or political subdivision) if the
> complaining party demonstrates that the respondent engaged in a discriminatory practice
> or discriminatory practices with malice or with reckless indifference to federally
> protected rights of an aggrieved individual. (emphasis added).

42 U.S.C. 1981a(b)(1).  See also, Erickson v. Hunter, 932 F. Supp. 1380 (M.D. Fla.

1996).  There is no dispute that the Department of Correction is an agency of the state.

Accordingly, plaintiff's request for punitive damages must be dismissed.

B.  Under 42 U.S.C. § 1981

The standard for allowing punitive damages under § 1981 is governed by 42
U.S.C. § 1983.  Danco and Guiliani v. Wal-Mart Stores, 178 F.3d 8 **26 (1st Cir. 1999).
Where we are concerned only with isolated acts of alleged harassment by someone with
limited supervisory authority, such as Lieutenant Sousa, punitive damages are not
appropriate.  Punitive damages should only be afforded "where management itself 'by
evil motive or intent' engaged in racial discrimination or behaved in a manner that
showed 'reckless or callous indifference' to such discrimination.  Id. at **27 citing Smith
v. Wade, 461 U.S. 30, 56 (1983).  There is no evidence to indicate reckless or callous
indifference.

**VI.    PLAINTIFF'S CLAIMS UNDER § 1983 SHOULD BE DISMISSED**.

A.  Claims Of Violations Of DOC Directives
Against Kruk and Murphy Are Not Cognizable Under § 1983.

The plaintiff alleges involvement by these two defendants only to the extent they
had responsibility over enforcement of DOC's affirmative action policies and practices
and were in a position to remedy discrimination and retaliation.  See Fourth Amended
Complaint, ¶ 4 and ¶ 5, 34, 36, 38, 40, 42, 44, 46, 60-64.  Paragraphs 36, 38, 40, 42, 44,
46 all refer to the alleged failing of defendants Kruk and Murphy to adhere to DOC
Directives.  A failure to follow state directives is not cognizable under § 1983. See Maine
v. Thiboutot, 448 U.S. 1, 4 (1980) (federal statutory or constitutional violations are
cognizable under § 1983).  Therefore, because it appears that the plaintiff relies solely on
such allegations of failure to adhere to agency directives, see ¶ 56, as a basis for her §
1981 suit, she fails to state a claim under § 1983.

In addition, The plaintiff alleges in ¶¶ 60-64 that defendants Kruk and Murphy knew of violations by Lt. Sousa, and failed to take action to investigate, prevent and punish those actions.  Because none of the alleged incidents reflect anything of a racial nature, Defendant Kruk would have no reason to investigate them as discrimination claims.  In addition, Murphy has no authority to conduct an investigation of alleged discrimination himself.  Both defendants have no authority to determine discipline, but rather only to refer incident reports to those that do have such authority. The Human Resources Unit is the only unit with authority to determine and impose appropriate discipline subject to final approval by the Commissioner.  Ryan Aff., ¶ 5; Murphy Aff., ¶ 15; Kruk Aff., ¶ 10.  Therefore, the plaintiff has failed to state a claim under § 1981 and § 1983 against defendants Kruk and Murphy.

B.  Plaintiff Fails to Establish The Necessary Personal Involvement of The Defendants With Regard To Particular Incidents.

It is well settled law that in a civil rights action, a plaintiff must demonstrate the defendant's direct or personal involvement in the actions that are alleged to have caused the constitutional deprivation.   Rizzo v. Goode, 423 U.S. 362, 376-378, 96 S. Ct. 598, 606-607 (1976); Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); U.S. ex rel. Summer v. Dixon, 524 F.Supp. 83, 85  (N.D.N.Y. 1981), aff'd, 709 F.2d 173, 174 (2d Cir. 1983) (per curiam), cert. denied, 434 U.S. 1087 (1977); Ellis v. Blum, 643 F.2d 68, 85 (2d Cir. 1981). Liability cannot be founded on official position alone.  Horowitz v. Anker, 437 F. Supp. 495, 504 (E.D.N.Y. 1977), aff'd mem. 578 F.2d 1368 (2d Cir. 1978); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), cert. denied, 434 U.S. 1087 (1977); Williams v. Vincent, 508 F.2d 541, 546 (2d Cir. 1974). A public official can only be liable if the official causes the harm.  Baker v. McCollan, 443 U.S. 137, 142,

99 S. Ct. 2689, 2693 (1979); <u>Vippolis v. Village of Haverstraw</u>, 768 F.2d 40, 44 (2d Cir.

1985). "[T]here must be some showing of personal responsibility" to support an

individual capacity damages claim.  <u>Duchesne v. Sugarman</u>, 566 F.2d 817, 830 (2d Cir.

