# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRENDA LEWIS, | : | CIVIL NO. 3:02CV2304(MRK) |
| *Plaintiff,* | : | |
| | : | |
| STATE OF CONNECTICUT, | | |
| DEPARTMENT OF CORRECTION, | | |
| ET AL., | : | |
| *Defendants.* | : | JUNE 15, 2004 |

## DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

1. Brenda Lewis was hired on August 18, 1989 by the Department of Correction and was assigned to the third shift, 12:00 a.m. to 8:00 a.m. at the Hartford Correctional Center during all times relevant to this complaint. She transferred to UCONN on Nov. 29, 2002. Ryan Affidavit ¶ 16.

2. Erik Sousa was a Lieutenant at Hartford CC from May 21, 1999 until June 1, 2003 at which time he transferred to Webster Correctional Institute in Cheshire, CT. During all times relevant to this complaint, he primarily worked the first or second shift at Hartford CC. When the second shift was 8 hours long, it went from 4 p.m. to 12 a.m.. When the second shift was 10 hours long, he was assigned to work 3 p.m. to 1:00 a.m.. Sousa Affidavit ¶ 3.

3. Peter Murphy was hired on Sept. 6, 1985 by the Department of Correction. He worked at Hartford CC as Warden from Feb. 14, 2000 through June 27, 2002 at which time he transferred to Enfield. Murphy Affidavit ¶ 3.

4.  Donald Kruk was hired on March 10, 1978 by the Department of Correction.  He worked at DOC's Central Office in Wethersfield, CT as Acting Director, then Director of the Affirmative Action Unit from October 1996 through August 31, 2002.   On Sept. 1**,** 2002, he was reassigned to External Affairs.  Kruk Deposition, April 13, 2004, p. 36:9-23; Kruk Affidavit ¶ 3.

5.  Commissioner Theresa Lantz replaced Commissioner John Armstrong in March of 2003.  Kruk Deposition, April 13, 2004, p. 41: 8-10.

6.  The only times Lt. Sousa came in contact with Brenda Lewis was when his shifts overlapped with hers.  And more often than not, when those overlaps occurred, he did not have any contact with third shift staff.  Therefore, he rarely supervised Brenda Lewis.  Sousa Affidavit ¶ 4; Lewis Deposition, January 21, 2004, p. 46, 47.

7.       Brenda Lewis at times relevant to her Fourth Amended Complaint was assigned to the third shift at HCC.  Because Lt. Sousa was not her primary supervisor on the third shift, he never had the responsibility to write an evaluation of her.  He did not have the authority to determine or impose discipline.  Nor did he have the authority to hire, fire, demote, promote or transfer Brenda Lewis.  Generally, Shift Commandeers on the third shift would make assignments for Correction Officers on the third shift.   Sousa Affidavit ¶ 5.

8.       Lt. Sousa was informed by a union steward Pittrazello that other union stewards were going to be filing claims against him in an effort to get him transferred.   Sousa Affidavit ¶ 6.

9.      On March 9, 2001, Lt. Sousa was working the second shift which was supposed

to end for him at 1:00 a.m.  Shortly after C/O Brenda Lewis started her third shift

assignment in Dorm 2 with C/O Morelli, she called the Lieutenant's office and spoke

with Lt. Sousa.  During that phone conversation she requested a relief.  Lt. Sousa asked

her what the relief was for.  She said that she felt a little dizzy.  He said, "Okay.  I'll send

you a relief.  Why don't you go to medical?"  She said "no, I just need some air."  He

immediately called Center Control and directed Officer Robinson to provide relief for

Officer Lewis.  He did not identify any particular individual as the relief person.  He did

not know who Officer Robinson sent to relieve Officer Lewis and did not speak to that

relieving Officer at any time that day.  Subsequently, he received a second call from

Brenda Lewis asking where her relief was.  He responded, "you haven't got a relief yet?"

