# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRENDA J. LEWIS,** | : | **CIVIL ACTION CASE NO.** |
| *Plaintiff*, | : | |
| **v.** | : | **302 CV 2304 (MRK)** |
| **STATE OF CONNECTICUT,** | : | |
| **DEPARTMENT OF CORRECTION** | : | |
| *et al.,* | : | |
| *Defendants* | : | **AUGUST 19, 2004** |

### PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT IN RESPONSE TO DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to the requirements of D.Conn.L.Civ.R. 56(a)(2), the Plaintiff in the captioned matter states whether each of the numbered paragraphs in the Defendants' Local Rule 56(a)(1) Statement of Undisputed Facts In Support Of Motion For Summary Judgment is admitted or denied, as follows:

1. Admitted.

2. Plaintiff has insufficient knowledge to admit or deny Paragraph 2 and leaves Defendants to their proof.

3. Plaintiff has insufficient knowledge to admit or deny Paragraph 3 and leaves Defendants to their proof.

4. Plaintiff has insufficient knowledge to admit or deny Paragraph 4 and leaves Defendants to their proof.

5.      Plaintiff has insufficient knowledge to admit or deny Paragraph 2 and leaves Defendants to their proof.

6.      Plaintiff admits that Lt. Sousa generally worked second shift, which occasionally overlapped with Plaintiff's third shift by one hour.  Plaintiff disagrees with Defendants' characterization of Lt. Sousa's supervision as rare.

7.      Plaintiff admits so much of Paragraph 7 as relates to Lt. Sousa's supervisory duties with respect to her.  Plaintiff admits that shift commanders "generally" make so-called 56-day post assignments for Correction Officers on all shifts.  However, Plaintiff asserts that it is the desk lieutenant who makes coverage assignments on the daily roster.

8.      Plaintiff has insufficient knowledge to admit or deny Paragraph 8 and  leaves Defendants to their proof.  Without admitting or denying Paragraph 8, Plaintiff asserts that even if true, such "fact" is irrelevant to any of the claims in dispute and further denies the implication that Plaintiff was involved in any such "effort to get him transferred."

9.      Plaintiff admits that on March 9, 2001, Lt. Sousa was working the second shift, which was supposed to end for him at 1:00 a.m.  Plaintiff admits calling the Lieutenant's office and speaking with Lt. Sousa shortly after reporting to Dorm 2 with Officer Morelli for duty at 12:00 a.m.  Plaintiff admits requesting Lt. Sousa for relief.  Plaintiff denies that Lt. Sousa inquired as to the reason for the relief.  Plaintiff denies stating to Lt. Sousa that she felt dizzy.  Her position is that she told Lt. Sousa that the top part of her body was aching and she was having difficulty breathing.  Plaintiff denies that Lt. Sousa ever offered to send her to medical and denies ever refusing such request and ever stating that she only needed some air.  Plaintiff has insufficient knowledge to admit or deny whether Lt. Sousa "immediately" called Center

Control to direct Officer Robinson to provide Plaintiff relief. Plaintiff denies that Lt. Sousa did

not identify any particular person as the relief officer and relies on Lt. Sousa's own statement in

the incident report generated by these events to the effect that he requested Officer Hebert to

relieve Plaintiff.  Lt. Sousa's own statements and statements of Correction Officer Hebert

contradict the assertion. that Lt. Sousa did not know who the relief officer was on March 9, 2001,

and, rather, affirm that Lt. Sousa did speak to the relief officer at least once.  Plaintiff denies, and

statements of Lieutenant Anna Dorozko contradict, that Plaintiff ever placed a second call to Lt.

Sousa. Plaintiff denies that she and Lt. Sousa ever had the exchange of conversation recited to

have occurred during the fictitious telephone call referenced in Paragraph 9.  Plaintiff has

insufficient knowledge to admit or deny whether Lt. Sousa ever called Officer Robinson to find

out who the relief officer was.   Plaintiff has insufficient knowledge to admit or deny any alleged

statements by Officer Robinson.  Plaintiff admits that she did not use the terminology

"emergency medical situation" or "severe or serious medical condition" in her single

conversation with Lt. Sousa.  Plaintiff has insufficient knowledge to admit or deny whether Lt.

Sousa saw her in the lobby as she was waiting for the ambulance, although Plaintiff denies

having seen Lt. Sousa.

