## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| BRENDA LEWIS, | : | | |
| | : | | |
| Plaintiff, | : | NO. | 3:02cv2304 (MRK) |
| | : | | |
| v. | : | | |
| | : | | |
| STATE OF CONNECTICUT | : | | |
| DEPARTMENT OF CORRECTIONS, | : | | |
| ET AL., | : | | |
| | : | | |
| Defendants. | : | | |

### MEMORANDUM OF DECISION

Plaintiff Brenda Lewis sues her employer, the Connecticut Department of Corrections

("DOC"), for injunctive and monetary relief arising from the DOC's alleged retaliation against

her for complaining about racial discrimination and for an alleged racially hostile work

environment at the Hartford Correctional Center, in violation of Title VII of the Civil Rights Act

of 1965 as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").[1]  *See* Fourth Am. Compl. [doc.

#49], at ¶¶ 53-55.   She also brings a retaliation claim under 42 U.S.C. § 1981, as enforced

through 42 U.S.C. § 1983, against Lieutenant Erik Sousa, an employee at the Hartford

Correctional Center, in his official capacity for injunctive relief and in his individual capacity for

monetary relief.  *See* Fourth Am. Compl. [doc. #49], at ¶¶ 56-66.  Officer Lewis also asserts a

hostile work environment claim under 42 U.S.C. § 1981, as enforced through 42 U.S.C. § 1983,

against Lieutenant Sousa and against the former Warden of the Hartford Correctional Center,

---

[1] In her briefing to the Court, Plaintiff abandoned her disparate treatment claim against all defendants, which was confirmed at oral argument on October 14, 2004.  *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 45.  Accordingly, Defendants are entitled to judgment on Officer Lewis' disparate treatment claim in Count Two of her Fourth Amendment Complaint.  *See* Fourth Am. Compl. [doc. #49], Count Two at ¶ 54(a).

Peter J. Murphy, in their official capacities for injunctive relief and in their individual capacities

for monetary relief.[2]  *See* Fourth Am. Compl. [doc. #49], at ¶¶ 56-66.  Finally, Officer Lewis

brings a state tort claim of false imprisonment against Lieutenant Sousa.  *See id.* at ¶¶ 67-69.

Currently pending before the Court is Defendants' Motion for Summary Judgment [doc. #58].

For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.

Unless otherwise noted, the following facts are not in serious dispute.  At all relevant

times, Plaintiff Lewis was a Corrections Officer at the Hartford Correctional Center assigned to

the third shift, which ran from 12:00 a.m. until 8:00 a.m.  Defs.' Local Rule 56(a)(1) Statement

[doc. #60], at ¶ 1.  Defendant Sousa was a Lieutenant at the Hartford Correctional Center who

primarily worked the first or second shift.  *Id.* at ¶ 2.  When the second shift was 8 hours long, it

ran from 4 p.m. until 12 a.m.; when the second shift was 10 hours long it ran from 3 p.m. until 1

a.m.  *Id.*   The parties dispute the degree to which Lieutenant Sousa supervised Officer Lewis.

*Compare id.* at ¶ 6 ("[Sousa] rarely supervised Brenda Lewis.") *with* Pl.'s Local Rule 56(a)(2)

Statement [doc. #67], at ¶ 6 ("Plaintiff disagrees with Defendants' characterization of Lt. Sousa's

supervision as rare.").  However, the parties do agree that because Lieutenant Sousa was not

Officer Lewis' primary supervisor on the third shift, he never wrote an evaluation of her work

---

[2] At oral argument on October 14, 2004, Plaintiff's counsel informed the Court that Officer Lewis had abandoned her 42 U.S.C. § 1981 retaliation claim, as enforced by 42 U.S.C. § 1983, against Warden Murphy in her Fourth Amended Complaint [doc. #49], and that summary judgment should enter for Warden Murphy on that claim.  In her briefing to the Court, Officer Lewis also abandoned all claims against Defendants Theresa C. Lantz and Donald T. Kruk.  Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 45.  Accordingly, the Court orally granted summary judgment for Defendants Kruk and Lantz on October 14, 2004, and judgment entered for these Defendants on that date.

performance and he did not have the authority to discipline, hire, fire, demote, promote, or transfer Officer Lewis. Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 7. Defendant Murphy was the Warden of the Hartford Correctional Center from February 14, 2000 until June 27, 2002. *Id.* at ¶ 3. While wardens do not have the authority to hire, fire, demote, or transfer, they do have the authority to recommend discipline and to recommend promotions. *Id.* at ¶ 23.

Officer Lewis' claims against all Defendants arise out of six "incidents" between Officer Lewis and Lieutenant Sousa, which occurred over a 17-month period from March 9, 2001 until August 13, 2002. The following chronology outlines the relevant details of these six incidents, and also highlights other key dates.

The first incident occurred on March 9, 2001, when Officer Lewis claims she was denied timely medical assistance when she was suffering a heart attack. *See* Fourth Am. Compl. [doc. #49], at ¶ 15. Though the parties dispute many of the details of this incident, both parties agree that unbeknownst to her or her co-workers, Officer Lewis suffered a heart attack while on the job on March 9. Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 9, 47, 48. Officer Lewis alleges that there was a delay of approximately one hour in providing her medical assistance, which she currently asserts was the result of racial animus. *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 30-31. Officer Lewis apparently called Lieutenant Sousa for relief at 12:04 a.m., and when relief did not immediately arrive, she called Corrections Officer Anna Dorozko at 12:25 a.m. Pl.'s Local Rule 56(a)(2) Statement [doc. #67], at ¶¶ 9, 41. Officer Dorozko told Officer Lewis that she would send relief, but it did not arrive until at approximately 1:00 a.m. *See* Fourth Am. Compl. [doc. #49], at ¶ 24. Defendants do not dispute that there was a delay of nearly an hour in Officer Lewis' receipt of medical attention; however,

they strenuously deny that racial animus played any role in the delay.  *See* Defs.' Reply Brief [doc. #75], at 4-5.

On April 20, 2001, while on leave recovering from her heart attack, Officer Lewis submitted an internal grievance through her union against Lieutenant Sousa related to the delay in providing medical assistance.  Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 25.  Her grievance was denied at Level III, when the grievance panel found that the reason for the delay was "mis-communication."  *Id.*  It is undisputed that Officer Lewis' internal grievance and accompanying incident reports never expressly stated or claimed that the delay in providing her with medical assistance was based on racial animus.  *Id.* at ¶ 68.

