# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRENDA J. LEWIS,** | : | **CIVIL ACTION CASE NO.** |
| *Plaintiff*, | : | |
| v. | : | 302 CV 2304 (MRK) |
| **STATE OF CONNECTICUT,** | : | |
| **DEPARTMENT OF CORRECTION** | : | |
| *et al.*, | : | |
| *Defendants* | : | **AUGUST 8, 2005** |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION IN LIMINE

Defendants in the captioned matter have correctly characterized this case as one alleging a hostile work environment against Defendant Sousa individually under 42 U.S.C. § 1981, as enforced under the provisions of § 1983, and against the state agency Defendant ("DOC") under Title VII of the Civil Rights Act of 1964, as amended.  As a relatively minor matter, Plaintiff takes issue with the description of Defendant Sousa as "one of her [Plaintiff's] few white supervisors."  *See* Defendants' Memorandum In Support Of Their Motion In Limine, July 15, 2005, ¶ 1, p.1.  Although Plaintiff will stipulate that Defendant Sousa was among her supervisors, no evidence has been offered to indicate how many of Plaintiff's supervisors were or were not white.

Defendants have submitted their Motion In Limine for the purpose of excluding two specific categories, or sets, of evidence that Plaintiff expects to present in support of her claims:

(1)   Statements of minority co-workers of Plaintiff who will testify regarding their observations of conduct by Defendant that they have attributed to improper racial motivation, along with documentary Trial Exhibits 18 – 24, 47 and 55.

(2)   Incident reports and other evidence regarding the experience of other correction officers who have requested medical relief, along with documentary Trial Exhibits 32 and 48 – 53.

1

Plaintiff will address each of these proposed submissions separately, as follows.

**I.     Minority Co-Workers**

Plaintiff's first claim is that the defendant Department of Correction either created or allowed to exist a racially hostile work environment in violation of Title VII. To prevail on a racially hostile work environment claim, Plaintiff must initially prove that she is a member of a protected class for Title VII purposes. This qualification is not disputed.

Plaintiff must also prove the following additional elements by a preponderance of the evidence:

> (1) That she was subjected to verbal or physical conduct of a harassing nature that was sufficiently severe or pervasive to unreasonably interfere with her work performance, to alter the conditions of her employment and to create an abusive working environment, and that she subjectively perceived the working environment as abusive or harassing;
>
> (2) That her race was a motivating factor in subjecting her to this conduct; and
>
> (3) That there is a basis for imputing the conduct at issue to her employer.

Adapted from *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434 (2d. Cir. 1998); *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002). Defendants wish to add language in the first element to the effect that the harassment was based on race. Doing so, however, would distort the analysis because *Alfano* and other cases make it clear that conduct which is sufficiently harassing, even if racially neutral on its face, may nevertheless support a racial harassment claim so long as the plaintiff meets the next element (2) of showing by inference, from the totality of circumstances, that race was a motivating factor.

The law to be applied to Plaintiff's second claim in this case is the federal civil rights law that provides a remedy for any person who has been deprived of his or her statutory rights under § 1981 to make and enforce contracts, including the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of

the contractual relationship. 42 U.S.C. § 1981(a) and (b), as amended by the 1991 amendments to the Civil Rights Act.

To establish a claim under § 1983, Plaintiff must establish, by a preponderance of the evidence, each of the following elements:

(1) That the conduct complained of was committed by a person (in this case, Defendant Sousa) acting "under color of state law;"

(2) That the alleged conduct deprived the Plaintiff of rights, privileges or immunities secured by § 1981 of the Civil Rights Act, as amended, to the benefits, privileges, terms or conditions of employment;

(3) That Defendant Sousa acted with the necessary state of mind of intent to deprive plaintiff of her rights *or* with reckless disregard for the consequence of his conduct; and

(4) That Defendant's acts were the proximate cause of the injuries and consequent damages sustained by Plaintiff.

