# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRENDA J. LEWIS,** | : | **CIVIL ACTION CASE NO.** |
| *Plaintiff*, | : | |
| **v.** | : | **302 CV 2304 (MRK)** |
| **STATE OF CONNECTICUT,** | : | |
| **DEPARTMENT OF CORRECTION** | : | |
| *et al.,* | : | |
| *Defendants* | : | **AUGUST 17, 2005** |

### SUPPLEMENTAL
### MEMORANDUM OF LAW IN SUPPORT OF
### PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTION IN LIMINE
### [OFFER OF PROOF]

The Court has requested Plaintiff to submit an offer of proof to supplement her Objection

To Defendants' Motion In Limine, originally dated August 8, 2005.  Specifically, Defendants

have submitted their Motion In Limine for the purpose of excluding the following two categories

of evidence that Plaintiff expects to present in support of her claims:

(1)     Statements of minority co-workers of Plaintiff, whose testimony will be offered
for the purposes (a) of showing a pattern of conduct on the part of Defendant Erik
Sousa from which the jury may reasonably infer racial animus (as a required
element of her Title VII hostile work environment claim); and (b) of establishing
that conduct of Sousa was made known to supervisory persons within the DOC
who refused to investigate or otherwise take appropriate remedial action (thus
overcoming the Defendants' affirmative defense under *Ellerth/Faragher* that
Defendants provided remedial opportunities and that Plaintiff unreasonably failed
to avail herself of them).

(2)     Evidence regarding the experience of other correction officers who requested
medical relief, along with documentary exhibits, for the purposes (a) of showing
that, as of March 9, 2001, Defendant Sousa had reason to know of the proper
protocol for granting medical relief in an expeditious manner, whether or not a
correction officer was aware of the severity of his or her condition at the time of
the request; and (b) of establishing that Plaintiff could not reasonably have been
expected to use the "self-help" remedy of sounding an emergency code or body
alarm.

1

## I.    <u>Minority Co-Workers</u>

(A) Racial Animus Prong

To prevail on her Title VII hostile work environment claim, Plaintiff must prove (in addition to other required elements) that racial animosity on the part of Defendant Sousa was a motivating factor in his subjecting her to the conduct that she claims was objectively and subjectively hostile.  She expects to do that, in part, by offering the testimony and supporting evidence described herein.

(B) Knowledge Of DOC And Failure To Act Prong

Plaintiff must also demonstrate that there is a basis for imputing the conduct of Defendant Sousa to her employer, Defendant DOC.  This will be done, in part, by showing that supervisory personnel had reason to be aware of discriminatory conduct on the part of Sousa and failed to take investigative or remedial action.  This failure addresses whether the DOC Defendant made effective relief available to persons in the position of Plaintiff, and makes Plaintiff Lewis's decision to bring her claims to the Connecticut Commission on Human Rights and Opportunities, and eventually to this Court, instead of to the Affirmative Action Unit, a reasonable option.

It places Defendants in an awkward position to rely on the fact that Defendant Sousa has never been imposed with formal discipline regarding any of the complaints or grievances of Plaintiff's co-workers (which would require investigation and referral up the chain of command through the Human Resources Division and to the office of the appropriate Deputy Commissioner), when a substantial part of the very complaint brought by these officers is that their reports have not been properly investigated or otherwise acted upon.  *See* **Exhibit C** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of Donald Kruk, former Director of Affirmative Action for DOC, dated 4/13/2004, regarding the duty of a warden

to forward complaints regarding discrimination to Affirmative Action, 54: 21-57: 23; and

**Exhibit D** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of

Peter J. Murphy, dated 04/01/2004, 32: 20 – 33: 18.  Also please refer to **Supplemental Exhibit**

**S-1**, attached hereto, Deposition of Peter J. Murphy, dated 04/01/2004, 47: 12 – 56: 2, regarding

the processing of disciplinary actions from the facility to Human Resources for recommended

action and the conduct of a pre-disciplinary ("Loudermill") conference and final action by the

respective unit Deputy Commissioner.  To the extent necessary or appropriate, Plaintiff can also

add the testimony of Human Resource personnel to verify this process, if not stipulated.