1988); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977), <u>cert. denied,</u> 434 U.S.

1087 (1978) (<u>emphasis</u> <u>added</u>); <u>Ayers v. Coughlin</u>, 780 F.2d 205, 210 (2d Cir. 1985);

<u>Alfaro Motors, Inc. v. Ward,</u> 814 F.2d 883, 886 (2d Cir. 1987); <u>Gill v. Mooney</u>, 824 F.2d

192, 196 (2d Cir. 1987). To have created a policy or custom under which there were

unconstitutional practices, one must have "impliedly or tacitly authorized, approved or

encouraged" the constitutional violation. <u>Turpin v. Mailet</u>, 619 F.2d 196 (2d Cir. 1980),

<u>cert. denied</u>, 449 U.S. 1016, 101 S. Ct. 577 (1980); <u>see also</u> <u>Rizzo v. Goode</u>, 423 U.S. at

371-72.

Furthermore, individual defendants are not liable simply by virtue of their

position in the organizational chain of command because a subordinate committed a

constitutional violation. <u>Blyden v. Mancusi</u>, 186 F.3d 252, 264 (2d Cir. 1999)(doctrine of

respondeat superior does not apply to Section 1983 actions).  In <u>Poe v. Leonard</u>, 282 F.3d

123, 141 (2d Cir. 2002), the Court of Appeals set forth the standard for liability when the

cause of action is based on a supervisor's deliberate indifference to the rights of others.

> We have held that a supervisor may be found liable for his
> deliberate indifference to the rights of others by his failure to act on
> information indicating unconstitutional acts were occurring or for his
> gross negligence in failing to supervise his subordinates who commit such
> wrongful acts, provided that the plaintiff can show an affirmative casual
> link between the supervisor's inaction and her injury.
>
>         *      *      *
>
> Poe [plaintiff] must allege sufficient facts to raise a triable issue of fact
> whether Leonard knew or should have known of the high degree of risk
> that Pearl would behave inappropriately with a woman during his
> assignment . . .

Id. at  141-42. The rule gleaned from the Poe case is that the plaintiff must allege and prove specific knowledge of facts putting each individual defendant on notice of facts giving rise to a constitutional violation.  Otherwise the daily operational decisions of every lower level supervisor would subject every manager to individual liability.  Such a result would be  inconsistent with federal law.

<u>With Regard To Murphy</u>

Peter Murphy was the Warden at Hartford CC from about February 11, 2000 until June 27, 2002 at which time he transferred to Enfield.  Murphy Aff., ¶ 3.  Warden Murphy's involvement in the March 9, 2001 incident (delay in receiving relief) was limited to receiving and reviewing the incident report and determining whether to forward it on for a determination as to whether a formal investigation was warranted.   He received the incident report on May 10, 2001.  Murphy Aff., ¶ 4.  After reviewing it, he did not see any need for further formal investigation. The incident report did not refer to any claim of racial discrimination.[10]

The only other role Warden Murphy played in regard to the March 9, 2001 incident was to facilitate her receipt of workers compensation benefits.  In a memo addressed to Warden Murphy, dated April 5, 2001, from Brenda Lewis, the plaintiff complained about the slow processing of her incident report by Shift Supervisor Lt. Barnette because she feared that it would negatively impact her timely receipt of worker's compensation benefits.  Ryan Aff. ¶ 9; Murphy Aff. ¶ 6.  Further support for the

---

[10] The plaintiff will claim that the report contained internal inconsistencies, such as the timing of events that transpired.  However, such inconsistencies do not create a genuine issue of material fact because none of the inconsistencies reveal facts that establish an inference of racial discrimination.  There would be no reason to refer for further investigation what appeared simply to be documentation of an unforeseen medical emergency.

agency's interpretation that this memo complained solely about the delay in processing the incident report and paperwork necessary to effectuate her timely receipt of her workers compensation package (as opposed to a complaint about a delay caused by Lt. Sousa) can be seen by plaintiff's reference to a complaint against Barnett (not Sousa), her reference to Administrative Directive 6.6 which sets forth time lines for filing incident reports, and her reference to the receipt of her "package."  Murphy Aff., ¶ 6.  Nowhere in that document does she complain about Lt. Sousa's conduct or raise a race discrimination claim.