She said, "no."  He stated, "I'll get right on it."  He called Officer Robinson back in the

Control Center and asked who he sent to relieve Officer Lewis.  Robinson stated, "I sent

Hebert, but he's on the door right now."  Brenda Lewis at no time that day communicated

to Lt. Sousa that she was in an emergency medical situation or that she was suffering a

severe or serious medical condition.  Before Lt. Sousa left that day, he saw Brenda Lewis

in the lobby as she was waiting to be placed in the ambulance.  Sousa Affidavit ¶ 7.

10.     Lt. Sousa played no role in assigning Brenda Lewis to the recuperative post with

regard to her June 20, 2001 assignment.  He did not ever laugh at her with regard to her

assignment there.  Sousa Affidavit ¶ 8.

11.     Lt. Sousa has no recollection of asking Brenda Lewis whether or not she had

signed the logbook on March 29, 2002.  It is part of his duties to make such inquiries

consistent with Administrative Directive 6.2 Post Orders and Logs and the Warden's

instructions.  Staff are expected to sign logbooks upon assuming a new post and whenever a new logbook is put in place.   Sousa Affidavit ¶ 9.

12.      On April 22, 2002, Lt. Sousa was doing a tour of the South Block Unit and asked Brenda Lewis about a mental health inmate who was being escorted somewhere without a supervisor.  At that time, a supervisor was required to accompany an officer escorting a level 5 mental health inmate.  She answered in a non-professional flippant manner stating that Lt. Sousa should know where he was going because she claimed he had been eavesdropping on her conversation.  After stating that he did not know and reminding her of the escort requirement, she started to discuss the March 9, 2001 incident.  She accused Lt. Sousa of lying at the Step III grievance about what she said to him during that March 9th incident.  When Lt. Sousa saw she was getting agitated and the conversation started to escalate, he said "this was going nowhere."  Upon exiting the Officer's Control area, she slammed the door so that it hit him in his back.  Although the nurse at DOC's medical department did not find any marks, he subsequently went to his own doctor due to pain and discomfort in that area.  The doctor set him up with physical therapy, which he attended for many weeks.  Lt. Sousa also saw a chiropractor and had a reoccurrence later.  Sousa Affidavit ¶ 10.

13.      Lt. Sousa filed an incident report related to the April 22, 2002 incident and this matter was further investigated as a workplace violence incident.  He also called the State Police seeking to press charges for assault.  The agency and the State Police reviewed the housing unit video from the mux tape, but it was found to be inconclusive.  Due to the positioning of the video camera and the fact that mux tapes only capture views approximately every three seconds, they were not able to capture everything that

happened.  The hitting him in the back with the door took probably no more than a second or two.  The investigative report also determined that due to the lack of witnesses and evidence, the investigator was unable to prove or disprove the claims made by him. Sousa Affidavit ¶ 11.

14.  Stuart Mendelson was assigned to investigate an alleged workplace violence incident CIU II-340 that occurred on April 22, 2002 and involved C/O Brenda Lewis and Lt. Erik Sousa in the South Block unit.   Mendelson Affidavit ¶ 3.

15.  After a thorough investigation, Mendelson concluded that due to the lack of evidence and/or witnesses he was unable to prove or disprove the claims made by Lt. Sousa.  Mendelson Affidavit ¶ 4.

16.    On Sept. 3, 2002, Lt. Sousa  received a counseling with regard to the April 22, 2002 incident.  Sousa Affidavit ¶ 12.

17.    Lt. Sousa can remember a time when he used the phone number in the overtime call list to try and contact Brenda Lewis for an overtime opportunity with regard to the second shift.  However, he cannot recall whether that occurred on July 24, 2002.  There was no answer, and an answering machine did not pick up.  He indicated on the form that there was No Contact.  Sousa Affidavit ¶ 13.