      10.     Plaintiff denies Lt. Sousa "played no role in assigning" Plaintiff to the

recuperative post with regard to her June 20, 2001.  Plaintiff denies Lt. Sousa's statement that he

did not laugh at her with regard to the assignment.

      11.     Plaintiff has insufficient knowledge to admit or deny whether Lt. Sousa has any

recollection of asking Plaintiff to sign the logbook on March 29, 2002.  Plaintiff admits that such

an inquiry is consistent with the duties of a supervisor and admits that staff are expected to sign logbooks upon assuming a new post or whenever a new logbook is put in place.

12.     Plaintiff admits that, on April 22, 2002, Lt. Sousa was in the South Block Unit and asked Plaintiff about a mental health patient being escorted without a supervisor.  Plaintiff admits that a supervisor was required to accompany an officer escorting such an inmate. Plaintiff denies responding to Lt. Sousa in a "non-professional flippant manner" and further denies making any comment whatsoever regarding an allegation of eavesdropping.  Plaintiff admits confronting Lt. Sousa about the incident on March 9, 2001, and admits questioning the truth of his statements during the Step III grievance.  Plaintiff denies that Lt. Sousa terminated this conversation or ever made the statement "this was going nowhere."  Plaintiff asserts that as she became increasingly agitated, she grew concerned about the effect on her blood pressure, turned away from Lt. Sousa and requested that he leave the "bubble."  Plaintiff denies ever slamming the door at all and, more particularly, in such a way that it hit Lt. Sousa in the back, or in any other manner, whether by direct or indirect means, touching Lt. Sousa's person with or without any object in hand.  Plaintiff admits that the nurse found no marks resulting from Lt. Sousa's claimed assault.  Plaintiff has insufficient knowledge to admit or deny whether Lt. Sousa went to his own doctor, followed any regimen of physical therapy, saw a chiropractor or had a recurrence of anything.

13.     Plaintiff admits that Lt. Sousa filed an incident report related to the April 22, 2002, incident, that the matter was investigated as a workplace violence incident, that Lt. Sousa called the State Police to press charges for assault against Plaintiff and that both the internal investigation and that of the State Police found evidence of the alleged assault to be

"inconclusive." Plaintiff denies that the reason for this inconclusive result has anything whatever to with the position of the video or the timing of its operation. Plaintiff denies, given the logistics of the room, the position of a certain doormat in the threshold of the doorway in question and the claim of Lt. Sousa that he re-entered the area to confront Plaintiff about her "assault" on him, that it would have been remotely possible for her to time her assault on Lt. Sousa to coincide precisely with the alleged two-to-three second interruption in the filming of the videotape. Plaintiff admits that the investigator reported his inability to prove or disprove Lt. Sousa's unsubstantiated claims.

14.    Admitted.

15.    Plaintiff admits that Mendelson concluded he was unable to prove or disprove Lt. Sousa's claims. Plaintiff denies that Mendelson's investigation was "thorough."

16.    Plaintiff has insufficient knowledge to admit or deny Paragraph 16 and leaves Defendants to their proof.

17.    Plaintiff has insufficient knowledge to admit or deny whether Lt. Sousa can remember using a telephone number on the overtime call list to call Plaintiff regarding an overtime opportunity or whether he can recall the date of such a call, if it occurred. Plaintiff denies that any unanswered calls came to her residence on July 24, 2002. Plaintiff admits that Lt. Sousa wrote "no contact" on the form.

18.    Plaintiff admits that on August 13, 2002, one of her duties in the 3 and 4 Control Center was to admit people into the facility upon the sounding of a buzzer that was to be activated at one of the outside doors. Plaintiff admits that it is possible for a person in the Control Center to view people at the gate if they have reason to turn from the desk and face that

direction.  Plaintiff denies that she viewed Lt. Sousa or Officer Medina at the gate until such time that she received a call from a third person advising that they were waiting to be admitted. Plaintiff denies that her failure to admit them to the facility was based upon her "refusal" to do so and instead attributes to the malfunctioning buzzer.  Plaintiff has insufficient knowledge to admit or deny the length of time that Lt. Sousa and Officer Medina waited at the gate before someone brought their presence to Plaintiff's attention.  Plaintiff admits that Lt. Sousa asked her to write up an incident report but denies that his reason for this request was connected in any way to her having ever harassed Lt. Sousa.  Plaintiff admits that Warden Levester attempted to intervene in this dispute but denies that Lt. Sousa ever intimated in any way that he was "willing to forget about submitting the incident report" and denies that Lt. Sousa ever expressed a desire for a "working relationship" with Plaintiff.  Plaintiff admits expressing her preference not to work with Lt. Sousa.