The second incident occurred on June 20, 2001, when Officer Lewis was assigned to a Lobby Control post to allow her to recuperate following her heart attack.  Both parties agree that the assignment was intended to accommodate Officer Lewis' continued recovery and was generally approved by her doctor.  Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 29.  Furthermore, the parties agree that Captain Michael Madden assigned Officer Lewis to the Lobby Control post.  *Id.* at ¶ 57.  However, the parties vigorously dispute the nature of this assignment, whether Lieutenant Sousa played any role in the assignment, and whether there were insidious motives behind the assignment.  Officer Lewis alleges that the Lobby Control post was a "stressful" work environment because she did not possess the computer skills needed to perform the job.  *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 9-10.  Officer Lewis also claims that Lieutenant Sousa had input into this assignment and laughed derisively when she was assigned to the post.  *See* Pl.'s Local Rule 56(a)(2) Statement [doc. #67], at ¶ 57; Fourth Am. Compl. [doc. #49], at ¶ 31.  She further alleges that assigning her to this

"stressful" post was directly related to her complaints about Lieutenant Sousa's delay in providing her medical assistance and that it was done in retaliation for her filing accusatory incident reports and a union grievance related to the medical assistance delay incident. *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 10. The parties do not dispute that on the day Officer Lewis was assigned to the Lobby Control post, she informally complained to Warden Murphy when he passed through the lobby. Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 71. Furthermore, the parties do not dispute that in response to her complaint to Warden Murphy, Captain Madden sent a corrections officer to train Officer Lewis on the computer system on the same day as her complaint to Warden Murphy. *See* Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 59; Aff. of Captain Michael Madden, Defs.' Exs. in Supp. of Summ. J. [doc. #61], at Ex. 5, at ¶ 6-7.

On November 30, 2001, Officer Lewis submitted a complaint to the Connecticut Commission on Human Rights and Opportunities ("CHRO"). Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 80. This initial complaint to the CHRO solely concerned Officer Lewis' allegations that the delay in providing her medical assistance on March 9 was racially motivated, and it made no mention of second incident involving the recuperative post assignment to Lobby Control. *Id.* On January 28, 2002, Officer Lewis' complaint to the CHRO was automatically forwarded to the Boston Area Office of the Equal Employment Opportunity Commission ("EEOC"), which issued a Notice of Charge of Discrimination based on race and color. *Id.* Because it was identical to her CHRO charge, Officer Lewis' EEOC charge dealt only with the medical assistance delay and made no mention of the Lobby Control assignment.

On March 29, 2002 the third incident occurred when Officer Lewis and Lieutenant Sousa

had a verbal dispute over the signing of a logbook.  Officer Lewis alleges that Lieutenant Sousa falsely reprimanded her for not signing the back of a logbook, as a part of his continuing race-based harassment of Officer Lewis.  *See* Fourth Am. Compl. [doc. #49], at ¶ 31.  Lieutenant Sousa asserts that he has no recollection of the incident.  Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 11.  Officer Lewis did not file an incident report following this verbal dispute, and she acknowledges that checking for signatures on the logbook was part of Lieutenant Sousa's job.  *Id.*

The fourth incident occurred on April 22, 2002, when Officer Lewis and Lieutenant Sousa engaged in a heated argument while Officer Lewis was stationed at her post in the South Block of the Hartford Correctional Center.  During this heated argument, Lieutenant Sousa alleges that Officer Lewis slammed a door into him, Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 12, which Officer Lewis denies.  Pl.'s Local Rule 56(a)(2) Statement [doc. #67], at ¶ 12. Lieutenant Sousa filed a report following this incident and called the Connecticut State Police seeking to press charges against Officer Lewis for assault.  Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 13.  This matter was investigated as a workplace violence incident, and it eventually resulted in each party receiving verbal counseling.  *Id.* at ¶ 30.  Officer Lewis contends that Lieutenant Sousa's filing of the incident report and threatening criminal charges were racially motivated.  *See* Fourth Am. Compl. [doc. #49], at ¶ 31; Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 31-32.  However, it is undisputed that Officer Lewis' reports and comments related to this incident never expressly stated or claimed that racial discrimination played a role in the incident.  Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 68.

On June 28, 2002, Mr. Nelvin Levester replaced Defendant Murphy as Warden at the Hartford Correctional Center, and Mr. Levester remained the Warden until October 2002.  Defs.'

Local 56(a)(1) Statement [doc. #60], at ¶ 24.[3]

The fifth incident occurred on July 24, 2002, when Officer Lewis alleges she was passed over for an opportunity to work overtime. The parties agree that when an overtime opportunity arose on the date in question, no one contacted Officer Lewis to offer her the opportunity. Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 17. Defendants claim that Officer Lewis' phone number in the overtime call list was outdated and that they attempted to call her at the old number to no avail. *See* Defs.' Mem. of Law in Supp. of their Mot. for Summ. J. [doc. #59], at 13. Officer Lewis denies that Lieutenant Sousa ever attempted to contact her, denies that the overtime roster contained incorrect telephone information, and claims that she was intentionally passed over in retaliation for filing her discrimination complaint. *See* Fourth Am. Compl. [doc. #49], at ¶ 31; Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 32. Officer Lewis filed a grievance complaining about the missed overtime opportunity. *See* Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. K. Though not clearly documented in the record before the Court, Officer Lewis' grievance was apparently denied at Step III with a finding that she had not updated her telephone number in the call list. *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 32.

On August 13, 2002, the sixth incident occurred, when Officer Lewis allegedly failed promptly to answer a buzzer that Lieutenant Sousa and another officer had pressed to gain access

---

[3] Though Officer Lewis states at one point that she has insufficient knowledge as to the tenure of Warden Levester, see Pl.'s Local Rule 56(a)(2) Statement [doc. #67], at ¶ 24, elsewhere Officer Lewis acknowledges the fact that Warden Murphy was transferred to another facility on June 28, 2002. *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 41 ("[Warden] Murphy's transfer to another facility on June 28, 2002, does not relieve his liability for conduct before that date.").

to a secured area.  The parties agree that Officer Lewis failed to answer the buzzer for some

period of time, and that Lieutenant Sousa wrote an incident report about this delay.  Defs.' Local

56(a)(1) Statement [doc. #60], at ¶ 18.  Lieutenant Sousa alleges that Officer Lewis' delay was

intentional and that Officer Lewis decided not to let him into the secured area as part of Officer

Lewis' harassment of Lieutenant Sousa.  *Id.*  Officer Lewis responds that this was an innocent

mistake based on a malfunctioning buzzer, and that she promptly buzzed Lieutenant Sousa in

once she received a call from a third person advising her that Lieutenant Sousa and the other

officer were waiting.  Pl.'s Local Rule 56(a)(2) Statement [doc. #67], at ¶ 18.  Once again,

Officer Lewis asserts that Lieutenant Sousa's filing of an incident report regarding this matter

was another example of his harassment of her based on racial animus.  *See* Fourth Am. Compl.

[doc. #49], at ¶ 31; Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 32.

On September 6, 2002, Officer Lewis and the Defendants engaged in an ultimately

unsuccessful mediation discussion with Ms. Elizabeth Marcus, a mediator at the EEOC.  *See* Pl.'s

Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 7; Pl.'s Index of Evidence in

Supp. of Objection to Summ. J. [doc. #68], at Ex. A-3 (letter dated September 9, 2002 from Ms.