*Parratt v. Taylor*, 451 U.S. 527 (1981).

The purpose of the proposed testimony of the various minority co-workers regarding their experiences, perceptions or observations regarding Defendant Sousa is to assist Plaintiff in meeting the burden of proving the second element of her Title VII action, demonstrating that race was a motivating factor in the conduct of Defendant Sousa.

Witnesses Plaintiff expects to call to testify as to their experiences or observations of inappropriate conduct they attribute to racial motivation on the part of Defendant Sousa include present or former Correction Officers Eunice Smith, Harris Porter, Errol Goodison, Bruce Denby, Patricia Gonzales, Carlos Garcia, Ossie Channer, Elwood Evans and present or former Lt. Jacqueline Foster-Eady. Documentary exhibits offered in connection with these witnesses includes Plaintiff's Exhibits B, C, D and E (Affidavits of Smith, Porter, Goodison and Denby) in support of Plaintiff's Objection to Defendant's Motion For Summary Judgment, dated August 19, 2004, and Trial Exhibits 18 – 24, 47 and 55, submitted as part of Plaintiff's Exhibits Expected To Be Used At Trial, on July 15, 2005.

As this Court noted at page 25 of its Memorandum Of Decision regarding Defendants' Motion For Summary Judgment, dated January 24, 2005, Plaintiff is entitled to consideration of her working environment in its entirety, including the experience of discriminatory harassment by other employees. *Citing Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000).

Notwithstanding some of the inflammatory and conclusory statements of the Defendants regarding the evidence proferred by Plaintiff in this regard,[1] the relatively simple and relevant purpose for the testimony and documents is to present the court and the jury with a more complete picture of how Plaintiff's claims developed in reality. It should also be noted that Defendants' claim that none of these multiple allegations against Defendant Sousa has ever been substantiated is not entirely correct. The grievance of Officer Channer at Trial Exhibit 22 was brought pursuant to Article 3 of the Collective Bargaining Agreement (regarding Non-Discrimination and Affirmative Action policies; *see* **Exhibit A**, attached) and Warden Murphy found it sufficiently meritorious to address the "issue" of Lt. Sousa's "mistake." In the investigation of the incidents involving Officer Evans at Trial Exhibit 55, repeated herein as **Exhibit B** (page 3 of Incident Report 01-662), we find the investigating officer's

---

[1] For example, referring to "self serving complaints made by black union members against defendant Sousa." Defendants' Memorandum, page 3. Defendants have offered no basis for the characterization of these statements as self-serving and not all of the statements are offered by black employees. There is no foundation to suggest that the statements would, in any case, be less reliable if they were offered by black correction officers. In the same way, Defendants refer to the prospective witnesses as "several black co-workers and friends" of Plaintiff without providing any basis, either for the assumed friendship or that such friendship would render the testimony unreliable. In fact, when specifically questioned regarding whether other complainants were "friends," Plaintiff expressly identified them only as other union stewards. *See* **Exhibit E,** Deposition of Brenda Lewis, dated 01/21/2004, pages 47 – 62. On page 13 of their Memorandum, Defendants characterize these prospective witnesses as "disgruntled employees … who have a personal ax to grind against Lt. Sousa" without offering any evidence whatsoever of any basis for personal animosity of these employees toward Defendant Sousa beyond what may have resulted from their perception of racially motivated misconduct. Finally, Defendants describe the proffered evidence and testimony as "every opined discriminatory act she can conjure up by her friends in hope that something will taint the defendants." If the Defendants are able to impeach the testimony of these witnesses as statements merely "conjured up" in support of Plaintiff's efforts to malign Defendant Sousa, this is information that should be evaluated on its merits by the jury.