TESTIMONY:

Former Correction Officer Eunice Smith – May be expected to testify substantially as follows:

 Ms. Smith was employed as a correction officer with the State of Connecticut,
Department of Correction from July 13, 1990, until November 12, 2003 and was assigned
to the Hartford Correctional Center throughout her tenure.  In or about May of 1999, Lt.
Erik Sousa was assigned to the Hartford Correctional Center.  Beginning in 2001, she
worked the first (8 a.m. to 4 p.m.) shift.  As verified by his Affidavit, offered as
Defendants' Exhibit #1 in support of their Motion For Summary Judgment, dated June
14, 2004, Lt. Sousa variously worked hours on the second (4 p.m. to 12 midnight) shift
and the first (8 a.m. to 4 p.m.) shift.  While working first shift, he was a direct supervisor
of Ms. Smith.  In her capacity as a union steward, Ms. Smith observed that, relative to the
number of African American correction officers at HCC, a disproportionate number of
complaints made by Lt. Sousa against correction officers were made against African
Americans.  Throughout her tenure as a correction officer, it was also her experience that
56-day post assignments are made by the shift commander, which may be a captain or in
some cases a lieutenant, and are posted approximately one week prior to commencement
of the applicable 56-day period.  However, notwithstanding this practice, it was, without
exception, the desk lieutenant in charge (at the time of roll call) who made final
adjustments to the daily roster in order to assure complete coverage.  This arrangement

was necessitated by the fact that it was only the desk lieutenant who was physically present for the roster assignment and, therefore, the shift commander was not in a position to know such information as which officers may be out ill or have any condition that would make a post coverage assignment difficult or impossible. During her experience, the daily roster regularly deviated more or less significantly from the 56-day post assignments, depending upon which lieutenant was desk lieutenant. During those shifts when Lt. Sousa was the desk lieutenant, she personally observed that actual assignments on the daily roster were regularly and frequently changed to the effect that a disproportionately high number of black officers were assigned to positions with inmate contact (considered more potentially dangerous and less desirable positions) and a corresponding disproportionately high number of white and Latino officers were assigned to the preferential positions that did not include inmate contact. (This testimony is offered, in part, to rebut the claims of Defendant Sousa and Capt. Michael Madden to the effect that Sousa had no authority regarding the disputed shift assignment on June 20, 2001. *See* Affidavits of Erik Sousa and Michael Madden offered, respectively, as Exhibits 1 and 5 to Defendants' Motion For Summary Judgment, dated respectively June 14 and June 8, 2004.) Ms. Smith will further testify that, on or about February 3, 2002, she acknowledges having reported to work approximately 42 minutes late due to a miscommunication between her "swap partner" Correction Officer Richard Shorter and herself. Switching schedules with another officer was a common and accepted practice at the Hartford facility. On the day in question, Ms. Smith had forgotten that Officer Shorter had been assigned to a training exercise off-site and would therefore be unable to work her shift. Her post assignment on that date was to a hallway post (no inmate contact) and, therefore, her absence until approximately 27 minutes after roll call did not affect facility security or coverage. When Ms. Lewis reported for duty and explained the situation to Desk Lt./Acting Shift Commander Maggio, it was his decision that the incident did not merit the making of a personnel record. Lt. Sousa, however, on his own initiative, determined to file a written notice of tardiness in Ms. Smith's permanent personnel file. Upon her objection that it was not appropriate for Lt. Sousa to make a unilateral decision that contradicted the acting Shift Commander, Lt. Sousa became unprofessionally belligerent with Ms. Smith, at which point she requested to have a union