Warden Murphy also played no role in the actual assignment of the plaintiff to the recuperative post.  On or about June 20, 2001, when he entered the lobby, C/O Lewis approached him to complain about not being qualified for her recent assignment to the recuperative post of Lobby Control.  He called Captain Michael Madden and related this information to him.  Captain Madden told him that he was aware of her complaints and that she was a seasoned veteran who should know how to work on that post and that he would get someone to train her on the assignment.  Captain Madden told him that C/O Trainor would be conducting training of C/O Lewis on that post.  Warden Murphy did see C/O Trainor sitting with C/O Lewis training her on that post.  Murphy Aff., ¶ 7; Madden Aff. ¶¶ 6-7.

Warden Murphy was not personally involved in any way nor did he have any knowledge pertaining to C/O Lewis' claim regarding Lt. Sousa questioning her about signing the logbook on March 29, 2002.  As Warden, he has given clear directions to supervisors and department heads at numerous monthly staff meetings to check that staff were signing the back of logbooks, which signature acknowledges that they had read and

understood post orders.  Staff are supposed to sign the first time they are assigned to a post and whenever a new logbook is put into place.  Post orders, approved by the Warden, delineate duty of posts.  The policy for signing of post orders is uniform throughout all DOC facilities.  Murphy Aff., ¶ 9.

Warden Murphy was advised of the April 22, 2002 South Block Bubble incident at 6:20 a.m.  He referred the incident for investigation to Central Intelligence Unit Director Huckabey and also to Mitch Drabik, Principal Personnel Officer, responsible for Workplace violence issues.  There is no reference to any claim of racial discrimination in the reports.  In his investigative report, dated June 12, 2002, Stuart Mendelson concluded that due to the lack of evidence and/or witnesses he was unable to prove or disprove the claims made by Lt. Sousa.  Mendelson Aff. ¶ 4.  Warden Murphy transferred out of Hartford CC on June 28, 2002 without knowing whether a final determination was made as to giving one or both of the parties a counseling or any disciplinary action.   Thus, he played no role in the determination to counsel both parties.  Murphy Aff., ¶10.

Warden Murphy has no knowledge or personal involvement in regard to the July 24, 2002 overtime claim by C/O Lewis because he had already transferred out of Hartford CC to Enfield as of June 28, 2002.  He also has no knowledge or personal involvement in regard to the August 13, 2002 buzzer door claim by C/O Lewis because he had already transferred out of Hartford CC to Enfield as of June 28, 2002. Murphy Aff.,¶¶ 11-12.

With Regard to Kruk

Donald Kruk was working as the Acting Director and Ass't. Director of the Affirmative Action Office within DOC from October 1996 through Aug. 31, 2002.  He

was reassigned to External Affairs on Sept. 1, 2002.  Kruk Aff., ¶ 3; Kruk Deposition,
April 13, 2004, p. 36:9-23.  Kruk did not have personal knowledge that discrimination
was claimed or was going to be claimed with regard to any of plaintiff's alleged
incidents.  Regarding the initial delay in providing relief on March 9, 2001, he first
learned that the plaintiff claimed race discrimination in that delay when he received the
untimely CHRO complaint (filed Nov. 30, 2001).  He only learned that the plaintiff
claimed race discrimination with regard to the subsequent alleged acts of retaliation when
he received the amended EEOC complaint dated Sept. 30, 2002, or possibly at the EEOC
mediation of Sept. 6 if they were raised at that time.  Kruk Aff., ¶ 6.

It should also be noted that Lt. Sousa had no personal involvement in the June 20,
2001 assignment of the plaintiff to her recuperative post.  The plaintiff admits that she did
not know who made that assignment.  Lewis Deposition, pp. 103-104.

    C.    Title VII Principles Guide Treatment Of Parallel 42 U.S.C. § 1981
        Claims Of Hostile Work Environment and Retaliation.

Although claims brought under 42 U.S.C. § 1981 are remediable under 42 U.S.C.
§ 1983, the standards under Title VII apply with regard to finding liability based on
hostile work environment and retaliation claims.  Alexander v. Wisconsin Department of
Health and family Services, et al., 263 F.32d 673 (7th Cir. 2001).  Therefore, for the same
reasons as stated above under those headings, the plaintiff has not raised a genuine issue
of material fact warranting a trial.