18.    On August 13, 2002,  one of Brenda Lewis' duties in the 3 and 4 Control Center was to buzz people into the facility.  She can view people at the gate.  On this date, she viewed Lt. Sousa and Officer Medina waiting to come in and refused to pop them in.  It usually takes maybe three seconds to reach the button to pop somebody in.  However, on this day, it took five minutes which was an extraordinarily long amount of time.  So Lt. Sousa asked her to write up a page one incident report because he wanted to document

her continued harassment of him.  Shortly after that occurrence, Warden Levester tried to

mediate this incident between them.  Lt. Sousa was willing to forget about submitting the

incident report as per Warden Levester's request and stated that he wanted a working

relationship with Brenda Lewis.  However, Brenda Lewis told Warden Levester that she

could not forget it and could not work with him.  Sousa Affidavit ¶ 14.

19.     Lt. Sousa has never acted based on someone's race with regard to anyone.  Sousa

Affidavit ¶ 15.

20.     Lt. Sousa is married to Christina Hernandez, a Hispanic.  Sousa Affidavit ¶ 16.

21.     Noral Ryan has been a Personnel Officer in DOC from February 26, 1999

to the present.  She was initially assigned to Hartford CC and remained there until

June 17, 2003.  Ryan Affidavit ¶ 3.

22.     Lieutenants have only limited supervisory authority.   Ryan Affidavit ¶ 4.

23.      Lieutenants and Affirmative Action officers do not have the authority to hire,

fire, demote, promote, transfer, determine or impose discipline.  Wardens do not have the

authority to hire, fire, demote, or transfer, but do have authority to recommend discipline

and to recommend promotions.  Only the Commissioner or Deputy Commissioner has the

authority to determine whether to impose discipline and the nature of any discipline, as

guided by the Human Resource Department.    Ryan Affidavit ¶ 5.

24.     Nelvin Levester replaced Peter Murphy as Warden at Hartford CC on June 28,

2002 and remained the Warden until October 2002.  Warden Levester is a black male.

Ryan Affidavit ¶ 6.

25.     On April 20, 2001, the union on behalf of Brenda Lewis filed a labor grievance in

regard to the delay in receiving relief on March 9, 2001.  On October 18, 2001 John Nord

denied the grievance at the Step III level finding that the delay in relief was due to a miscommunication. The Union did not pursue this grievance to arbitration. Ryan Affidavit ¶ 7.

26. Chief Union Steward Farrar brought DOC's workers compensation papers from the agency to the hospital for Brenda Lewis. He was expected to bring the papers back from Brenda Lewis to DOC. For some reason there was a delay in his getting the papers back to the agency. Nora Ryan had tried to track the paperwork down several times and eventually the papers were turned into DOC. Ryan Affidavit ¶ 8.

27. Nora Ryan remembers seeing the memo dated 4-5-01 from Brenda Lewis to Peter Murphy, and talking about it with him. In that memo Brenda Lewis complains about the delay in getting the workers' compensation papers filed so that she could seek benefits. Initially, she was denied benefits. Subsequently, she was granted benefits. Ryan Affidavit ¶ 9.

28. Recuperative post assignments are utilized by DOC for 90 days to assist employees, regardless of race, in facilitating a speedy return from injury or illness to full employment because they do not involve inmate contact and do not involve physically demanding work. Recuperative post assignments fall within the normal job duties for Correction Officers. Thus, the employees' title, rank, position, and pay remain the same. Thus, these assignments are not considered transfers. Recuperative post assignments include the following Control Center Posts: Lobby Control, Center Control, Dorm Control. Ryan Affidavit ¶ 10.

29. Nora Ryan was the Human Resource officer who received approval from Brenda Lewis' physician, Doctor Cohen, for her to return to work from medical

leave as of May 12, 2001 to a recuperative post assignment.  The recuperative post assignment for Brenda Lewis was approved by her physician after he reviewed the physical and cognitive tasks, which are related to all Control Center Post assignments.  A letter, dated May 11, 2001, was presented to Brenda Lewis notifying her of her doctor's approval of her recuperative post assignment.  Ryan Affidavit ¶  11.