19.    Plaintiff has insufficient knowledge to admit or deny Lt. Sousa's personal history with respect to actions toward any person of another race other than toward herself or with respect to documented incidents of hostility within the Facility.  Plaintiff can only attest to her own experience of animosity from Lt. Sousa that she attributes to racial animus.

20.    Plaintiff has insufficient knowledge to admit or deny whether Lt. Sousa is married to a Hispanic woman.

21.    Plaintiff has insufficient knowledge to admit or deny Paragraph 21 and leaves Defendants to their proof.

22.    Plaintiff has insufficient knowledge to characterize the supervisory authority of lieutenants as limited or expansive and avers that the departmental job description for lieutenants speaks for itself.

23.    Plaintiff admits that, to her knowledge, lieutenants, Affirmative Action officers and Wardens do not have the authority to hire, fire, demote, promote, transfer or determine or impose discipline on correction officers, although Wardens have the authority to recommend discipline and promotion.  Plaintiff further admits that, to her knowledge, the Commissioner and Deputy Commission have the authority to determine whether discipline will be imposed and the form it will take, with the advice and counsel of the Human Resource Department.

24.    Plaintiff has insufficient knowledge to admit or deny the tenure dates of Warden Levester.  Plaintiff admits that former Warden Levester is a black male.

25.    Admitted.

26.    Plaintiff admits that Chief Union Steward Farrar brought her workers compensation benefit papers to the hospital to be signed.  Plaintiff has insufficient knowledge to admit or deny what else was expected of Steward Farrar.  Plaintiff has insufficient knowledge to admit or deny whether there was a delay in returning those papers to the agency or whether Nora Ryan either "tried to track the paperwork down" or whether the papers were eventually turned in to DOC.

27.    Plaintiff has insufficient knowledge to admit or deny whether Nora Ryan remembers seeing or discussing the April 5, 2001, memo with then-Warden Peter Murphy. Plaintiff denies that her April 5, 2001, memo to Warden Murphy makes any reference whatsoever to workers' compensation benefits or was in any way intended to refer only to such

benefits.  Plaintiff admits that she was at first denied, then was granted, workers compensation benefits.

28.     Admitted.

29.     Plaintiff admits that *her physician approved a recuperative post assignment* after he reviewed the physical and cognitive tasks provided to him.  However, Plaintiff denies that the job description provided to her physician accurately described the post to which she was in fact assigned.

30.     Plaintiff admits that verbal counseling is not defined as discipline within the scope of the collective bargaining agreement.  Plaintiff admits that she received verbal counseling with regard to the April 22, 2002, incident on August 22, 2002 from Major Torres.  Plaintiff does not have sufficient information to admit or deny when or from whom Lt. Sousa received counseling.

31.     Plaintiff admits that none of the actions taken against her and identified in her Fourth Amended Complaint are defined as discipline within the scope of the collective bargaining agreement.

32.     Plaintiff admits filing a grievance regarding a missed overtime opportunity on July 24, 2002.  Plaintiff further admits the substance, although not the accuracy, of the finding of hearing officer Margeson, and Plaintiff further denies having failed to provide current telephone information.

33.     Plaintiff admits that the collective bargaining agreement mandates annual equalization of overtime, without admitting that such mandate is in fact achieved.

34.     Plaintiff has insufficient knowledge to admit or deny Paragraph 34 and leaves Defendants to their proof.

35.     Due to her absence, Plaintiff has insufficient knowledge to admit or deny what transpired at the Step II hearing on her grievance.  Plaintiff admits that her grievance was referred to Step III.

36.     Plaintiff admits that Millholen represented the agency at the Step III hearing of her grievance regarding Lt. Sousa's failure to deliver prompt medical relief on March 9, 2001.

37.     Plaintiff admits that these are the representations that were made.

38.     Plaintiff has insufficient knowledge to admit or deny what information Ms. Millholen may have been "cognizant of" with respect to Plaintiff's workers compensation claim.

39.     Plaintiff admits that this was the finding of the hearing officer, without conceding to its accuracy.

40.     Plaintiff admits that Anna Dorozko was working as Provisional Lieutenant on the third shift, March 9, 2001.  Plaintiff has insufficient knowledge to admit or deny whether Ms. Dorozko was ever confirmed as a permanent lieutenant.