Marcus to parties describing the failed mediation).  During the mediation with Ms. Marcus,

Officer Lewis was given until September 30, 2002 to amend her original EEOC charge with any

additional allegations of racial discrimination from the intervening period since the original

filing.  *See* Pl.'s Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 8; Pl.'s Index of

Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. A-3 (letter dated September 9,

2002 from Ms. Marcus to both parties describing the failed mediation; letter dated September 20,

2002 from Mr. Kenneth Feng An to Plaintiff).

On September 30, 2002, Officer Lewis responded to the EEOC's invitation to amend her charge, and, according to the record and Officer Lewis' counsel's representations at oral argument, Officer Lewis' counsel faxed an amended charge to Mr. Kenneth Feng at the EEOC. *See* Pl.'s Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 8; Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. A-3 (letter dated September 30, 2002 sent by facsimile and Federal Express from Mr. Lowell L. Peterson to Mr. Feng An); Ex. A-4 (copy of the amended charge). This amended charge outlined additional acts of discrimination, which included, *inter alia*, all of the incidents described above. On that same day, September 30, 2002, the EEOC issued a right to sue letter. Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. A-5 (EEOC right to sue letter dated September 30, 2002). On October 1, 2002, Mr. Feng An of the EEOC informed the DOC by letter that the EEOC had received the amended charge from Officer Lewis, and that the DOC "[did] not need to submit a rebuttal to the amended complaint (which is usually required) until the Commission notifies you otherwise." Defs.' Index of Evidence in Supp. of Defs.' Mot. for Summ. J. [doc. #61], at Ex. 3-F. This lawsuit followed.

## II.

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(b). A genuine issue of fact exists when "a reasonable jury could return a verdict for the nonmoving party," and facts are material to the outcome if the substantive law renders them so. *Andersen v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.

-9-

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If the moving party carries its burden, the party opposing summary judgment "may not rest upon mere allegations or denials," rather the opposing party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The Court must draw all ambiguities and inferences in favor of the plaintiffs. *See Andersen*, 477 U.S. at 255. However, to defeat a motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Andersen*, 477 U.S. at 249-50.

## III.

Before discussing the merits of Officer Lewis' claims, the Court must first address certain preliminary issues regarding Officer Lewis' charge with the CHRO and EEOC. Defendants originally asserted that Officer Lewis' claims were time barred. *See* Def.'s Mem. in Supp. of their Mot. for Summ. J. [doc. #59], at 7-8. However, Defendants conceded at oral argument that in light of a work-sharing agreement between the CHRO and the EEOC, a filing with the CHRO is properly deemed to be a filing with the EEOC. As a result, Officer Lewis' November 30, 2001 filing with the CHRO should be treated as a simultaneous filing with the EEOC and as that filing was well within 300 days of the first incident, Officer Lewis' complaint is timely.[4] *See generally*

---

[4] The CHRO's and EEOC's work-sharing agreement states in relevant part:

In order to facilitate the assertion of employment rights, the EEOC and the FEPA each designate the other as its agent for the purpose fo receiving and drafting charges, including those that are not jurisdictional with the agency that initially receives the charges. . . . Charges that are received by the [CHRO], whether in person or by mail, and jurisdictional with the EEOC and timely filed by the

Aff. of Anne Giantonio, Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at

Ex. A-1 (affidavit of the Supervisor of the Charge Receipt Technical Intake Unit (CRTIU) of the

Boston Area EEOC, stating that the EEOC treated Officer Lewis' charge as timely filed because

of the work-sharing agreement).

Though timely, there is still a lingering question whether the alleged discriminatory

incidents listed in the amended EEOC complaint (which include all of the incidents alleged in the

complaint) were encompassed within the right to sue letter ultimately issued by the EEOC.

Defendants argue that because Officer Lewis' amended EEOC complaint was filed on the same

day as the right to sue letter was issued – September 30, 2002 – the right to sue letter could not

possibly cover any incident other than the delay in providing medical assistance.  Accordingly,

Defendants argue that Plaintiff has failed to exhaust her administrative remedies for any

complaint other than the delay in providing medical assistance on March 9, 2001.  *See* Def.'s

Mem. in Supp. of their Mot. for Summ. J. [doc. #59], at 8-11.

"It is true that [courts] generally have no jurisdiction to hear claims not alleged in the

employee's EEOC charge. The purpose of this exhaustion requirement is 'to give the

_____

charging party or his/her representative will *be automatically dual-filed* with the
EEOC and vice versa.  The date the charge was received will be the date of filing.
. . . *The FEPA waives* its right of exclusive jurisdiction to initially process all
charges for a period of 60 days.  This waiver is to . . . ensure that charging parties
in all co-jurisdictional charges initially filed with the FEPA are timely dual filed
with the EEOC.

FY 2001 EEOC/FEPA Worksharing Agreement Between Connecticut Commission on Human
Rights and Opportunities and Equal Employment Opportunity Commission, Pl.'s Index of
Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. A-2, at ¶¶ II.A, II.C, III.A.1
(emphasis in original).  *Cf. Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 308 (2d Cir. 1996)
(describing the effect of a similar work-sharing agreement in New York).

-11-

administrative agency the opportunity to investigate, mediate, and take remedial action.' " *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998) (quoting *Stewart v. INS*, 762 F.2d 193, 198 (2d Cir. 1985)).  However, the requirement that plaintiff first exhaust her administrative remedies is effectively treated as an affirmative defense.  *See Pollock v. Ridge*, 310 F. Supp. 2d 519, 525 (W.D.N.Y. 2004); *see also Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) ("[F]iling a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.") (quoted in *Downey v. Runyon*, 160 F.3d 139, 145 (2d Cir. 1998)); *Boos v. Runyon*, 201 F.3d 178, 182 (2d Cir. 2000) ("[T]he exhaustion requirement, while weighty, is not jurisdictional."); *Briones v. Runyon*, 101 F.3d 287, 290 (2d Cir. 1996) (exhaustion of administrative remedies "is analogous to a statute of limitations").  As an affirmative defense, Defendants bear the burden of proof in the first instance.[5]  *But see McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1106 (10th Cir. 2002) ("[B]ecause failure to exhaust administrative remedies is a bar to subject matter jurisdiction, the burden is on the plaintiff as the party seeking federal jurisdiction to show, by competent evidence, that she did exhaust.").