recommendation that corrective action be taken "as appropriate" with respect to Lt. Sousa's conduct "unbefitting as a manager." It may place Defendants in an awkward position to rely on the fact that Defendant Sousa has never been imposed with formal discipline regarding any of these complaints or grievances (which would require investigation and referral up the chain of command through the Human Resources Division and to the office of the appropriate Deputy Commissioner), when a substantial part of the very complaint brought by these officers is that their reports have not been properly investigated or otherwise acted upon. *See* **Exhibit C**, Deposition of Donald Kruk, former Director of Affirmative Action for DOC, dated 4/13/2004, regarding the duty of a warden to forward complaints regarding discrimination to Affirmative Action, 54: 21-57: 23; and **Exhibit D,** Deposition of Peter J. Murphy, dated 04/01/2004, 32: 20 – 33: 18, regarding a warden's duty to report any incident involving discrimination, regardless of how it comes to his or her attention. It would be disingenuous at best for DOC officials otherwise charged with that duty simply never to follow up on investigating complaints regarding the performance of Defendant Sousa and then rely on this failure to exonerate him of liability.

Defendants have relied substantially upon deposition testimony of Plaintiff to the effect that she either did not learn about some of the complaints of other minority correction officers, or they did not even occur, until after initial incident on March 9, 2001. *See references to* Deposition of Brenda Lewis, dated 1/21/ 2004, pages 50-59, in Defendants' Memorandum. Plaintiff points out, however, that these statements are dramatically taken out of their complete context.

A more complete review of Plaintiff's testimony will disclose the following sequence of events: Prior to the incident pertaining to the delayed medical relief on March 9, 2001, Plaintiff

has testified that she had no prior confrontations or negative experiences with Defendant Sousa. She had no reason to formulate any judgments regarding his racial motivations one way or another. Following the heart attack, she was out of work for a recuperative period. However, upon her return to the Hartford Facility, she almost immediately began having other encounters with Sousa that triggered her suspicions. It was over the next several months, based in part on her own experiences and in part upon the reports of others, that she became reluctantly convinced that Defendant Sousa regularly conducted himself in a hostile and belligerent manner toward minority correction officers that was not exhibited toward their white counterparts. *See* **Exhibit E,** Deposition of Brenda Lewis, dated 1/21/2004, 47: 9-62: 18. Defendant Sousa also noted in his deposition that, "We [referring to himself and Plaintiff] were fine [in response to a question regarding Plaintiff's apparent change of attitude toward Defendant Sousa] up until to [sic] point that she returned to the facility [after recuperating from her heart attack]." *See* **Exhibit F,** Deposition of Erik Sousa, dated 04/12/2004, 192: 1-4.

There is a significant dispute over a question of fact raised by the defense in this case: Lt. Sousa has stated, and Defendants have implied in their Memorandum, that Plaintiff was part of a conspiracy of minority correction officers at the Hartford Facility who were engaged in a campaign of some sort to discredit the reputation or damage the career of Defendant Sousa. *See* **Exhibit F**, Deposition of Erik Sousa, dated 04/12/2004, 26: 10-32: 23; 39: 2-12; 58: 7-22; and 170: 8- 182: 7, for multiple references to his suspicion that a combination of minority union stewards were out to harm him. Plaintiff has acknowledged, in fact, that she and at least one of the other officers whose testimony is offered did discuss their mutual interest in exposing what they believed to be racially discriminatory conduct on the part of Defendant Sousa. Defendant Sousa's interpretation of events is that these officers were motivated against him for racial

6

reasons, in part because he had been warned that "certain people were conspiring against me to bring up racial issues against me." *See* **Exhibit F,** Deposition of Erik Sousa, dated 04/12/2004, 30: 8-12. Sousa's "best guess" is that five particular staff members [Lewis, Smith, Porter, Denby and Channer] were "motivated by racial bias against" him because he was "fair and firm." Sousa offered no reason, nor even a statement to the effect, that proposed witnesses Goodison, Foster-Eady, Gonzales, Garcia or Evans would have some how "conjured up" their stories against him in furtherance of this alleged conspiracy.