steward present.  Lt. Sousa denied her the right to have a union representative.  Ms. Smith then filed an incident report complaining of Lt. Sousa's behavior.  It will be Ms. Smith's sworn statement that she filed this incident report properly through the chain of command.  To Ms. Smith's knowledge and belief, the incident was never investigated and she learned afterward that the incident report was never assigned a report number and was never processed beyond the level of lieutenant or shift commander.  In addition to the uninvestigated incident report, Ms. Smith will testify that she has personally directed correspondence to Major Mary Collins, then-Warden Peter Murphy, then-Director of the Affirmative Action Unit Donald Kruk and then-Commissioner Armstrong explaining and objecting in detail to the discriminatory and abusive conduct of Lt. Sousa.  To her knowledge and belief, no investigation or any other response was ever made to these complaints.  Ms. Smith will further testify that it has been her personal observation and experience that Lt. Sousa was routinely belligerent and demeaning in his tone toward her in particular and toward black correction officers in general.  She will state under oath that she is not now and never has been involved with any other minority correction officers in any kind of concerted or conspiratorial effort to discredit Lt. Sousa or to jeopardize his career, nor is she aware that any such concerted or conspiratorial effort has ever existed.  She will further testify as to harmonious and cooperative working relationships with other non-black management personnel, such as Lt. Maggio referred to above.  She will deny any kind of personal vendetta against Defendant Sousa, with the qualification that she does believe he should have been disciplined at some point for his inappropriate conduct.

Refer **Trial Exhibit # 18** with respect to the incident report and notice of tardiness generated by Lt. Sousa in connection with the episode of February 3, 2002, described above, and with respect to correspondence directed to Captain Ruffin, central DOC office, dated April 27, 2000, and courtesy copied to then-Warden Peter Murphy.

Anticipated duration of testimony:  two to three hours, depending on cross-examination.

<u>Correction Officer Harris Porter</u>– May be expected to testify substantially as follows:

Officer Porter has been employed as a correction officer with the State of Connecticut, Department of Correction since January 16, 1987, and has been assigned to the Hartford

Correctional Center since December 1987.  Following Defendant Sousa's assignment to HCC in or about May of 1999, Officer Porter generally, though not exclusively, worked the first (8 a.m. – 4 p.m.) shift and Lt. Sousa was a direct supervisor of Mr. Porter.  Like Ms. Smith, Mr. Porter will testify that his position as a union steward enabled him to observe that, relative to the number of African American correction officers at HCC, a disproportionate number of complaints made by Lt. Sousa against correction officers were made against minority officers.  He may also be expected to corroborate the testimony of Plaintiff and Ms. Lewis regarding the discretionary authority exercised by Defendant Sousa with respect to changing the daily position of correction officers from the 56-day post assignments made by the shift commander, and Defendant Sousa's habit of assigning black officers to the least desirable positions.  Although Mr. Porter will testify that he personally has never been the object of an incident report generated by Defendant Sousa, and has no kind of personal "grudge" against Defendant Sousa, it has been Officer Porter's experience and observation, throughout the tenure of Lt. Sousa at the Hartford facility, that he engaged in unnecessary and unprovoked confrontations with Mr. Porter personally and with black officers in general.  As a result of these experiences and observations, on or about May 8, 2001, Mr. Porter wrote a letter of complaint to then-Warden Peter Murphy, with copies to the personnel officer, Affirmative Action Unit and his union, requesting that an investigation be commenced regarding Lt. Sousa's conduct. Mr. Porter will acknowledge that he received a return letter dated May 11, 2001, from the Affirmative Action Program Manager, Joseph Civitello, directing Mr. Porter to provide more complete information regarding the names and incidents that would verify Defendant Sousa's discriminatory treatment of black officers.  Mr. Porter will further testify that he complied with this request and provided the Affirmative Action Unit with such specific information.  However, to Mr. Porter's knowledge and belief, no investigation of Lt. Sousa was ever initiated.  In the same respect, in his capacity as a union steward, Mr. Porter will testify that he has been informed by correction officers of more than one occasion when incident reports were filed regarding the racially charged environment at the Hartford facility but were never assigned a report number and were never processed beyond the level of lieutenant or shift commander, notwithstanding departmental and unit directives to the contrary.  As in the case of Ms. Smith, Mr. Porter

will state under oath that he is not now and never has been involved with any other minority correction officers in any kind of concerted or conspiratorial effort to discredit Defendant Sousa or to jeopardize his career, nor is he aware that any such concerted or conspiratorial effort has ever existed.