In addition, 42 U.S.C. § 1983 provides the individual defendants with qualified
immunity as they did not have reason to know that their actions as alleged were unlawful.

## VII.    The Plaintiff Has Failed To State a Claim
## For the Tort Of False Imprisonment.

The plaintiff alleges that she was falsely imprisoned by defendant Sousa on

March 9, 2001.  The common law tort of false imprisonment or unlawful restraint has

been defined as the "unlawful restraint by one person of the physical liberty of another"

Green v. Donroe, 186 Conn. 265, 267 (1982).  In order for this claim to survive, the

defendant must have failed to provide a means of escape.  32 Am. Jur. 2d, False

Imprisonment (1995) provides that:

> If a person has induced another to put himself or herself in a place which it is
> impossible to leave without such person's assistance, by words or other conduct which
> gives the other reason to believe that such assistance will be given when it is needed, the
> refusal to do so, if for the purpose of detaining the other, is a sufficient act of
> confinement to make such a person liable.  It is generally held, however, that the mere
> refusal of permission on the part of an employer to leave the premises during the ordinary
> work hour hours or a failure to provide prompt facilities to enable the servant to leave
> does not constitute false imprisonment.

See, Davis & Allcott Co. v. Boozer, 215 Ala. 116,(1926) (an employer cannot be held

liable for arrest of an employee by merely refusing to permit him to leave the plant upon

his complaining of illness);  Green, 186 Conn. at 267.

In the instant case, the facts do not establish the tort of false imprisonment.  First

of all, there was no refusal to provide relief to Officer Lewis.  Both Lt. Sousa and Lt.

Dorozko immediately contacted Control Center to facilitate relief and were assured of

action.  Sousa Aff., ¶ 7; Dorozko Affidavit, ¶ 4.  The communication between C/O Lewis

and Lt. Sousa and Lt. Dorozko did not accurately relay the seriousness of the situation.

Id.  Indeed, C/O Lewis admits that she herself did not realize that she was having a heart

attack.  Lewis Deposition, p. 29:11-13.  Neither did Officer Morelli, who was with

Officer Lewis the whole time she was waiting for relief, perceive Officer Lewis'

condition to be bad enough to call 911 or to be worsening. Morelli Deposition pp. 40:20-41:3.; Sousa Aff., ¶ 7; Dorozko Aff., ¶ 4. Plaintiff fails to characterize the delay following her contact with Lt. Dorozko as false imprisonment (12:25 to 1:00), and that delay was even a little longer than the one following her contact with Lt. Sousa (12:04 to 12:25). More importantly, the plaintiff herself, always had the ability to call a number code from her telephone indicating staff needs assistance, use her radio to call a color code, or use her body alarm to communicate the severity of her condition and her need for immediate medical assistance, but she failed to do so. Dorozko Aff. ¶ 5; Murphy Aff., ¶ 13. There have been numerous instances when other staff members have chosen to use such means to help themselves. Murphy Aff., ¶ 14. Such incidents undermine plaintiff's attempt to limit the application of the code directive to use with inmates only. The language of the code directive does not limit its use to illness of inmates only. Murphy Aff., ¶ 13. Therefore, Count Four must be dismissed for failure to state a claim of false imprisonment as there was no refusal to get her help and she did not initiate any emergency assistance.

<u>CONCLUSION</u>

For all the above stated reasons, the defendants' motion for summary judgment should be granted in its entirety. The defendants respectfully request that the case be dismissed.

DEFENDANTS, DOC, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____

Beth Z. Margulies
Assistant Attorney General
Federal Bar # ct08469
Attorney General's Office
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: (860) 808-5340
Fax: (860) 808-5383
E-mail:
Beth.Margulies@po.state.ct.us

## CERTIFICATION

I hereby certify that the foregoing Defendants' Memorandum of Law in Support of Motion for Summary Judgment was mailed first class, postage pre-paid, this 15th day of June, 2004 to Attorney Lowell Peterson, Community Law Practice, LLC, 2065-A Main Street, Hartford, CT 06120; Tel: 860-728-3788; Fax:  860-728-3755.

_____
Beth Z. Margulies
Assistant Attorney General