30.     Both Lt. Sousa and C/O Lewis received verbal counseling with regard to the April 22, 2002 South Block incident.  Verbal counseling is not considered discipline.  Verbal counseling may be memorialized in writing, but it is not placed in the employees' personnel file. Brenda Lewis received the counseling with regard to the April 22, 2002 incident on August 22, 2002 by Major M. Torres.  Lt. Sousa received the counseling with regard to the April 22, 2002 incident on Sept. 3, 2002.  Ryan Affidavit ¶ 12.

31.     Brenda Lewis received no discipline in regard to any of her allegations in the Fourth Amended Complaint related to the above-captioned case.  Ryan Affidavit ¶ 13.

32.     Brenda Lewis filed a grievance complaining about a missed overtime opportunity on the second shift on July 24, 2002.  On January 15, 2003, Phil Margeson denied this grievance at Step III, finding that she had not updated her telephone number in the call list.  Ryan Affidavit ¶ 14.

33.     Article 15 of the applicable collective bargaining agreement provides for annual equalization of overtime opportunities for DOC employees in case some employees have inadvertently received more overtime opportunities.  Ryan Affidavit ¶ 15.

34.     Sandra Millholen was a Principal Personnel Officer assigned to the Eastern Region, which included the Hartford CC, a facility within the Department of Correction, from September 1997 through April 18, 2002.   Millholen Affidavit ¶ 3.

35.     Sandra Millholen was assigned to provide a Step II response regarding the March 9, 2001 incident.  Because the grievant was not in attendance, and the union steward did not feel comfortable proceeding in her absence, she asked whether the union wanted to reschedule.  The union preferred to file to Step III.  Accordingly, she denied the grievance.  Millholen Affidavit ¶ 4.

36.     Millholen was assigned to present DOC's case at the Step III grievance regarding the March 9, 2001 incident  providing Brenda Lewis' relief.  Millholen Affidavit ¶ 5.

37.     During the Step III grievance meeting, the union representative stated that the union did not believe the delay in providing relief was intentional.  John Nord, the decisionmaker, responded by asking "then how does this matter violate the contract?"  The union answered that they were bringing the grievance on behalf of Brenda Lewis because it involved health and safety issues.   Millholen Affidavit ¶ 6

38.     During October 2001, when Millholen was preparing for the Step III conference, she was cognizant that a delay had occurred in regard to the filing of Brenda Lewis' workers compensation papers with  the agency.  Millholen Affidavit ¶ 7

39.     John Nord issued a Step III Answer dated October 18, 2001 in which he denied the grievance stating that the situation appeared to be due to a miscommunication.  Millholen Affidavit ¶ 3.

40.     Anna Dorozko was working as the Provisional Lieutenant on the third shift for the Department of Correction on March 9, 2001.  She has since been made a permanent Lieutenant as of October 17, 2003.  Dorozko Affidavit ¶ 3.

41.     Around 12:25 a.m. on March 9, 2001, Lt. Dorozko received a call from Brenda Lewis.  She stated that she was not feeling well and had previously requested relief, but that it had not yet arrived.  Lt. Dorozko replied that she had not known of her prior request and that she would follow up right away.  At no time during this conversation did Brenda Lewis state that she was having trouble breathing, or that she was experiencing chest pains, or that the top part of her body was aching.  She did not convey anything more than that she did not feel well.  Dorozko Affidavit ¶ 4.

42.     In an urgent medical situation, a Correction Officer could call a number code from her telephone indicating staff needs assistance, use her radio to call a color code, or use her body alarm.  Dorozko Affidavit ¶ 5.

43.     Lt. Sousa would have no reason to inform me of Brenda Lewis' prior request for relief made to him, as he can expect that Control Center would follow his orders to provide relief.  Dorozko Affidavit ¶ 6.