41.     Plaintiff admits calling Lt. Dorozko about 12:25 a.m. on March 9, 2001, to complain that Plaintiff was not feeling well, had previously requested medical relief and was distressed that no relief had arrived.  Plaintiff admits that Lt. Dorozko stated to Plaintiff that Lt. Sousa had mentioned nothing of Plaintiff's request for medical relief.  Plaintiff denies that she failed to mention her symptoms to Lt. Dorozko.

42.     Plaintiff admits that administrative directives provide for the use of emergency codes.  However, as a practical matter, Plaintiff contends that such use by officers for their own medical assistance is strongly discouraged.

43.     Plaintiff has insufficient knowledge to admit or deny whether Lt. Sousa would have had reason to inform Lt. Dorozko of Plaintiff's previous request for relief or to comment upon his expectations.

44.     Plaintiff denies that she has never complained about waiting from the period 12:25 to 1:00 a.m., in addition to the period from 12:04 to 12:25 a.m. Plaintiff has stated, to the contrary, that she attributes the aggregate delay to the actions of Lt. Sousa in assigning additional duties to her relief officer.  Plaintiff also notes that Lt. Sousa has contended in his deposition that he took both the 12:05 and the 12:25 call from Plaintiff, in which case, if true, Lt. Dorozko obviously has no responsibility for either delay.

45.     Admitted.

46.     Plaintiff has insufficient knowledge to admit or deny the work tenure of Correction Officer Morelli.

47.     Plaintiff admits to the content of Officer Morelli's testimony at his deposition that Plaintiff informed him of her symptoms on the morning of March 9, 2001, and admits that he claimed his memory of whether Plaintiff complained about dizziness was imperfect.  Plaintiff admits that Officer Morelli was with her for most of the hour between 12:00 and 1:00 a.m. on March 9, 2001.  Plaintiff has insufficient knowledge to admit or deny his impressions of her condition.

48.     Plaintiff admits she was not aware that her medical conditions were precursors to a heart attack.

49.     Plaintiff admits her statement that the use of emergency codes in certain contingencies involving inmates was part of her DOC training.

10

50.    Admitted.

51.    Plaintiff admits that she separately asked Officers Morelli and Hebert to record their recollection of the incidents that occurred on March 9, 2001.  Plaintiff admits that Officer Morelli stated at his deposition that his recall of Plaintiff's description of her condition on March 9, 2001, was imperfect.

52.    Plaintiff admits to the content of Officer Morelli's testimony at his deposition.

53.    Admitted.

54.    Plaintiff has insufficient knowledge to admit or deny the work tenure of Correction Officer Hebert.

55.    Admitted.

56.    Plaintiff admits that Captain Madden was a captain during her tenure at the Hartford Facility.  Plaintiff has insufficient knowledge to admit or deny his present assignment or the date of his promotion from Lieutenant to Captain.

57.    Plaintiff admits that Captain Madden was the Acting Shift Commander on third shift, June 20, 2001.  Plaintiff admits that it is part of the duties of a shift commander to assign so-called "56-day" posts.  Plaintiff denies, however, that any desk lieutenant, including particularly Lt. Sousa, lacks the power or the responsibility to make adjustments in the daily roster assignments for the purpose of assuring the most complete and appropriate coverage.

58.    Plaintiff has insufficient knowledge to admit or deny an exchange of conversation between Warden Murphy and Captain Madden.

59.    Plaintiff admits that Officer Trainor assisted Plaintiff with the performance of certain of her duties over a portion of her work period.

60.     To the best of her knowledge and belief, Plaintiff admits this paragraph summarizes a part of the Affirmative Action investigative and disciplinary function.

61.     Plaintiff admits that none of the actions taken against her and identified in her Fourth Amended Complaint are defined as discipline within the scope of the collective bargaining agreement.

62.     Admitted.

63.     Admitted.

64.     Admitted.

65.     Admitted.

66.     Admitted.

67.     Plaintiff denies that she claims that only Lt. Sousa caused her stress.  Plaintiff admits going to EAP once or twice for distress.  Plaintiff denies that she has never sought other assistance for work-related stress.