The Court is not convinced that Defendants have satisfied their burden of showing that the incidents other the delay in providing medical assistance are not properly before the Court. The mere fact that the amended complaint and the right to sue letter bear the same date does necessarily mean that the EEOC did not have the amended EEOC complaint before it when the

---

[5] Though defendants initially bear the burden of establishing the affirmative defense of failure to exhaust administrative remedies, once established, the burden shifts to plaintiff to provide facts sufficient to counter the affirmative defense, for instance, facts showing equitable tolling, estoppel, waiver or a continuing violation.  *See Boos*, 201 F.3d at 185; *Pollock*, 310 F. Supp. 2d at 525.

agency issued the right to sue letter.  The EEOC told Officer Lewis that she could amend her charge if she so desired by submitting an amended complaint by September 30, 2002, and she did so by faxing the amended charge to the EEOC on that date.  Whether the EEOC should have allowed an amendment at such a late stage is not properly before this Court.  Instead, the Court is solely concerned with the contents of the amended charge as incorporated into the right to sue letter.  And on the basis of the current record, the Court cannot conclude that the EEOC's right to sue letter was limited to the single incident set forth in the original charge and that it did not also encompass all of the other incidents set forth in Officer Lewis' amended charge.[6]

## IV.

Having disposed of these threshold issues, the Court will now turn to the merits of Officer Lewis' claims.  Officer Lewis' Title VII claims against her employer, the DOC, are for retaliation and a hostile work environment, not disparate treatment.[7]  Relying upon 42 U.S.C. § 1981, as enforced by 42 U.S.C. § 1983, Officer Lewis also asserts a similar retaliation claim against Lieutenant Sousa and similar hostile work environment claims against both Lieutenant Sousa and Warden Murphy.

## A.

"In order to establish a *prima facie* case of retaliation [under Title VII], an employee must

---

[6]  As a consequence, the Court need not, and does not, address Officer Lewis' "continuing violation" arguments.  *See* Pl.'s Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 8-14.

[7]  Title VII claims can be brought only against an employer, not an individual employee. *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004) ("[W]e note that 'individuals are not subject to liability under Title VII.' ") (quoting *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir.2000)).  Therefore, Officer Lewis' Title VII claims are brought only against the DOC and not the individual defendants.

show [1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action." *Feingold v. New York*, 366 F.3d 138, 156 (2d Cir. 2004) (internal quotations and citations omitted); *see also Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). Though Officer Lewis could conceivably satisfy the first element of a *prima facie* case of retaliation, as will be discussed below, she did not suffer a materially adverse employment action and thus fails to present a *prima facie* case of retaliation against the DOC.

The term "protected activity" in the first element of the *prima facie* case of retaliation refers to "action taken to protest or oppose statutorily prohibited discrimination," and "the law is clear that opposition to a Title VII violation need not rise to the level of a formal complaint in order to receive statutory protection." *Cruz*, 202 F.3d at 566. Officer Lewis' filing of a complaint with the CHRO alleging discrimination in the workplace on account of her race on November 30, 2001 qualifies as protected activity. However, at oral argument, Officer Lewis conceded that neither the first incident (the delay in medical assistance) nor the second incident (the recuperative post assignment) were done in retaliation for her engaging in protected Title VII activity. This is because Officer Lewis filed her CHRO complaint on November 30, 2001, *after* both of these alleged incidents occurred, and because the union grievance Officer Lewis filed on April 20, 2001 associated with the delay in providing medical assistance did not explicitly allege racial discrimination and thus could not be considered protected activity under Title VII. *See, e.g.*, *Clemente v. New York State Div. of Parole*, No. 01 Civ. 3945(TPG), 2004 WL 1900330, at *13 (S.D.N.Y. Aug. 24, 2004) (union grievances that do not allege discrimination do not qualify as protected activity under Title VII); *Vital v. Interfaith Med. Ctr.*, No. 96CV363FBSMG, 2001

-14-

WL 901140, at *6 (E.D.N.Y. Jul. 31, 2001) (same).

That leaves the remaining four incidents (the logbook argument; the South Block door slamming incident; an alleged denial of an overtime opportunity; and the door buzzing incident) that Officer Lewis claims were all in retaliation for the filing of her CHRO complaint. However, Officer Lewis has failed to show that any of the incidents themselves, or even the actions taken by the DOC in response to them, constituted materially adverse employment actions. A "materially adverse" employment action "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (internal quotations and citations omitted). According to the Second Circuit, "[e]xamples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Feingold*, 366 F.3d at 152 (internal quotations and citations omitted). It is undisputed that the DOC never fired her, demoted her, changed her title, lessened her benefits or reduced her compensation in connection with any of the four incidents that Officer Lewis claims were in retaliation for protected activity.

In certain circumstances, discipline could be considered a form of adverse employment action, if the discipline materially affected the employee or her prospects. *See, e.g., Knight v. City of New York*, 303 F. Supp. 2d 485, 497 (S.D.N.Y. 2004) ("Disciplinary memoranda and evaluations are adverse employment actions only if they affect ultimate employment decisions such as promotions, wages or termination.") (internal quotation and citation omitted); *Forts v. City of New York Dep't of Corr.*, No. 00 Civ.1716 LTS FM, 2003 WL 21279439, at *8 (S.D.N.Y.

-15-

Jun. 4, 2003) (a disciplinary suspension constituted an adverse employment action); *but see Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001) (holding that a "notice of discipline" and a "counseling memo" by themselves were insufficient, as a matter of law, to constitute adverse employment action), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108-14 (2002).  *Cf. Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (In the First Amendment Retaliation context, "adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and *reprimand*.") (emphasis added).  However, Officer Lewis concedes that she was never subjected to any discipline for the incidents at the Hartford Correctional Center that comprise the basis for her lawsuit.  *See* Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 61; *see also* Lewis Dep., Defs.' Index of Evidence in Supp. of Defs.' Mot. for Summ. J. [doc. #61], at Ex. 7, at 139-40.  And while both Officer Lewis and Lieutenant Souza received a mandatory verbal counseling after one of the incidents, both parties agreed that this mandatory verbal counseling did not qualify as discipline.  *See* Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 30.

In certain circumstances, a transfer can constitute an adverse employment action "if 'accompanied by a negative change in the terms and conditions of employment.' "  *Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003) (quoting *Morris*, 196 F.3d at 113).  *See, e.g.*, *Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 444 (2d Cir. 1999) (transfer and reassignment to a new position with different job responsibilities and involving contact with the prisoner population constituted an adverse employment decision because Plaintiff believed the transfer was intended to force her to quit); *de la Cruz v. New York City Human Res. Admin. & Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (transfer to a position with no change in pay

-16-

but less prestige and fewer opportunities for advancement may constitute an adverse employment decision).  During oral argument, Officer Lewis' counsel stated that Officer Lewis had been transferred to another correctional facility.[8]   However, the Court found nothing in the record that indicated that this transfer represented a setback in Officer Lewis' career, or was done to force her to quit, or in any way adversely affected Officer Lewis.  During argument, Officer Lewis' counsel agreed with the Court's assessment of the transfer, and therefore, this transfer cannot constitute adverse employment action.

One alleged incident involved a claimed denial of a single overtime opportunity.  Under certain circumstances, the denial of overtime may be considered an adverse employment action. *See, e.g.*, *Knight*, 303 F. Supp. 2d at 499 (assuming *arguendo* that a plaintiff could establish that a loss of overtime was an adverse employment action); *O'Bar v. Borough of Naugatuck*, 260 F. Supp. 2d 514, 517 (D. Conn. 2003) (transfer to a shift where there was less opportunity for overtime, which actually resulted in loss of overtime pay, was an adverse employment action when considered with other actions taken against employee).  However, even assuming that Officer Lewis was deliberately denied the opportunity to work overtime on this lone occasion (which Defendants dispute), there is no indication from the record that this single instance where Officer Lewis did not have the opportunity to work overtime meant that she received less in overtime than others similarly situated over the course of the year in question.