No explanation has yet been offered as to why this "conspiracy" has not targeted other white supervisors, unless Defendants are claiming that other white supervisors at HCC were not equally fair and firm. It remains to be seen whether Defendants can produce any credible evidence that Defendant Sousa was more compliant with DOC policies and regulations than other supervisory personnel or, if so, that there is some credible reason that only minority correction officers resented him for it.

At page 7 of their Memorandum, Defendants refer to the statement of Plaintiff that she learned of the events involving her coworkers through "hearsay." It should be pointed out, however, that it is apparent Plaintiff used this term more in its common, vernacular meaning than as applying to a rule of evidence. Clearly, in any legal sense, reports of Smith, Denby, Harris, Potter and others as to their own personal experiences with Defendant Sousa are not technically hearsay.

On pages 15 and 16 of their Memorandum, Defendants argue that witnesses Smith, Denby and Foster-Eady should be excluded because they have pending actions against the State, which would render their testimony unfairly prejudicial. Defendants then reference Docket No. 3:03cv0386(AWT), as to which only witness Smith is a party. Plaintiff is not aware of any

7

actions involving any of the others witnesses she has offered. Furthermore, the fact that witness Smith has brought a case against the DOC in which Sousa is also named as a defendant does not in and of itself render her testimony in the present case inadmissible, although it may create a question of bias and credibility for the jury.

At pages 4 and 5 of their Memorandum, Defendants rely on the *Leibovitz* case in their effort to exclude evidence that Plaintiff's co-workers experienced racially discriminatory conduct directed at them by Sousa. *Referring to Leibovitz v. New York City Transit Authority*, 252 F.3d 179 (2d Cir. 2001), attached hereto at **Exhibit G**. Defendants mistakenly attempt to suggest that, like the remote stories the plaintiff in *Leibovitz* heard second or third hand from others, this Plaintiff has no basis for claiming objective harassment because of her knowledge regarding the experience of co-workers. However, a closer reading of *Leibovitz* will reveal that its facts are easily and significantly distinguished from those in the present matter. Although Leibovitz had made a claim of sexual harassment on her own behalf, that claim was rejected by the jury, thereby depriving her of any complaint that she had directly sustained a hostile work environment. *Leibovitz*, 252 F.3d at 183 and 189. Plaintiff Lewis's personal claims regarding conduct of Defendant Sousa, obviously, have not yet been and may not be, discredited by the jury. Leibovitz was therefore left to basing her case *solely* upon a claim that simply hearing about the experience of co-workers, who worked in different departments of the employer and under different supervisors, was so traumatic for her, and she was so frustrated in her efforts to obtain relief for her co-workers, that this made her own workplace a hostile environment. Plaintiff Lewis, on the other hand, still has a viable claim of her own experience of harassment at the hands of Defendant Sousa. Equally or more importantly, the *Leibovitz* court noted that the co-workers about whom Leibovitz heard rumors and second-hand stories worked in "another part

8

of the employer's premises, out of Leibovitz's sight and regular orbit; they were doing another job, and were allegedly subjected to harassment by a supervisor who supervised them but did not supervise Leibovitz …". *Leibovitz*, 252 F.3d at 189.  Plaintiff Lewis, on the contrary, offers evidence regarding other union stewards and/or correction officers with whom she worked in close proximity and whose complaints *all* pertain to the same supervisor, Defendant Sousa.

Plaintiff Lewis's case is much more analogous to others discussed in dicta in *Leibovitz*, as the appellate court explains that "… we recognize that evidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination." *Leibovitz*, 252 F.3d at 190, *citing (inter alia) Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000); and *Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997).  Both Plaintiff and Defendants have already referenced *Cruz* for the proposition that the experience of co-workers contributes to the environment, in its totality, experienced by a plaintiff.