Refer **Trial Exhibit # 19** with respect to the letter from Officer Porter to then-Warden Murphy, courtesy copied to Warden Donahue, Personnel Officer Nora Ryan and his union, and with respect to responses thereto.

Anticipated duration of testimony:  two to three hours, depending on cross-examination.

<u>Correction Officer Errol Goodison</u> – May be expected to testify substantially as follows:

Officer Goodison has been employed as a correction officer with the State of Connecticut, Department of Correction since January 7, 1994, and has been assigned to the Hartford Correctional Center since June of 1994.  Like Officers Smith and Porter, Officer Goodison worked on the first shift with Defendant Sousa and Sousa was in a supervisory position relative to Officer Goodison.  Mr. Goodison will further corroborate the observations previously stated of Officers Lewis, Smith and Porter that, as a union steward, it was his observation that a disproportionate number of complaints made by Lt. Sousa against correction officers were made against African American officers.  He will also add further corroboration to the testimony regarding Defendant Sousa's abuse of his function as the desk lieutenant to change minority officers from their 56-day post assignment to less desirable positions.  In his capacity as union steward, Officer Goodison represented Correction Officer Ossie Channer concerning the latter's grievance against Lt. Sousa with respect to being denied overtime hours.  He will also testify in this connection that it has been his experience and personal observation that the system of assigning overtime hours in use at the time of the incident (the so-called "book system" that depends upon officers having first been assigned to a quarterly overtime list and then to a call-up roster) has never been reliable to achieve the mandate of annual equalization. (Defendants in their Motion For Summary Judgment offered the Affidavits of Lt. Sousa and Nora Ryan with respect to their claim that Plaintiff suffered no loss of overtime resulting from Defendant Sousa's alleged failure to call her because overtime is equalized on an annual basis.)  Mr. Goodison will also testify that, (in his capacity as a union

steward) on or about November 20, 2001, he was en route to discuss a personnel matter with then-Warden Peter Murphy.  Defendant Sousa exited an office in an intimidating and threatening manner and deliberately blocked Officer Goodison's progress.  Sousa gave no legitimate reason for this conduct and, upon Goodison's inquiry, only stated that, since Goodison's shift was over, he should head on home.  It is Officer Goodison's testimony that, on or about November 21, 2001, he filed a Step 1 grievance through the union against Defendant Sousa for unprofessional conduct and that no action was ever taken on Officer Goodison's request that his grievance be continued to the Step 2 level. He will further testify that he submitted this grievance pursuant to Article 3 of the Collective Bargaining Agreement, pertaining to discrimination and violations of the DOC's Affirmative Action policies.  After obtaining no further action, Officer Goodison concedes that he then gave up the process in discouragement.  Mr. Goodison is prepared to state under oath his observation and experience that Defendant Sousa was routinely belligerent and demeaning in his tone toward Officer Goodison in particular and toward black correction officers in general, as well as his representation that he is not now and never has been involved with other minority correction officers in any kind of concerted or conspiratorial effort to discredit Lt. Sousa or to jeopardize his career, nor is he aware that any such concerted or conspiratorial effort has ever existed.

Refer **Trial Exhibit # 20** as a record of the union grievance referred to above.

Anticipated duration of testimony:  two to three hours, depending on cross-examination.

<u>Correction Officer Bruce Denby</u> – May be expected to testify substantially as follows:

Officer Denby has been employed as a correction officer with the State of Connecticut, Department of Correction since 1994 and has been assigned to the Hartford Correctional Center since that year.  He is prepared to testify that, on or about August 15, 2001, he filed a claim of discrimination against the Department of Correction with the Connecticut Commission on Human Rights and Opportunities ("CHRO").  It is further his testimony that, since that date, he has been the subject of multiple retaliatory disciplinary actions – in substantial part by Defendant Sousa, specifically to include discriminatory enforcement of administrative directives on July 19, 2002 and September 20, 2002.  More specifically, Officer Denby claims that on or about October 20, 2002, he was the target of