44.     Brenda Lewis never complained about the fact that she waited longer after calling Lt. Dorozko at 12:25 a.m. (12:25 – 1:00 a.m.) than after calling Lt. Sousa (12:04 – 12:25 a.m.) before relief arrived around 1:00 a.m.  Lewis Deposition, January 21, 2004, p. 41:2-17; Kruk Affidavit ¶ 8; See Millholen Affidavit, Exh. A.

45.     Lt. Dorozko was a supervisor regularly assigned to the third shift that Brenda Lewis worked on.  Lewis Deposition, January 21, 2004, p. 67:20-23, p. 68.

46.     C/O Morelli was hired by the DOC in December 2000.  Morelli Deposition, p. 7:1-10.

47.  C/O Morelli recalled at the time of the deposition that C/O Lewis told him that she did not feel well, that she was a little warm and a little sweaty.  He was not sure if she mentioned that she was a little dizzy.  Morelli Deposition, 3/31/04, p. 14:6-12; p. 26:21-25.

24.  C/O Morelli waited with C/O Lewis 90-95% of the time between 12 a.m. and 1 a.m., when he was done doing his count and tours of the inmates.  Morelli Deposition, 3/31/04, p. 26:5-11.  He did not observe that she was so seriously ill that he would know to take medical action.  Morelli Deposition, p. 13:5-8.

48.  Brenda Lewis, herself, did not recognize that she was having a heart attack.  Lewis Deposition, January 21, 2004, p. 29:11-13.

49.  Brenda Lewis was aware of the use of a color code for medical emergencies as it had been part of her training and she had used it in the past.  Lewis Deposition, January 21, 2004, p. 17, 18:1.

50.  Lt. Barnette, who was responsible for the completion of the incident report related to March 9, 2001 is an African-American.  Kruk Deposition, April 13, 2004, p. 142:3-5.

51.  On or about May 26, 2001, C/O Lewis asked C/O Morelli and Hebert to write a statement regarding the night of 3/9/01.  Morelli Deposition, p. 31:19-25, Hebert Deposition, p. 40:1-5.

Although C/O Morelli, in Morelli Deposition Exhibit 2, pp. 36-38, included the statement that C/O Lewis mentioned that she felt dizzy, warm and had chest pains, C/O Morelli, stated that, even after reviewing the document in preparation for the deposition, he had

not recalled at the time of the deposition that C/O Lewis had suffered chest pains. He stated that the strength of his memory at the time of the deposition was that she had simply felt warm and a little sweaty. C/O Morelli stated that he had not studied his earlier statement because he wanted to go by what he could remember at the time of the deposition. Morelli Deposition, p. 37:11-24; p. 38:3-15.

52.     C/O Morelli was shocked to learn afterwards that C/O Lewis had suffered a heart attack because he "didn't know that's what happened to her, I just know she felt a little warm and she wasn't feeling good." Morelli Deposition, p. 40:20-25 through p. 41:1-3.

53. C/O Morelli's earlier written statement and his recollection at the deposition was that C/O Lewis' condition during her wait for relief did not worsen, and that she did not ever complain that her condition was worsening over time. Morelli Deposition, p. 42:16-25 through p. 43:1-15.

54.     C/O Hebert was hired by DOC in 1999 and assigned to Hartford CC on the third shift. Hebert Deposition, p 8:1-7.

55.     C/O Hebert arrived at Dorm 2 to provide relief for C/O Lewis around 1:00 a.m. Hebert Deposition, p. 32:22-25.

56.     Michael Madden is a Captain in the State of Connecticut, Department of Correction and presently assigned to York Correctional Institute. Madden was assigned to the Hartford Correctional Center from May 2000 through July 2002. He was promoted from Lieutenant to Captain in October 2000. Madden Affidavit ¶ 3 and 4.