68.     Plaintiff has insufficient knowledge to admit or deny when Warden Murphy received the incident report regarding the incident on March 9, 2001, or why it may have been delayed.  Plaintiff admits that Lt. Barnette completed page one of the incident report and forwarded the same to the major of operations, in accordance with standard procedure.  Plaintiff admits that Warden Murphy did not forward the incident report for further investigation. Whether he was or should have been aware of any need to do so is a matter of dispute in this case.  Plaintiff admits that she did not use any terminology expressly alleging racial discrimination in her incident report regarding March 9, 2001.  Plaintiff denies that the incident report does not include references to calls made before 1:00 a.m.

69.     Plaintiff has insufficient knowledge to admit or deny whether Warden Murphy remembers receiving Plaintiff's April 5, 2001, memo or remembers having a conversation with Nora Ryan regarding workers compensation papers.  Plaintiff has insufficient knowledge to admit or deny the content or accuracy of any alleged conversation between Nora Ryan and Warden Murphy.

70.     Plaintiff denies that April 5, 2001, memo was directed expressly, solely or even primarily to her concerns regarding workers compensation benefits.  Plaintiff admits to the content of Article 20 of the applicable collective bargaining agreement.  Plaintiff admits making a reference to Administrative Directive 6.6 regarding the timeliness of filing incident reports.  Plaintiff denies that she failed to complain about Lt. Sousa's conduct in her April 5, 2001, memo inasmuch as the memo expressly incorporates by reference her incident report.  Plaintiff further admits that her charge of race discrimination has throughout this matter been one of inference.

71.     Plaintiff admits that, on or about June 20, 2001, Plaintiff complained to Warden Murphy about her lack of qualification to operate the Lobby Control post.  Plaintiff has insufficient knowledge to admit or deny whether Warden Murphy had a subsequent conversation with Captain Madden, anything that Captain Madden may or may not have said during the course of that conversation or whether Warden Murphy saw Officer Trainor sitting with Plaintiff at her post.

72.     Plaintiff has insufficient knowledge to admit or deny whether Warden Murphy had any knowledge pertaining to Plaintiff's claim that Lt. Sousa questioned her inappropriately regarding signing a logbook on March 29, 2002.

73.    Plaintiff has insufficient knowledge to admit or deny whether Warden Murphy had given the indicated directions to supervisors and department heads.  Plaintiff admits there is a uniform policy with respect to the signing of logbooks.

74.    Plaintiff has insufficient knowledge to admit or deny when Warden Murphy was advised of the April 22, 2002 South Block Bubble incident.  Upon information and belief, Plaintiff admits that Warden Murphy referred the incident for investigation to Central Intelligence Unit Director Huckabey and Principal Personnel Officer Drabik, as a possible workplace violence issue.  Plaintiff admits that Lt. Sousa's complaint included no reference to racial discrimination.  Plaintiff admits that Mendelson's report reached an inconclusive result. Plaintiff has insufficient knowledge to admit or deny whether "he" (the reference is uncertain, but likely to Warden Murphy) transferred from Hartford to Enfield on June 28, 2002, whether such transfer was before or after a determination was made regarding disciplinary action or whether Warden Murphy had any input in the decision-making process, and will leave Defendants to their proof.

75.    Plaintiff admits that the July 24, 2002, overtime incident was subsequent to Warden Murphy's transfer from the Hartford Facility.

76.    Plaintiff admits that the August 13, 2002, buzzer door incident was subsequent to Warden Murphy's transfer from the Hartford Facility.

77.    Plaintiff admits that equipment available to a correction officer and regulations in administrative directives open a range of options for a correction officer seeking emergency or unexpected assistance.  Plaintiff denies, however, that such materials have the effect of

determining that the maximum response to any given situation is necessarily the most prudent or appropriate response.

78.     Plaintiff testified in her deposition that she is wholly unfamiliar with the use of emergency codes to report a staff member's medical emergency.

79.     Admitted.

80.     Plaintiff admits that the filing of her initial complaint with the CHRO was limited to the events of March 9, 2001, and further admits that the filing of her complaint with CHRO was untimely.  Plaintiff admits to the substantial accuracy of the chronology of her EEOC Charge.

81.     Plaintiff has insufficient knowledge to admit or deny whether or when Defendant Donald Kruk had personal knowledge of Plaintiff's claims regarding the March 9, 2001 incident.

82.     Plaintiff has insufficient knowledge to admit or deny whether or when Defendant Donald Kruk had personal knowledge of Plaintiff's subsequent claims.