At oral argument, Officer Lewis' counsel admitted that the crux of what Officer Lewis

---

[8] The Court assumes that this transfer was from the Hartford Correctional Center to her current position at the DOC Unit at John Dempsey Hospital of the University of Connecticut. *See* Aff. of Brenda J. Lewis, Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. F, ¶ 4.

claims was "adverse" employment action was the fact that she had to "endure" an internal investigation for the South Block incident.  But that internal investigation did not conclude that Officer Lewis was at fault, it did not result in any discipline against her, and it did not result in any reduction in her pay or benefits, either during or after the investigation.  In short, there is nothing in the record that shows that this internal investigation materially altered Officer Lewis' employment at all.  Nor could Officer Lewis' counsel cite a single case that held that the mere participation in an internal investigation – standing alone – was an adverse employment action. Indeed, case law on this subject holds precisely the opposite.  *See, e.g.*, *Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) (employee put on paid administrative leave pending the outcome of an internal investigation, who was restored to her position upon the termination of the investigation, suffered no adverse employment action); *O'Dell v. Trans World Entm't Corp.*, 153 F. Supp. 2d 378, 396 (S.D.N.Y. 2001) ("[A]n alleged deficiency in an employer's internal complaint procedure or internal investigation of a sexual harassment complaint – even if the deficiency is little more than an attempt to strengthen an employer's defense – is not a retaliatory adverse employment action.").  *Cf. Jones v. Fitzgerald*, 285 F.3d 705, 715 (8th Cir. 2002) (an internal investigation is no adverse employment action where employee "suffered no material disadvantage in a term or condition of employment as a result of the investigations" in First Amendment Retaliation context); *Benningfield v. City of Houston*, 157 F.3d 369, 376 (5th Cir. 1998) (same); *Richards v. State of Connecticut Dep't of Corr.*, --- F. Supp. 2d. --- , 2004 WL 2900984, at *9 (D. Conn. Dec. 10, 2004) (same).

Accordingly, the Court grants summary judgment for the DOC on Officer Lewis' Title VII retaliation claim.

**B.**

Officer Lewis also brings a retaliation claim against Lieutenant Sousa in his individual capacity for purposes of damages, and in his official capacity for purposes of injunctive relief, based on all the same facts and allegations in her Title VII claim against the DOC.

Section 1981 states in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a). Section 1981 essentially "outlaws discrimination with regard to the enjoyment of all benefits, privileges, terms, and conditions of a contractual relationship," *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 68 (2d Cir. 2000), though § 1981 only prohibits discrimination based on race, ancestry, ethnic characteristics or alienage and does not prohibit discrimination based on gender, religion, or national origin. *See Anderson v. Conboy*, 156 F.3d 167, 169-70 (2d Cir. 1998). Because Officer Lewis only alleges race-based discrimination, she may bring her claims under § 1981.[9]

As stated by the Second Circuit, "[a]n act of retaliation for engaging in activity protected by Title VII does not give rise to a claim for retaliation that is cognizable under § 1981 unless that activity was also protected by § 1981." *Hawkins v. 1115 Legal Service Care*, 163 F.3d 684,

---

[9] Section 1983 allows an action at law against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Thus, § 1983 provides the method for Officer Lewis to seek vindication of alleged violations of § 1981 by Lieutenant Sousa (or Warden Murphy) since they are state employees. *See, e.g., Jett v. Dallas Independent School District*, 491 U.S. 701, 735 (1989) ("We hold that the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.").

693 (2d Cir. 1998).  As the Second Circuit explained in *Choudhury v. Polytechnic Inst. of New York*, 735 F.2d 38 (2d Cir. 1984),

> [a] retaliation claim is cognizable under § 1981 to make that section an available and effective remedy for racially motivated employment discrimination. . . . [A]n employee who is punished for seeking administrative or judicial relief, regardless of the merits of his initial claim, has failed to secure that right to equal treatment which constitutes the fundamental promise of § 1981. When a complainant experiences retaliation for the assertion of a claim to even-handed treatment, he remains under a handicap not faced by his colleagues. Such inequality . . . is proscribed by § 1981.

*Id.* at 43.  *See also Lizardo v. Denny's, Inc.*, 270 F.3d 94, 105 (2d Cir. 2001) ("Retaliation claims are cognizable under § 1981.").  Therefore, "[m]ost of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981."  *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004); *see also Whidbee*, 223 F.3d at 69.[10]

Officer Lewis' counsel conceded at oral argument that if her Title VII retaliation claim against the DOC failed, her § 1981 retaliation claim against Lieutenant Sousa should also fail.

---

[10] There are a few key differences between Title VII actions and § 1981 claims as enforced by § 1983 that are relevant in this case.  First, "claims under 42 U.S.C. §§ 1981 and 1983 need not be asserted within the 180-[day] or 300-day period applicable to Title VII claims." *Patterson*, 375 F.3d at 225.  The statute of limitations applicable to claims brought under § 1981 and § 1983 in Connecticut is three years. *See, e.g.*, *Walker v. Jastremski*, 159 F.3d 117, 119 (2d Cir. 1998) ("When a § 1983 action is filed in the District of Connecticut, it is subject to a three-year statute of limitations."); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 131 (2d Cir. 1996) ("In Connecticut, the applicable period [for § 1981] is the three year statute of limitations in tort.").  Second, although "Title VII claims are not cognizable against individuals, individuals may be held liable under [§ 1981] . . . for certain types of discriminatory acts, including those giving rise to a hostile work environment." *Patterson*, 375 F.3d at 226.  And third, "although in certain circumstances a Title VII claim may be established through proof of a defendant's mere negligence, without a showing of discriminatory intent, . . . a plaintiff pursuing a claimed violation of § 1981 . . . must show that the discrimination was intentional." *Id.* (citing *Richardson*, 180 F.3d at 441-42).

-20-

As explained above, because the core substantive standards that apply to Title VII also apply to §

1981 and because Officer Lewis' Title VII retaliation claim failed for her failure to demonstrate

an adverse employment action, Officer Lewis' § 1981 retaliation claim against Lieutenant Sousa

must also fail. The Court, therefore, grants summary judgment for Lieutenant Sousa on Officer

Lewis' § 1981 retaliation claim.

## C.

"A hostile work environment claim [under Title VII] requires a showing [1] that the

harassment was sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment and [2] that a specific basis exists for

imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373-74

(2d Cir. 2002). The Supreme Court has ruled that a work environment must be both subjectively

and objectively hostile and abusive in order to establish a hostile environment claim. *Harris v.

Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993) ("The conduct alleged must be severe and pervasive

enough to create an environment that would reasonably be perceived, and is perceived, as hostile

or abusive.").