In *Schwapp*, at the trial court level, District Judge Covello had granted a motion of summary judgment for the defendants in a Title VII/§§ 1981/1983 complaint of hostile work environment as to which the only African American police officer in the Avon, Connecticut police department claimed he had been exposed to twelve racially derogatory remarks during a 20-month tenure before resigning due to work-related stress resulting from these incidents.  Of those twelve, only four had occurred directly in Schwapp's presence and the District Court had excluded the other eight (which had occurred, variously, before Schwapp's employment, outside his presence or in connection with non-black racial minorities).  Interestingly, in distinction to Defendants' claim that Plaintiff in the present case received her information from other "disgruntled" employees, it was conceded by Plaintiff Schwapp that he accumulated a file of reports from other officers who came to him with this information because they were angry at

9

having received disciplinary suspensions from the persons whose conduct they reported to Schwapp.  *See Schwapp v. Town of Avon*, 30 F.Supp.2d 279, 281 (Conn. 1998). Although the appellate court did not address whether the lower court correctly or incorrectly found that the four incidents it did consider were insufficient to create a triable case and thereby sustain the summary judgment motion, it did find that failure to consider the other eight claims was reversible error.  Of particular note, the appellate court found that even those "incidents relating to other minorities and those occurring before Schwapp's tenure may be of limited probative value, but cannot be ignored on summary judgment.  Whether Schwapp was aware of them during his employment, and, more significantly, *whether in light of these incidents, the incidents Schwapp experienced more directly 'would reasonably be perceived, and [were] perceived, as hostile or abusive,' Harris [v. Forklift Systems, Inc.]* 510 U.S. [17] at 22, are factual issues that should be resolved by a trier of fact."  *Schwapp*, 118 F.3d at 112 (emphasis added).

In the circumstances of Plaintiff Lewis' case, she does not present evidence either of statements made prior to her employment by the DOC or (with the exception of Officers Garcia and Gonzales) pertaining to other minorities.

In *Zubulake v. UBS Warburg, LLC*, 02cv1243(SAS) (S.D.N.Y. 2005), District Judge Scheindlin noted that, " 'As a general rule, the testimony of other employees about their treatment by the defendant is relevant to the issue of the employer's discriminatory intent.'" *Citing Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990).  Defendants in the instant matter have presented no compelling reason for this Court to exclude the testimony of other DOC employees who will report their observations and experiences regarding the racially motivated conduct of Defendant Sousa.

10

**II.     Other Medical Relief Situations**

As Defendants note at page 36 of their Memorandum, Plaintiff's Trial Exhibits 32 and 48 – 53 pertain to other medical relief situations as to which Plaintiff asserts that other similarly situated DOC employees were granted prompt medical relief in distinction to the facts of her situation on March 9, 2001. Contrary to the assertion of Defendants, these reports do include information pertaining to the timeliness of other medical relief situations. (As explained and referenced below.)   As to the observation of the Defendants that several of these situations do not involve Defendant Sousa, that information is immaterial to the purpose for which the evidence is offered. Plaintiff is cognizant of the differences between a disparate treatment claim under Title VII and a complaint of hostile working environment. The parties do not dispute, however, that, in either instance, Plaintiff has the burden of producing evidence from which reasonable jurors may infer racially discriminatory intent.

The more particularized purpose for which Plaintiff offers the evidence regarding other incidents of medical relief is to demonstrate unequivocally that there were standard policies and procedures in use at the Hartford Correctional Center and throughout the DOC pertaining to the requirement that anyone suggesting the need for medical relief was to be granted it promptly. Plaintiff has expressly refuted the implication repeated regularly by Defendants that Plaintiff should have been expected to implement some kind of emergency code if she needed prompt relief. That requirement was not only not imposed on other, non-minority correction officers, but there was at least one incident in which an officer who sounded an emergency code to obtain medical relief was reprimanded for creating an unnecessary disruption in the facility.  Plaintiff's Trial Exhibit 33 contains one of the more interesting documents in the case where Warden Murphy himself, in a handwritten note, requested that an officer be verbally counseled and