discriminatory and selective enforcement of administrative directives by Sousa in that Sousa generated certain incident reports that resulted in Officer Denby's receiving a five-day suspension for "exiting the building without authorization." It is not disputed that this conduct consisted of stepping outside the building for air during an authorized chow break. Mr. Denby's expected testimony and documentation of this incident, as offered in his CHRO claim, avers that Defendant Sousa personally knew of white correction officers who regularly left the premises altogether to take breaks at the nearby Dunkin' Donuts, Subway, McDonald's or Burger King outlet without any consequence. Mr. Denby's documentation further recited five incidents of white officers who had left their respective facilities under significantly more egregious circumstances (including taking vehicles off the premises without permission, lying during the course of the investigation and, in one case, becoming involved in an incident of domestic violence while off-site) but received equal or lesser discipline. As in the case of Lewis, Smith, Porter and Goodison, to the extent it is not excessively redundant, Officer Denby is also able to testify regarding his observation and experience that 56-day post assignments are made by the shift commander, but that it is the desk lieutenant in charge who makes the final adjustments to the daily roster in order to assure coverage. As in the other instances, he would testify that Sousa has misused this opportunity to give non-black officers preferential assignments. Officer Denby is also prepared to add his observation and experience to that of others to the effect that Defendant Sousa has been routinely belligerent and demeaning in his tone toward Denby in particular and toward black correction officers in general, as well as his representation that he is not now and never has been involved with any other minority correction officers in any kind of concerted or conspiratorial effort to discredit Lt. Sousa or to jeopardize his career, nor is he aware that any such concerted or conspiratorial effort has ever existed.

At Plaintiff's **Supplemental Exhibit S-2**, attached hereto, please find documentation regarding Mr. Denby's disciplinary action involving incident number HCC 02-2001, as well as his documentation regarding disparate, more favorable treatment of similarly situated white officers. If necessary or appropriate to enter any of this material in testimony in the case in chief, it will be offered as **Trial Exhibit 58** following # 57 previously submitted.

9

Anticipated duration of testimony:  two to three hours, depending on cross-examination.

<u>Correction Officer Ossie Channer</u> – May be expected to testify substantially as follows:

Officer Ossie Channer is expected to testify that, on or about October 23, 2001, he brought a Step 1 union grievance against Defendant Sousa in which he claimed that Defendant Sousa intentionally overlooked him for an overtime opportunity and further claimed that this "oversight" was part of a "history of harassment" toward Officer Channer.  It is important to note that the grievance of Officer Channer was brought pursuant to Article 3 of the Collective Bargaining Agreement (regarding Non-Discrimination and Affirmative Action policies; *see* **Exhibit A** in support of Plaintiff's Objection To Defendants' Motion In Limine).  The documentation also confirms that Warden Murphy found Officer Channer's claim sufficiently meritorious to address the "issue" of Lt. Sousa's "mistake."  However, notwithstanding that action, and contrary to statements of Donald Kruk and Peter Murphy himself, Officer Channer will also testify that, to his knowledge and belief, there was no further investigation of his claim of discriminatory treatment.  Officer Channer will testify that he also reached the conclusion that any further effort to bring attention to the conduct of Defendant Sousa was frustrating and futile.

Refer **Trial Exhibit # 22** as a record of the union grievance referred to above.

Anticipated duration of testimony:  one to two hours, depending on cross-examination.

<u>Correction Officer Elwood Evans</u> – May be expected to testify substantially as follows:

Officer Elwood Evans is expected to testify in connection with events that occurred at the Hartford facility on or about May 5, 2001, and were investigated as a part of HCC Incident Report # 01-662 and Administrative Investigation # HCC-AI-01-026.  Officer Evans is prepared to concede, as he has done on the record, that at approximately 4:15 p.m. on that date he requested relief from another officer, Michael Lynch, while he delivered a set of keys to his "goddaughter" who had contacted him for assistance.  He has also acknowledged that neither he nor Officer Lynch had requested the consent of West Housing Unit Supervisor Lt. Kenneth Smith for this relief and that he, Officer Evans, was therefore in violation of both an Administrative Directive and a Hartford

General Post Order prohibiting correction officers from leaving the facility without permission from a supervisor. Officer Evans also contends, however, and as observed by Investigating Officer Captain Case, that he has a history of "reliable work performance and impeccable work history" and that he was singled out for a commonplace infraction that is routinely overlooked because of his race. He also expects to testify that his comment to Defendant Sousa regarding his belief that Sousa was looking for an opportunity to "write him up" was based on a history of observations regarding Sousa's discriminatory demeanor toward black correction officers. Investigator Case also apparently reached the conclusion that Lt. Sousa had conducted himself in a non-professional manner toward Officer Evans (although not attributing that fact to race).