57.     Madden was the Acting Shift Commander on the third shift for June 20, 2001. It was part of his job responsibilities to make post assignments and he was

the person who initiated assigning and approving C/O Brenda Lewis to the recuperative post in the Lobby Control for June 20, 2001. Lieutenant Sousa had no input in this assignment. Madden Affidavit ¶ 5.

58.    Peter Murphy informed Madden that Brenda Lewis was complaining that she did not know how to use the computer for that assignment. Madden explained that she was a veteran employee who should know how to work that post and that he would make sure she was trained for that post. Madden Affidavit ¶ 6.

59.   Madden sent C/O Trainor to that post on June 20, 2001 to train the plaintiff. Madden Affidavit ¶ 7.

60.    Once an Affirmative Action investigation substantiates discrimination, the report is sent to the Deputy Commissioner who then decides whether the matter is referred to Human Resources for issuing discipline, if appropriate.   Kruk Deposition, April 13, 2004, p. 43:14-25; p. 45:2-12; p. 46:2-18.

61.   Brenda Lewis was never subjected to any discipline for any of the incidents she alleges in this lawsuit to have occurred at Hartford Correctional Center. Lewis Deposition, January 21, 2004, p. 139-140.

62.    DOC had an anti-harassment policy in place during the period relevant to the complaint and Brenda Lewis knew about it. Kruk Deposition p. 49, 51, 89-91.

63.    Brenda Lewis never reported a claim of race or color discrimination based on the incidents alleged in her complaint to the Affirmative Action Office of DOC or other DOC personnel. Lewis Deposition, January 21, 2004, pp. 133-138; Kruk Deposition, April 13, 2004, p. 69:9-21.

64.    Brenda Lewis does not know if Comm'r Lantz knew anything about the alleged discriminatory conduct by Lt. Sousa.  Lewis Deposition, January 21, 2004, p. 143:23-25 through p. 144:1-4 and 147.

65.    Brenda Lewis has no information indicating that Donald Kruk knew anything about the alleged discriminatory conduct by Lt. Sousa.  Lewis Deposition, January 21, 2004, p. 144:5-19 and p. 147.

66.    Brenda Lewis has no information indicating if Peter Murphy knew that she was alleging that Lt. Sousa engaged in the incidents alleged in plaintiff's Fourth Amended Complaint because of her race or color.  Lewis Deposition, January 21, 2004, p. 146:21-24.

67.    Brenda Lewis claims that only Lt. Sousa caused her emotional distress and that she only went to an EAP once or twice for such distress and never went to a doctor or anyone else.  Lewis Deposition, January 21, 2004, pp. 178-179.

68.    With regard to the March 9, 2001 incident related to providing relief for Brenda Lewis, Murphy received an incident report on or about May 10, 2001.  The report did not come directly to him after the incident because the Shift Supervisor or Major was holding the report until Brenda Lewis completed a page one.  Due to her lengthy absence, Lieutenant Barnette finally filled out page one and sent the incident report and summary report to the Major.  After reviewing it, Murphy did not see any need to forward it further.  The incident report did not refer to any claim of racial discrimination.  Nor did it include any reference to calls having been placed prior to 1:00 a.m.  Murphy Affidavit ¶ 4.

69.     Murphy does not recall ever receiving the memo from Brenda Lewis, dated April 5, 2001, to himself, in which she complains about the slow processing of her incident report by Shift Supervisor Lt. Barnette.  However, he does remember speaking to Nora Ryan about the delay in receiving her workers' compensation papers as Nora Ryan was the one who helped facilitate the processing of C/O Lewis' workers compensation package.  She informed him that she had given the workers compensation paperwork to the union steward to give to Brenda Lewis for completion and the union steward was supposed to return the paperwork to Nora Ryan, but he hadn't yet.  Murphy Affidavit ¶ 5.