83.     Admitted.

84.     Admitted.

85.     Admitted.

86.     Admitted.

87.     Admitted as to all times prior to March 9, 2001.

88.     Admitted.

## DISPUTED ISSUES OF MATERIAL FACT

Pursuant to the requirements of D.Conn.L.Civ.R. 56(a)(2), the Plaintiff in the captioned matter states lists each issue of material fact as to which she contends there is a genuine issue to be tried, as follows:

1.       Whether the actual policy in practice at the Hartford Facility prohibited or discouraged the use of body alarms and/or color codes for staff emergency relief.  Defendants contend that such a measure by Plaintiff would have been appropriate.  Plaintiff contends, and Lt. Sousa's deposition testimony supports her belief, that sounding a facility-wide emergency after making the appropriate call to a desk lieutenant would be regarded as superfluous and inappropriate.

2.       Whether Lt. Sousa knowingly and deliberately instructed Officer Hebert to perform additional time-consuming duties before reporting to relieve Plaintiff.  Lt. Sousa denies having any contact at all with Hebert on the morning of March 9, 2001; Hebert's contemporaneous statement and his deposition testimony indicate at least two direct conversations with Lt. Sousa.

3.       Whether there is sufficient evidence in the form of other complaints or disparate treatment to warrant an inference that Lt. Sousa's conduct toward Plaintiff was motivated by racial animus.

4.       Whether Warden Murphy knowingly and deliberately chose, or negligently defaulted, to disregard or otherwise prevent action upon complaints brought by African

American Correction Officers while referring complaints of white officers and supervisors for prompt investigation and possible disciplinary action.

5.      Whether, if evidence demonstrates that Lt. Sousa knowingly and deliberately delayed Plaintiff's relief on March 9, 2001, and then knowingly and deliberately engaged in the other discriminatory and/or retaliatory acts complained of by Plaintiff, such conduct individually or in the aggregate is sufficiently egregious to have created a hostile work environment for Title VII and § 1981 purposes.

6.      Whether other non-minority officers and/or supervisors have been granted immediate medical relief upon request without the necessity of sounding an alarm or a code color.

7.      Whether Defendant Kruk was aware of the disparity in referring of discriminatory incidents for further investigation between white and minority officers or supervisors at the Hartford Facility.

8.      Whether Lt. Sousa's supervisory relationship to Plaintiff was of sufficient scope to establish Title VII vicarious agency liability.

9.      Whether Lt. Sousa, as a "desk lieutenant" had sufficient discretionary authority to reassign Plaintiff's recuperative post assignment and whether, under all prevailing circumstances, including his mocking of Plaintiff's distress, his refusal to do so was discriminatory in character.

10.     Whether Plaintiff, acting alone or in concert with other minority union stewards at the Hartford Correctional Center, was involved in a deliberate effort to discredit Lt. Sousa or effect his transfer to another DOC facility.

17

11.     Whether Plaintiff's call to the desk lieutenant (Lt. Sousa) on the morning of March 9, 2001, sufficiently communicated a need for prompt medical relief, notwithstanding whether Plaintiff was able to predict her own heart attack, that Lt. Sousa is culpable for his failure to deliver such relief.

12.     Whether Lt. Sousa or Provisional Lt. Dorozko received the second call at 12:25 a.m. on March 9, 2001.

13.     Whether Lt. Sousa specifically inquired as to the reason for Plaintiff's request for relief and Plaintiff stated only that she felt dizzy and needed some air, or Plaintiff expressly told Lt. Sousa that the top part of her body was aching and she was having difficulty breathing.

14.     Whether Lt. Sousa laughed derisively at Plaintiff's plea for a less stressful recuperative post assignment on June 20, 2001.

15.     Whether Plaintiff in fact ever struck Lt. Sousa with an office door, whether or not with sufficient force to cause long-term injury, or Lt. Sousa fabricated these charges for the sole purpose of seeking disciplinary and even criminal penalties against Plaintiff.

16.     Whether the assignment of incident report numbers and referral up the chain of command, as required by administrative directives, of complaints lodged by white supervisory personnel and the alleged disregard, destruction or failure to process complaints of minority correction officers is a misperception or a reality.

17.     Whether Lt. Sousa's claim that he attempted to call Plaintiff for overtime duty on July 24, 2002, but was unable to do so because of incorrect telephone information is credible in view of Plaintiff's contention that other desk lieutenants had been successful in reaching her with

overtime opportunities, during the same quarterly posting and with the same telephone information.