The Court concludes that Officer Lewis has presented sufficient evidence to allow a trier

of fact to conclude that she subjectively perceived her work environment as hostile. Specifically,

Officer Lewis asserts that the racial discrimination she claims to have been subjected to made it

difficult for her to work at the Hartford Correctional Center, made her feel humiliated, made her

feel that her job security was threatened and that she should seek job relocation, and that the

entire experience made her suffer severe anxiety disorder. *See* Pl.'s Am. Mem. of Law in Supp.

of Objection to Summ. J. [doc. #80], at 23. Therefore, Officer Lewis has provided sufficient

evidence at this stage of the proceeding to satisfy the subjective prong of the hostile work environment test.

The more difficult question in this case is whether Officer Lewis has satisfied the objective portion of the test – that is, taking her allegations as true, whether or not they rise to the level of a hostile work environment as the Supreme Court and the Second Circuit have defined it. In order to survive summary judgment on her claims alleging a hostile work environment, Officer Lewis must

> demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.  To decide whether the threshold has been reached, courts examine the case-specific circumstances in their totality and evaluate the severity, frequency, and degree of the abuse. . . . [R]elevant factors include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Alfano*, 294 F.3d at 374 (citing *Cruz*, 202 F.3d at 570; *Harris*, 510 U.S. at 23).  Though the standard for establishing an objectively hostile work environment is high, the Second Circuit has repeatedly cautioned against setting the bar "too high," noting that

> while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. The environment need not be "unendurable" or "intolerable".  In brief, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

*Feingold*, 366 F.3d at 150 (internal citations and quotations omitted).

Where to set the bar in this case is a very close question.  As Officer Lewis' counsel conceded at oral argument, other than the first incident involving the delay in medical assistance and perhaps the South Block altercation, the other four incidents standing alone could not be

considered so "extraordinarily severe" to have created a hostile work environment.  *Alfano*, 294

F.3d at 374.  The prototypical "single incident" that creates a hostile work environment usually

involves a clear, expressed, overt, and truly egregious act of discrimination.  *See, e.g.*, *Ferris v.*

*Delta Air Lines, Inc.*, 277 F.3d 128, 136 (2d Cir. 2001) (single instance of drugging and raping a

co-worker created a hostile work environment); *Howley v. Town of Stratford*, 217 F.3d 141, 148,

154 (2d Cir. 2000) (though single instance of obscene comments directed at plaintiff occurred

only once, this one occasion was an "extended barrage of obscene verbal abuse" which was done

"at length, loudly, and in a large group in which [plaintiff] was the only female and many of the

men were her subordinates" and thus created a hostile work environment); *Tomka v. Seiler Corp.*,

66 F.3d 1295, 1305 (2d Cir. 1995) ("[E]ven a single incident of sexual assault sufficiently alters

the conditions of the victim's employment and clearly creates an abusive work environment for

purposes of Title VII liability."), *abrogated on other grounds by Burlington Indus., Inc. v.*

*Ellerth*, 524 U.S. 742 (1998).

From the record, the Court has considerable doubt whether the delay in providing medical

assistance or the South Block altercation standing alone could constitute a material alteration of

the work environment, since neither incident involved a comparably overt, egregious, and clear

act of racial discrimination (such as a barrage of racial slurs).  Indeed, the official DOC

complaints, grievances, and incident reports involving these incidents – which included reports

from Officer Lewis – did not even mention race as a motivating factor.[11]  However, Officer

---

[11]  The closest Officer Lewis comes to any such allegation is in an incident report
involving the South Block altercation, where she states: "I feel that I'm being harassed by Lt.
Sousa and he is creating a hostile work environment since I put in the Grievance against him and
he is trying to take my job."  *See* Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc.
#68], at Ex. J.1.

Lewis argues that the alleged denial of medical assistance on the basis of race was sufficiently egregious because that act essentially put her life in jeopardy.  *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 23.  Taking Officer Lewis' allegations as true, as the Court must at this stage of the proceeding, the Court cannot say as a matter of law that an alleged near death experience precipitated by alleged racial discrimination could never as a matter of law be considered sufficiently severe to have permanently altered the work environment.

Moreover and in any event, the Court is better served by considering all of the six incidents that form the basis of Officer Lewis' case as a whole.  The Court believes a reasonable trier of fact considering the totality of circumstances, could conclude that these incidents, occurring over a relatively short period of time, "were sufficiently continuous and concerted" to have altered the conditions of her working conditions as to constitute a hostile environment. *Alfano*, 294 F.3d at 374.  The Second Circuit has cautioned that "there is neither a threshold magic number of harassing incidents that gives rise, without more, to liability as a matter of law, nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Id.* (internal quotations omitted); *see also Richardson*, 180 F.3d at 439 ("[T]he appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.") (internal quotations omitted).  Furthermore, this is not an issue of whether Officer Lewis was still able to successfully perform the basic functions of her job; rather the question is "whether the conditions under which those tasks must be performed have been altered for the worse." *Terry*, 336 F.3d at 149 (citing *Whidbee*, 223 F.3d at 70).  Finally, courts "recognize that most discrimination . . . is not carried out so openly as to provide direct proof of it. Accordingly, an aggrieved party may use

-24-

circumstantial evidence to assert a prima facie case of discrimination." *Sanders v. New York City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004).   Considering the events in their totality, as the Court must, the Court cannot say that DOC is entitled to judgment as a matter of law.

The Court is fortified in this view by the fact that Officer Lewis has provided evidence of alleged incidents of racial discrimination involving other employees. *See Cruz*, 202 F.3d at 570 ("Because the crucial inquiry focuses on the nature of the workplace environment as a whole, a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.").  Officer Lewis has offered the affidavits of other African-American employees who allege that they experienced discriminatory harassment and hostility at the hands of Lieutenant Sousa.  *See* Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. B, ¶¶ 8, 18, 23 (affidavit of Eunice E. Smith); *id.* at Ex. C, ¶¶ 8, 13, 14, 15 (affidavit of Harris Porter); *id.* at Ex. D, ¶¶ 8, 13, 16, 18, 19 (affidavit of Errol Goodison); *id.* at Ex. E, ¶¶ 6, 7, 8, 13 (affidavit of Bruce Denby).[12]

In sum, and though Officer Lewis has just barely made it over the bar, insofar as all disputed issues of fact must be viewed in the light most favorable to her, *Tomka*, 66 F.3d at 1304, the Court concludes that a reasonable juror to conclude that Officer Lewis was subjected to an objectively hostile work environment as defined by the Supreme Court and the Second Circuit.

---

[12] Though the Court could not find an affidavit from her in the record, Officer Lewis also refers to similar allegations by Lieutenant Jacqueline Foster-Eady.  *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 28.  Officer Lewis has also presented affidavits from employees at the Hartford Correctional Center who also allege a perceived systematic discounting, or insufficient consideration, of minority employees' grievances.  *See* Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. B, ¶ 22 (affidavit of Eunice E. Smith); *id.* at Ex. C, ¶¶ 15-18 (affidavit of Harris Porter); *id.* at Ex. D, ¶¶ 17-18 (affidavit of Errol Goodison).