11

reprimanded for activating a code orange after communicating his need for medical relief to a lieutenant. This is precisely the mistake that Plaintiff sought to avoid. *See* Trial Exhibit 33, hand-written memo from the desk of Warden Peter J. Murphy, to the effect that it is inappropriate and potentially dangerous for a correction officer who has been injured to sound an alarm code. Defendants' Trial Exhibit No. 545, General Post Orders approved by Peter J. Murphy, dated February 16, 2001, states at page 20 that, "Body alarms are a swift means for staff to notify the center control **only** when he or she is in immediate distress from an aggressive attacking inmate or a severe medical condition." (Emphasis in original.) Again, the reality that Officer Lewis was experiencing a severe medical condition only came to light after contacting Defendant Sousa for relief twice. *See* **Exhibit E**, Deposition of Brenda Lewis, dated 01/21/2004, 29: 11 – 13.

  Regarding the March 9, 2001, incident, Plaintiff's disputed factual claim is that Lt. Sousa had sufficient reason, based on his telephone conversation with Plaintiff and without imposing upon Plaintiff the additional burden of activating an alarm code, to provide medical relief to Plaintiff in a prompt manner. Notwithstanding the lengths that Defendants have taken to demonstrate that Plaintiff, at least theoretically, *could have* activated the code for emergency medical relief, the record (as also supported by the evidentiary exhibits presently in question) demonstrates that departmental policy expected doing so to be limited to instances of inmate emergency. *See* Affidavit of Plaintiff at Exhibit F to Plaintiff's Memorandum Of Law In Support Of Objection To Defendants' Motion For Summary Judgment; also, incident package at Exhibit P and the incidents recorded at Exhibit T, both exhibits to Plaintiff's Memorandum Of Law In Support Of Objection To Defendants' Motion For Summary Judgment, particularly the directive from Warden Murphy instructing an officer *not* to use the medical alarm call when a

telephone call should suffice. Perhaps more importantly, upon receiving assurances from Lt. Sousa that help was on the way, Plaintiff reasonably believed that such additional measures would be superfluous and unjustifiably disruptive.

Instead of honoring his promise to Plaintiff, we have testimony from Correction Officer Hebert that Defendant Sousa specifically directed him to complete other unrelated and less urgent duties before relieving Plaintiff. *See* the deposition statement of Officer Hebert at Exhibit Q to Plaintiff's Memorandum Of Law In Support Of Objection To Defendants' Motion For Summary Judgment, 20: 3 – 21; 22: 19 – 25; 23: 3 – 24: 25.

Defendant Sousa himself acknowledges that, even in the event that a correction officer called the Lieutenant's desk and said nothing more than, "I'm not feeling well," it would be his duty to "send a relief as quickly as possible." See **Exhibit F**, Deposition of Erik Sousa, dated 04/12/2004, 17: 17 – 18: 21. However, in such an incident where a correction officer, at the moment in question, had no indication of anything more than not feeling well, it would be inappropriate to sound an alarm. *Id.***,** 79: 1 – 19. In the facts of the case at hand, Plaintiff has acknowledged that she was unaware she was experiencing a heart attack. It is not possible to determine whether she may have deemed it necessary or appropriate to sound an alarm if she had known the severity of her condition. It is not disputed that she reported to Defendant Sousa, at the least, that she felt "dizzy." It is, of course, a fact in dispute whether she also stated she was experiencing upper body pain and finding it difficult to breathe. *Id.* 88: 24 – 89: 15; **Exhibit E**, Deposition of Brenda Lewis, dated 01/21/2004, 29: 11 – 13.