Refer **Trial Exhibit # 55** as a record of the incident report and administrative investigation referred to above.

Anticipated duration of testimony: one to two hours, depending on cross-examination.

NOTE: There is a significant dispute over a question of fact raised by the defense in this case. Defendant Sousa has stated, and Defendants have implied in their Memorandum in support of Defendants' Motion In Limine, that Plaintiff was part of a conspiracy of minority correction officers at the Hartford Facility who were engaged in a campaign of some sort to discredit the reputation or damage the career of Defendant Sousa. *See* **Exhibit F** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of Erik Sousa, dated 04/12/2004, 26: 10-32: 23; 39: 2-12; 58: 7-22; and 170: 8- 182: 7, for multiple references to his suspicion that a combination of minority union stewards were out to discredit him.

Defendant Sousa's interpretation of events is that these officers were motivated against him for racial reasons, in part because he had been warned that "certain people were conspiring against me to bring up racial issues against me." *See* **Exhibit F** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of Erik Sousa, dated 04/12/2004, 30: 8-12. Sousa's "best guess" is that five particular staff members [Lewis, Smith, Porter, Denby and

11

Channer] were "motivated by racial bias against" him because he was "fair and firm." However, in the language of the Defendants' memorandum, whether these witnesses have attempted to "throw every opined act of discrimination they could conjure up in the hope that something may stick," has nothing to do with whether their testimony is properly admissible. The possibility of fabrication that Defendant Sousa raises goes to the credibility of the testimony, which is properly a question for the jury.

**Plaintiff agrees to withdraw the names of Patrick Gonzales, Carlos Garcia, and Jacqueline Foster-Eady as prospective witnesses, along with corresponding Trial Exhibits ## 23, 24 and 47.**

## II.     <u>Other Medical Relief Situations</u>

(A) Sousa's Knowledge Of Protocol

The principal purpose for which Plaintiff offers evidence regarding other incidents of medical relief that occurred prior to March 9, 2001, is to demonstrate unequivocally that there were standard policies and procedures in use at the Hartford Correctional Center, and reasonably known to Defendant Sousa, pertaining to the requirement that any staff person requesting the need for medical relief was to be granted it promptly.

Defendant Sousa himself acknowledges that, even in the event that a correction officer called the Lieutenant's desk and said nothing more than, "I'm not feeling well," it would be his duty to "send a relief as quickly as possible." See **Exhibit F** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of Erik Sousa, dated 04/12/2004, 17: 17 – 18: 21. Also see **Exhibit D** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of Peter J. Murphy, dated 04/01/2004 63: 9 – 70: 25, regarding the duties of a supervisor on duty to respond expeditiously to a call for medical relief and further

12

acknowledging that it appears to have been Defendant Sousa who had that obligation on the date in question.

It is likely that testimony of Defendant Sousa and/or Peter Murphy will be sufficient to lay the foundation for the documentary exhibits referenced below and Plaintiff does not expect call additional witnesses unless required to do so by ruling of the Court.

(B)  Plaintiff's Failure To Sound An Emergency Code Or Body Alarm

Plaintiff has expressly refuted the implication repeated regularly by Defendants that she should have been expected to implement some kind of emergency code if she needed prompt medical relief.  That requirement was not only not imposed on other, non-minority correction officers, but there was at least one incident in which an officer who sounded an emergency code to obtain medical relief, after having called a lieutenant, was reprimanded for creating an unnecessary disruption in the facility.