70.     The timing and content of the memo reflects C/O Lewis' concern that the untimely filing with the agency of her workers' compensation claim forms would negatively impact her receipt of benefits.  Article 20 of the applicable collective bargaining agreement sets forth rights pertaining to Workers' Compensation benefits and they are contingent upon proper presentation of an injury claim form and supporting medical documentation.  In that memo, C/O Lewis cites to Administrative Directive 6.6 which sets forth time lines for filing incident reports.  Nowhere in that document does she complain about Lt. Sousa's conduct or raise a race discrimination claim.  Murphy Affidavit ¶ 6.

71.     On or about June 20, 2001, when Murphy entered the lobby, C/O Lewis approached me to complain about not being qualified for her recent assignment to the recuperative post of Lobby Control.  Murphy called Captain Michael Madden and related this information to him.  He told Murphy that he was aware of her complaints and that she was a seasoned veteran who should know how to work on that post and that he would get someone to train her on the assignment.  Captain Madden told Murphy that C/O

Trainor would be conducting training of C/O Lewis on that post.  Murphy did see C/O Trainor sitting with C/O Lewis training her on that post.   Murphy Affidavit ¶ 7.

72.     Murphy was not personally involved in any way nor did he have any knowledge pertaining to C/O Lewis' claim regarding Lt. Sousa questioning her about signing the logbook on March 29, 2002.  Murphy Affidavit ¶ 8.

73.     As Warden, Murphy had given clear directions to supervisors and department heads at numerous monthly staff meetings to check that staff were signing the back of logbooks, which signature acknowledges that they have read and understood post orders. Staff are supposed to sign the first time they are assigned to a post and whenever a new logbook is put into place.  Post orders, approved by the Warden, delineate duty of posts. The policy for signing of post orders is uniform throughout all DOC facilities.  Murphy Affidavit ¶ 9.

74.     Murphy was advised of the April 22, 2002 South Block Bubble incident at 6:20 a.m..  He referred the incident for investigation to Central Intelligence Unit Director Huckabey and also to Mitch Drabik Principal Personnel Officer responsible for Work Place violence issues.  There is no reference to any claim of racial discrimination in the reports.  The investigative report, dated June 12, 2002, conducted by Stuart Mendelson concluded that due to the lack of evidence and/or witnesses he was unable to prove or disprove the claims made by Lt. Sousa.  He transferred out of Hartford CC to Enfield on June 28, 2002, before a final determination was made as to whether any disciplinary action was appropriate.  He did not have any input in the decision-making process related to the investigation or recommendation of discipline.  Murphy Affidavit ¶ 10.

75.    Murphy has no knowledge or personal involvement in regard to the July 24, 2002 overtime claim by C/O Lewis because he had already transferred out of Hartford CC to Enfield on June 28, 2002.  Murphy Affidavit ¶ 11.

76.    Murphy has no knowledge or personal involvement in regard to the August 13, 2002 buzzer door delayed entry claim by C/O Lewis because he had already transferred out of Hartford CC to Enfield on June 28, 2002. Murphy Affidavit ¶ 12.

77.    A staff member has several different ways to call for medical attention.  Besides calling a superior with a request to be relieved, a staff member has a radio and body alarm available.  In addition, each staff member is familiar with color codes for different emergencies as they are set out in Administrative Directive 7.7 and all Post Orders.  More specifically, there is a particular color code for "medical situation" and another one for "staff needs assistance."  The relevant language in Administrative Directive 7.7 does not limit the use of these codes in relation to inmates' health or conduct.  Murphy Affidavit ¶ 13.

78.    Other staff members have used color codes, radio signals, and body alarms  to seek assistance for their own or other staff member's medical emergencies.  Murphy Affidavit ¶ 14.

79.    As a Warden Murphy has no authority to hire or fire DOC staff or determine discipline.  Murphy Affidavit ¶ 15; Ryan Affidavit ¶ 5.