18.     Whether Plaintiff deliberately disregarded Lt. Sousa's efforts to gain admittance at the buzzer door on August 13, 2002, as he claims (making the record of an incident report appropriate), or there was a legitimate malfunction in the buzzer system as Plaintiff claims (suggesting that the motivation for the incident report was harassment).

19.     Whether the recuperative post to which Plaintiff was assigned on June 20, 2001, was in fact substantially consistent with the job description approved by her physician after he reviewed the physical and cognitive tasks provided to him.

20.     Whether the cumulative impact of the delayed medical relief in potentially life threatening circumstances, the dismissive lobby control post assignment, an unprofessionally confrontational manner in performing supervisory duties, fabrication of serious charges against Plaintiff for workplace violence and criminal assault, deliberate oversight of her request for overtime, apparent efforts to discredit Plaintiff by requiring documentation of petty incidents, disregard or derailing of legitimate incident reports prepared and submitted by Plaintiff, was altogether sufficient to establish a hostile working environment created by the affirmative acts of Lt. Sousa and the managerial oversights of Warden Murphy, notwithstanding whether any of those events alone conformed to the collective bargaining definition of disciplinary action.

21.     Whether the admitted failure of management at the Hartford Facility to conduct the required "thorough investigation" of the incidents on March 9, 2001 (as evidenced by the failure ever to request statements from four directly involved witnesses whose accounts differed from that of Lt. Sousa[Officers Hebert, Morelli and Robinson and Provisional Lt. Dorozko]) was

a mere administrative oversight or part of a calculated strategy to protect Lt. Sousa at the expense of Plaintiff.

22.    Whether Plaintiff's concerns about performing the tasks associated with Lobby Control were legitimately connected to the correspondence to DOC from her doctor or merely part of the strategy to diminish Lt. Sousa. Upon information and belief, Plaintiff admits that Warden Murphy referred the incident for investigation to Central Intelligence Unit Director Huckabey and Principal Personnel Officer Drabik, as a possible workplace violence issue. Plaintiff admits that Lt. Sousa's complaint included no reference to racial discrimination. Plaintiff admits that Mendelson's report reached an inconclusive result.  Plaintiff has insufficient knowledge to admit or deny whether "he" (the reference is uncertain, but likely to Warden Murphy) transferred from Hartford to Enfield on June 28, 2002, whether such transfer was before or after a determination was made regarding disciplinary action or whether Warden Murphy had any input in the decision-making process, and will leave Defendants to their proof.

23.    Whether the curious failure of Warden Murphy to refer the complaints of Plaintiff against Lt. Sousa for his fabrications and slander against her, notwithstanding the thorough investigation of Lt. Sousa's unsubstantiated claims against her, was part of a strategy to protect Lt. Sousa at Plaintiff's expense or merely an administrative oversight.

Respectfully Submitted,

FOR THE PLAINTIFF
BRENDA J. LEWIS

_____

Lowell L. Peterson
Community Law Practice, LLC
2065-A Main Street
Hartford, CT 06120
(Tel.) 860-728-3788
(Fax) 860-728-3755
lpeterson@clpllc.com
Federal Bar # ct-22165

## CERTIFICATION

I, LOWELL L. PETERSON, attorney for the Plaintiff Brenda J. Lewis, hereby certify that, on the 19th day of August 2004, I delivered the foregoing Plaintiff's Local Rule 56(a)(2) Statement In Response To Defendants' Local Rule 56(a)(1) Statement Of Undisputed Facts In Support Of Motion For Summary Judgment and Disputed Issues Of Material Fact, to the Clerk of the United States District Court, District of Connecticut, Richard C. Lee United States Court House, 141 Church Street, New Haven, Connecticut, 06510 by electronic filing transmission, and delivered copies of the same by first class mail, postage prepaid, to the following counsel of record for all Defendants:

> Beth Z. Margulies, Esq.
> Assistant Attorney General
> 55 Elm Street, P.O. Box 120
> Hartford, CT 06141-0120

> Joseph A. Jordano, Esq.
> Assistant Attorney General
> 55 Elm Street, P.O. Box 120
> Hartford, CT 06141-0120

Dated:  August 19, 2004

_____
Lowell L. Peterson
Attorney for Plaintiff