*See, e.g.*, *Patterson*, 375 F.3d at 227 ("Where reasonable jurors could disagree as to whether alleged incidents of racial insensitivity or harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law."). Close cases such as these are best left for the jury to decide. *See, e.g.*, *Richardson*, 180 F.3d at 437 ("The existence of racial harassment in a hostile work environment . . . . may thus be characterized as a mixed question of law and fact because it involves the application of a legal standard to a particular set of facts. Such mixed questions are especially well-suited for jury determination and summary judgment may be granted only when reasonable minds could not differ on the issue.") (internal quotations and citations omitted).

Officer Lewis thus advances to the second stage of the hostile work environment analysis, where she must demonstrate that "a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Van Zant*, 80 F.3d at 715. Different standards are applied depending on whether the employee creating the hostile environment was a supervisor or merely a co-worker of the aggrieved employee, as laid forth by the Supreme Court in *Burlington Indust. Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

Neither party disputes that Warden Murphy was Officer Lewis' supervisor. *See* Pl.'s Am. Mem. of Law in Supp. of Objection to Summ. J. [doc. #80], at 29. However, as mentioned above, there is a disputed issue of material fact as to the extent to which Lieutenant Sousa was Officer Lewis' supervisor during the six allegedly discriminatory incidents.[13] If Lieutenant Sousa

---

[13]  The Second Circuit has stated that

[t]he question in such cases is not whether the employer gave the employee the

was merely a co-worker (and not a supervisor) at the time of the alleged incidents, the Second

Circuit has stated that "[w]here the harassment was done by a co-employee without supervisory

authority over the plaintiff, liability will be imputed to the employer 'only if it is negligent, that

is, if it either provided no reasonable avenue for complaint or knew of the harassment but did

nothing about it.' " *Ferris*, 277 F.3d at 136 (quoting *Richardson*, 180 F.3d at 441) (citing

*Faragher*, 524 U.S. at 799).

On the other hand, if Lieutenant Sousa was in fact Officer Lewis' supervisor during these

incidents, the DOC would be presumptively liable for the harassment, though in the absence of a

tangible employment action, DOC might be able to avoid liability by showing that it exercised

reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and

Officer Lewis unreasonably failed to avail herself of any corrective or preventative opportunities

provided by the employer or to avoid harm otherwise. *See Quinn v. Green Tree Credit Corp.*,

159 F.3d 759, 767 (2d Cir. 1998) ("In contrast to allegations of harassment by co-workers or

customers, employers are presumptively liable for all acts of harassment perpetrated by an

employee's supervisor.") (citing *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807-08).

The Court need not decide at this stage whether Lieutenant Sousa was in fact Officer

Lewis' supervisor for Title VII purposes, and thus which of these two standards applies, because

Officer Lewis has raised sufficient issues of material fact over the degree of supervision

---

authority to make economic decisions concerning his or her subordinates. It is,
instead, whether the authority given by the employer to the employee enabled or
materially augmented the ability of the latter to create a hostile work environment
for his or her subordinates.

*Mack v. Otis Elevator Co.*, 326 F.3d 116, 126 (2d Cir. 2003).

Lieutenant Sousa exerted over her.  Furthermore, regardless of whether Lieutenant Sousa was her supervisor or co-worker, Officer Lewis has also raised sufficient issues of material fact on whether Lieutenant Sousa's conduct is properly attributable to DOC.  *See generally* Pl.'s Index of Evidence in Supp. of Objection to Summ. J. [doc. #68], at Ex. B (affidavit of Eunice E. Smith); Ex. C (affidavit of Harris Porter); Ex. D (affidavit of Errol Goodison); Ex. E (affidavit of Bruce Denby).  In particular, Officer Lewis alleges that the internal racial discrimination grievance procedure at DOC was futile and ineffective.  *See* Lewis Dep., Defs.' Index of Evidence in Supp. of Defs.' Mot. for Summ. J. [doc. #61], at Ex. 7, at 136.  Therefore, the reasonableness of Officer Lewis' decision not to go through the DOC's internal affirmative action procedures – opting instead for filing a complaint with the CHRO and EEOC –  is a disputed issue of fact that precludes summary judgment.  *See Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) (summary judgement for employer might not be appropriate if employee's decision not to use affirmative action procedures was "based on a credible fear that her complaint would not be taken seriously").

In sum, regardless of whether Lieutenant Sousa was Officer Lewis' supervisor or merely her co-worker, Officer Lewis has asserted facts which, if believed, would enable a reasonable fact finder to conclude that the conduct of Lieutenant Sousa was fairly attributable to the DOC.  Accordingly, the Court denies summary judgment to the DOC on Officer Lewis' hostile work environment claim under Title VII.

### D.

As was the case in the Court's discussion of the relationship between retaliation claims under Title VII and § 1981, "most of the standards applicable to the conduct alleged to constitute

hostile work environment in violation of Title VII are also applicable to employment claims under § 1981." *Patterson*, 375 F.3d at 225. Therefore, for the same reasons that the Court must deny summary judgment to the DOC on Officer Lewis' hostile work environment claim under Title VII, the Court must also deny summary judgment to Lieutenant Sousa on Officer Lewis' hostile work environment claim under § 1981.

Warden Murphy presents a different case, however. It is well settled that " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir. 2001) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Personal involvement of a supervisory official may be established by evidence that:

> (1) the official participated directly in the alleged constitutional violation, (2) the official, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the official created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the official was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the official exhibited deliberate indifference to the rights of others by failing to act on information indicating that unconstitutional acts were occurring.

*Johnson*, 239 F.3d at 254 (internal citations, quotations, and brackets omitted). This is a standard that Officer Lewis has not met with regard to Warden Murphy.

To begin, only the first four incidents could conceivably be connected to Warden Murphy, because he left the Hartford Correctional Center on June 28, 2002, and the last two incidents alleged by Officer Lewis occurred on July 24, 2004 and August 13, 2004, respectively. Furthermore, it is undisputed that the third incident (the logbook argument) involved only Officer Lewis and Lieutenant Sousa. As stated above, Warden Murphy had some personal involvement

in connection with the delay in medical assistance incident, the recuperative post assignment, and the South Block altercation, but his involvement was limited to his oversight of the post-incident investigations into these matters.  Indeed, because no formal complaints or grievances were filed in connection with the recuperative post assignment, Warden Murphy's personal involvement in this incident only involved an informal verbal complaint that Officer Lewis relayed to Warden Murphy as he walked past her post.  Though the parties dispute some of the elements of this incident, Warden Murphy apparently did follow up on his conversation with Officer Lewis with a phone call to Captain Madden, who apparently assured him that Officer Lewis should have no problem with the assignment.  *See* Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 58; Aff. of Captain Michael Madden, Defs.' Exs. in Supp. of Summ. J. [doc. #61], at Ex. 5, at ¶ 6.