Refer to **Exhibit D**, attached, Deposition of Peter J. Murphy, dated 04/01/2004 63: 9 – 70: 25, regarding the duties of a supervisor on duty to respond expeditiously to a call for medical relief and further acknowledging that it appears to have been Defendant Sousa who had that

13

obligation on the date in question. This section of Warden Murphy's deposition also refers to incidents regarding the medical relief of Correction Officer Elizabeth Mingo, and the failure of a supervisory officer to attend adequately to her relief, at Trial Exhibit 32, the first of the listed exhibits that Defendants move to exclude.

Trial Exhibit 48 pertains to an instance in which Defendant Sousa apparently did follow the facility protocol with respect to providing medical relief to a white food services employee, Stephen Mannette. Trial Exhibit 49, also an incident occurring at HCC, documents the prompt medical relief of Correction Officer Patricia Gonzales upon complaining of not "feeling too well" and experiencing chest pains and sweating. Trial Exhibit 50 documents another instance in which Defendant Sousa exhibited his awareness of the proper protocol when Correction Officer David Milewski reported chest pains and shortness of breath, and Sousa's compliance with that protocol in the instance of a white officer. Trial Exhibit 51 demonstrates the risk of injury that may occur as the result of sounding a facility wide alarm and provides reason for the limited use of such a measure. Trial Exhibit 52 pertains to an incident in which a black correction officer, Marion Baker, was relieved promptly upon reporting chest pains, by a supervisory officer other than Defendant Sousa. Trial Exhibit 53 reports still another instance in which the appropriate procedure was for a correction officer to call the Lieutenant's office to report difficulty breathing, rather than sounding an alarm.

The cumulative weight of the evidence, including those exhibits that Defendants now seek to exclude, will indicate that it may have been appropriate for Plaintiff to sound one of the medical emergency codes if both of two conditions had been met: she was aware of the severity of her situation; *and* no one had responded to her requests for relief. But in this case, where she admits she was not aware she was having a heart attack but did request and was promised

medical relief, it was entirely reasonable for Plaintiff to believe that sounding a facility-wide alarm was unnecessary and superfluous. However, even more to the point, the evidence (including Defendant Sousa's own testimony) indicates there was abundant reason for Defendant Sousa to be aware of his duty to provide her relief in as expeditious a manner as possible. The evidence also indicates he did not do so, and Defendants have offered no non-discriminatory reason for his failure to do so.

It is for these reasons that evidence of past practices and procedures, particularly at the Hartford Correctional Center, are relevant and not unduly prejudicial.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion in limine be denied and that Plaintiff be permitted to proceed with the testimony of witnesses Eunice Smith, Harris Porter, Errol Goodison, Bruce Denby, Ossie Channer, Jacqueline Foster-Eady, Patricia Gonzales, Carlos Garcia and Elwood Evans, along with documentary Trial Exhibits 18 – 24, 47 and 55, and, as necessary or otherwise appropriate, the introduction of incident reports and other evidence regarding the experience of other correction officers who have requested medical relief, along with documentary Trial Exhibits 32 and 48 – 53.

Respectfully Submitted,

PLAINTIFF,
BRENDA LEWIS

By: _____
Lowell L. Peterson
Community Law Practice, LLC
Federal Bar ID # ct-22165
2065-A Main Street
Hartford, CT  06120
Tel.: 728-3788
Fax: 728-3755
E-mail:  lpeterson@clpllc.com

## **CERTIFICATION**

I certify that a copy of the foregoing Memorandum Of Law In Support Of Plaintiff's Objection To Defendants' Motion In Limine, together with supporting exhibits, was delivered by hand to the following counsel of record on August 8, 2005.

>Beth Z. Margulies
>Assistant Attorney General
>55 Elm Street, P.O. Box 120
>Hartford, CT 06141-1020
>E-mail: Beth.Margulies@po.state.ct.us


>_____
>Lowell L. Peterson
>Community Law Practice, LLC
>Federal Bar ID # ct-22165
>2065-A Main Street
>Hartford, CT  06120
>Tel.: 728-3788
>Fax: 728-3755
>E-mail:  lpeterson@clpllc.com