Regarding the March 9, 2001, incident, Plaintiff's disputed factual claim is that Lt. Sousa had sufficient reason, based on his telephone conversation with Plaintiff and without imposing upon Plaintiff the additional burden of activating an alarm code, to provide medical relief to Plaintiff in a prompt manner.  Notwithstanding the lengths that Defendants have taken to demonstrate that Plaintiff, at least theoretically, *could have* activated the code for emergency medical relief, the record (as supported by the evidentiary exhibits presently in question) demonstrates that departmental policy expected doing so to be limited to instances of inmate emergency.

Defendant Sousa himself has acknowledged that, in the event a correction officer called the Lieutenant's desk and requested medical relief, and where the correction officer at the moment in question had no indication of anything more than not feeling well, it would be

inappropriate to sound an alarm. *See* **Exhibit F** in support of Plaintiff's Objection To

Defendants' Motion In Limine, Deposition of Erik Sousa, dated 04/12/2004, 17: 17 – 18: 21; 79:

1 – 19. In the facts of the case at hand, Plaintiff has acknowledged that she was unaware she was

experiencing a heart attack. It is not possible to determine whether she may have deemed it

necessary or appropriate to sound an alarm if she had known the severity of her condition. It is

not disputed that she reported to Defendant Sousa, at the least, that she felt "dizzy." It is, of

course, a fact in dispute whether she also stated she was experiencing upper body pain and

finding it difficult to breathe. *Id.* 88: 24 – 89: 15; **Exhibit E** in support of Plaintiff's Objection

To Defendants' Motion In Limine, Deposition of Brenda Lewis, dated 01/21/2004, 29: 11 – 13.

The cumulative weight of the evidence, including those exhibits that Defendants now

seek to exclude, will indicate that it may have been appropriate for Plaintiff to sound one of the

medical emergency codes if both of two conditions had been met: she was aware of the severity

of her situation; *and* no one had responded to her requests for relief. But in this case, where she

admits she was not aware she was having a heart attack, but did request and was promised

medical relief, it was entirely reasonable for Plaintiff to believe that sounding a facility-wide

alarm was unnecessary and superfluous. However, even more to the point, the evidence

(including Defendant Sousa's own testimony) indicates there was abundant reason for Defendant

Sousa to be aware of his duty to provide her relief in as expeditious a manner as possible. The

evidence also indicates he did not do so, and Defendants have offered no non-discriminatory

reason for his failure to do so.


DOCUMENTARY EVIDENCE:

**Trial Exhibit # 32**, relating to Hartford Correctional Center Initial Inquiry # 014 and based on

Incident Report # 00-534, documents events that transpired on May 28, 2000, when a West 3

Housing Unit Correction Officer, Elizabeth Mingo, called Lieutenant André Chouinard to report that she was "not feeling well and request[ed] another officer to relieve [her] of duty." Lieutenant Chouinard instructed Officer Mingo to do as Plaintiff did on March 9, 2001, that is, to contact the Center Control Officer to request proper relief. The Office of the Major of Investigations noted in its investigation that, as a matter of "historical perspective," in such circumstances, "A supervisor has an obligation to appoint a relief for the officer expeditiously … he/ or she is required to physically observe the condition of the subordinate to accurately document his/ or her perception of the symptoms reported. The supervisor then has an obligation to seek medical attention for the subordinate …[I]f the condition is such that the officer is physically impaired and appears unable to drive, the supervisor has an obligation to offer or provide transportation to a … hospital or residence … It is the officer's responsibility to confirm authorization from their immediate supervisor prior to exiting and departing the correctional facility." At no point in this historical perspective, or elsewhere in his report, did the Major of Investigations mention that it would be either required or even appropriate for a correction officer to sound her or his body alarm or activate an emergency code in such a situation. The investigation did, however, conclude that Lt. Chouinard, as the first contact by the correction officer in question, had "[f]ailed to supervise" and "[f]ail[ed] to follow protocol guidelines for the relief of a staff member." These "failures" resulted in an employee counseling for Lt. Chouinard on June 20, 2000, a full nine months before the incident involving Plaintiff. Given Lt. Sousa's admission in his deposition to having received extensive emergency training as part of his supervisory orientation, it is inconceivable that he was not acquainted with the "protocol guidelines for the relief of a staff member." *See* excerpts from Deposition of Erik Sousa, dated 04/12/2004, 16: - 17: 21, at Plaintiff's **Supplemental Exhibit S-3** attached hereto.