80.    The date of Brenda Lewis' filing of a CHRO complaint, which was limited to the March 9, 2001 incident, was November 30, 2001.  CHRO sent out a draft "no reasonable cause" finding of dismissal, dated Dec. 3, 2001, because the complaint was untimely.  EEOC received plaintiff's discrimination complaint and

issued a Notice of Charge of Discrimination based on race and color on January 28, 2002.  On July 23, 2002, EEOC assumed jurisdiction over Brenda Lewis' charge No. 16AA200439.  By letter dated Sept. 30, 2002, plaintiff's attorney sent a letter to EEOC investigator Kenneth Feng An requesting a Right to Sue Notice and informing him of an attached amended EEOC charge also dated Sept. 30, 2002.  The plaintiff's Sept. 30, 2002 Amended EEOC charge included additional acts of discrimination and/or retaliatory acts dated June 20, 2001, March 29, 2002, April 22, 2002, July 24, 2002, and August 13, 2002.  EEOC issued a Notice of Right to Sue, dated Sept. 30, 2002.   On Oct. 1, 2002, EEOC informed the respondent that it did not have to file an answer at that time.  Kruk Affidavit ¶ 5.

81.    Kruk did not have personal knowledge that Brenda Lewis claimed discrimination with regard to the March 9, 2001 incident where relief was delayed until he received notice of her CHRO complaint, which was accompanied by CHRO's Draft Recommendation of No Reasonable Cause for Lack of Jurisdiction due to its untimeliness.  Kruk Affidavit ¶ 4.

82.    Kruk did not have personal knowledge that Brenda Lewis claimed discrimination with regard to the actions alleged in ¶ 31 of her Fourth Amended Complaint that occurred on June 20, 2001, March 29, 2002, April 22, 2002, July 24, 2002, and August 13, 2002, until he received the amended EEOC complaint dated Sept. 30, 2002, as they had not been included in the original CHRO complaint.  However, if any subsequent incidents were raised at the Sept. 6, 2002 mediation, he would have learned of them at that point. Kruk Affidavit ¶ 6.

83.    The Department of Correction has had an anti-discrimination policy in effect since before I was made Director of the Affirmative Action Unit.  Administrative Directive 2.1 sets forth such policy and practice.  New employees hired are introduced to this policy as part of their orientation package and it is posted at every facility on employee informational bulletin boards.  Employees are reminded of this policy annually by way of notice issued with a paycheck.  Kruk Affidavit ¶ 7.

84.    Brenda Lewis never filed a complaint directly with the Affirmative Action Unit of DOC or otherwise informed DOC's Affirmative Action Unit about the incidents alleged in her federal court complaint, Civil No. 3:02CV2304 (MRK).  Kruk Affidavit ¶ 8.

85.    Nor did Brenda Lewis ever contact the Commissioner's Office with regard to any of her allegations in the aforementioned lawsuit, as such complaint would have been sent to Kruk for processing.  Kruk Affidavit ¶ 9

86.    The Affirmative Action Unit does not have authority to determine or impose discipline.  Kruk Affidavit ¶ 10

87.    Brenda Lewis had a good relationship with Peter Murphy and never had any complaints about him.  Lewis Deposition, January 21, 2004, pp. 113-114.

88.    Brenda Lewis cannot recall having any problems with Lt. Sousa prior to March 9, 2001.  Lewis Deposition, p. 47.

DEFENDANTS,
DOC, et al.

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY:     _____
        Beth Z. Margulies
        Assistant Attorney General
        Attorney General's Office
        55 Elm Street
        P.O. Box 120
        Hartford, CT 06141-0120

<u>CERTIFICATION</u>

I hereby certify that the foregoing Local Rule 56(a) Statement Of Undisputed

Facts In Support of Motion for Summary Judgment was mailed first clas, postage pre-

paid, this 15th day of June, 2004 to Attorney Lowell Peterson, Community Law Practice,

LLC, 2065-A Main Street, Hartford, Ct 06120; tel: 860-728-3788; fax: 860-728-3755.

_____
Beth Z. Margulies
Assistant Attorney General