The question then arises whether through his mere involvement in overseeing investigations and complaints arising from these three incidents alone, Warden Murphy created an objectively hostile work environment for which he should be held individually accountable. The Court does not believe a reasonable jury could find Warden Murphy liable on the basis of these three events alone.  He was not immediately nor intimately involved in the incidents themselves – *i.e.*, he did not participate in the decisions regarding sending relief to Officer Lewis when she needed medical help, he did not decide to post Officer Lewis at the front desk, and he was not in the South Block area when the altercation between Officer Lewis and Lieutenant Sousa occurred.  Warden Murphy was only involved in the aftermath of these incidents, in his role as a reviewer of Officer Lewis' and Lieutenant  Sousa's internal grievances, incident reports, and other formal and informal complaints.  His role in merely processing those complaints cannot be said to have created a hostile work environment.  Thus, the Court grants summary

judgment as to Warden Murphy on Officer Lewis' hostile work environment claim under § 1981.

### E.

Because Officer Lewis' hostile work environment claims against Lieutenant Sousa survived summary judgment, the Court must address the question whether Officer Lewis can seek both compensatory and punitive damages against him. Under § 1983a(b)(1),

> [a] complaining party may recover punitive damages . . . against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with *malice or with reckless indifference* to the federally protected rights of an aggrieved individual.

42 U.S.C. § 1983a(b)(1) (emphasis added). Therefore, while Officer Lewis may not recover punitive damages against DOC under Title VII, she may seek punitive damages for her hostile work environment § 1981 claim against Lieutenant Sousa. Officer Lewis has raised sufficient issues of material fact as to whether Lieutenant Sousa displayed a malicious or reckless indifference to the racial discrimination at issue in this case, so that the Court cannot say as a matter of law at least at this stage that no reasonable juror could award Officer Lewis punitive damages on her claims against Lieutenant Sousa. Accordingly, the Court will not grant Lieutenant Sousa's motion for summary judgment on Officer Lewis' claim for punitive damages.

### V.

Officer Lewis also sues Lieutenant Sousa for common law false imprisonment arising from the delay in providing medical assistance on March 9, 2001. According to the Connecticut Supreme Court, the common law tort of false imprisonment " 'is the unlawful restraint by one person of the physical liberty of another.' " *Rivera v. Double A Transp. Inc.*, 248 Conn. 21, 31 (1999) (quoting *Felix v. Hall-Brooke Sanitarium*, 140 Conn. 496, 499 (1953)). " 'A person is not

liable for false imprisonment unless his act is done for the purpose of imposing a confinement, or with knowledge that such confinement will, to a substantial certainty, result from it.' " *Rivera*, 248 Conn. at 31 (quoting *Green v. Donroe*, 186 Conn. 265, 268 (1982)) (internal citations omitted).

An employer's refusal to grant *permission* for an employee to leave normally does not rise to the level of false imprisonment. *See, e.g.*, *Davis & Allcott Co. v. Boozer*, 215 Ala. 116 (1926) (holding that refusing to let a sick employee go home does not rise to the level of false imprisonment, if there are actual means to leave the premises); Francis Collins, *Failure to Provide Means of Escape*, 32 Am. Jur. 2d False Imprisonment § 20 ("It is generally held, however, that the mere refusal of permission on the part of an employer to allow an employee to leave the premises during the ordinary working hours or a failure to provide prompt facilities to enable the servant to leave does not constitute false imprisonment."); *but see Kanner v. First Nat'l Bank of South Miami*, 287 So.2d 715, 717 (Fla. App. 1974) (reversing grant of summary judgment because bank's decision that a sick teller could not leave until her money was verified "may have been unreasonable and unwarranted and resulted in false imprisonment"). However, being "*physically prevented* from leaving a locked facility from which there was *no other means of escape*" unlike being denied permission to leave, could, in certain circumstances, constitute false imprisonment. *Barstow v. Shea*, 196 F. Supp. 2d 141, 150 (D. Conn. 2002) (emphasis added).

Officer Lewis' reliance on *Barstow v. Shea* is unconvincing, however. In *Barstow*, a nurse at a Connecticut state correctional facility who was visibly suffering from a severe reaction to poison ivy was physically prevented from leaving the facility by her supervisor, who allegedly

stood between the sick nurse and the door, and repeatedly refused her requests to leave. *Barstow*, 196 F. Supp. 2d at 146-47, 150. Both parties in this case admit that Officer Lewis at no time communicated that she was in an emergency medical situation or that she was suffering a severe or serious medical condition. *See* Defs.' Local 56(a)(1) Statement [doc. #60], at ¶ 9. More importantly, however, the undisputed facts of this case demonstrate that Officer Lewis was not actively, directly, and physically prevented from leaving her post. Rather, she was informed by both Lieutenant Sousa at 12:04 a.m. and Corrections Officer Dorozko at 12:25 a.m. that relief was on the way and she could leave as soon as it arrived.

If Officer Lewis' condition had deteriorated to a state of acute emergency, she does not dispute that she could have either (1) used a number code from her telephone to alert others that she needed assistance immediately, (2) used her radio to signal an emergency color code to alert others that she needed assistance immediately, or (3) used her personal body alarm to alert others that she needed assistance immediately. Defs.' Local Rule 56(a)(1) Statement [doc. #60], at ¶ 42. The Court recognizes that these codes and alarms are seldom used for this purpose, and the Court will assume that Officer Lewis' claim that employees are discouraged from using these codes and alarms for this purpose is true. *See* Pl.'s Local Rule 56(a)(2) Statement [doc. #67], at ¶ 42. However the fact that something is seldom done or even discouraged does not mean it is absolutely prohibited. Thus, the fact that these alternative means of receiving immediate medical attention (the telephone numeric code, the radio color code, or the personal body alarm) were available negates any claim that Officer Lewis was actually physically prevented from leaving and that there was absolutely no means for her to escape her situation.

Thus, Officer Lewis' false imprisonment claim fails as a matter of law, and Lieutenant

Sousa is entitled to summary judgment on this claim.

## VI.

In sum, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [doc. #58]. Summary judgment has already entered for Defendants Kruk and Lantz on all counts. Summary judgment shall enter for all Defendants on Officer Lewis' claims of disparate treatment and retaliation, either under Title VII or under 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983. Summary judgment shall also enter for Defendant Murphy on Officer Lewis' claim of hostile work environment under 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983. Finally, summary judgment shall enter for Defendant Sousa on Officer Lewis' state law false imprisonment claim.

As a result of these rulings, only two of Officer Lewis' claims remain: (1) a hostile work environment claim against the DOC under Title VII (for which punitive damages are not available); and (2) a hostile work environment claim under 42 U.S.C. § 1981 as enforced through 42 U.S.C. § 1983 against Lieutenant Sousa (for which punitive damages conceivably might be available). The Court shall issue a scheduling order forthwith setting dates for the submission of a Joint Trial Memorandum, the final pretrial conference, and for trial on the two remaining claims in this case.

IT IS SO ORDERED.


/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: January 24, 2005.**


-34-