**Trial Exhibit # 33** refers to Incident Report # 01-0138 and an incident occurring on January 25, 2001. This report relates to an incident in which a Correction Officer Robert Taylor slipped on some unmarked floor "stripper" in the facility commissary area and injured his back. After numerous calls for relief, Officer Taylor activated his body alarm and Center Control then activated a "code orange." By a hand-written memo dated February 8, 2001, only one month prior to the incident involving Plaintiff, Warden Murphy directed a Major Carter to "please have C/O Taylor counseled on the use of his BA [body alarm]. I understand his frustration in not getting a relief when he was injured but to put other staff in a position where they may be injured

responding to a code orange is wrong. … If a staff member claims they are injured it should be addressed immediately."  Officer Taylor was then counseled, "Never call a code orange after you have spoken to a supervisor, unless directed by the supervisor."  Although this exhibit provides no direct evidence that either Lt. Sousa or Officer Lewis were informed about these events, Plaintiff has given deposition testimony to the effect it was a well understood policy that the use of emergency codes is to be limited to the most extreme circumstances following the failure of other means of communication.  This is precisely the mistake that Plaintiff sought to avoid. Defendants' Trial Exhibit # 545, General Post Orders approved by Peter J. Murphy, dated February 16, 2001, states at page 20 that, "Body alarms are a swift means for staff to notify the center control **only** when he or she is in immediate distress from an aggressive attacking inmate or a severe medical condition."  (Emphasis in original.)  Again, the reality that Officer Lewis was experiencing a severe medical condition only came to light after contacting Defendant Sousa for relief twice.  *See* **Exhibit E** in support of Plaintiff's Objection To Defendants' Motion In Limine, Deposition of Brenda Lewis, dated 01/21/2004, 29: 11 – 13.

**Plaintiff agrees to withdraw Steven Mannette, Patricia Gonzales, David Milewski, Garland May, Marion Baker and Debra Sholes as prospective witnesses with respect to medical relief and also to withdraw her corresponding Trial Exhibits ## 48, 49, 50, 51, 52 and 53 pertaining to such incidents.**

**CONCLUSION**

Based on the proferred testimony and evidence, and for the reasons stated in her

Objection To Defendants' Motion In Limine submitted as of August 8, 2005, Plaintiff

respectfully requests that Defendants' Motion In Limine be denied and that Plaintiff be permitted

to proceed with the testimony of witnesses Eunice Smith, Harris Porter, Errol Goodison, Bruce

Denby, Ossie Channer and Elwood Evans, along with documentary **Trial Exhibits ##18, 19, 20,**

**22 and 55;** and the introduction of incident reports and other documentary evidence regarding

the experience of other correction officers who have requested medical relief, along with

documentary **Trial Exhibits ## 32 and 33**.

Respectfully Submitted,

PLAINTIFF,
BRENDA LEWIS

By: _____
Lowell L. Peterson
Community Law Practice, LLC
Federal Bar ID # ct-22165
2065-A Main Street
Hartford, CT  06120
Tel.: 728-3788
Fax: 728-3755
E-mail:  lpeterson@clpllc.com

## CERTIFICATION

I certify that a copy of the foregoing Supplemental Memorandum Of Law In Support Of

Plaintiff's Objection To Defendants' Motion In Limine [Offer Of Proof], together with

supporting exhibits, was delivered by hand to the following counsel of record on August 17,

2005.

Joseph A. Jordano, Esq.
Assistant Attorney General
Beth Z. Margulies, Esq.
Assistant Attorney General
55 Elm Street, P.O. Box 120
Hartford, CT 06141-1020


_____
Lowell L. Peterson
Community Law Practice, LLC
Federal Bar ID # ct-22165
2065-A Main Street
Hartford, CT  06120
Tel.: 728-3788
Fax: 728-3755
E-mail:  lpeterson@clpllc.com