UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRENDA LEWIS,<br> *Plaintiff,* | :   CASE NO. 3:02CV2304(MRK)<br>:<br>: |
| v. | : |
| STATE OF CONNECTICUT,<br>DEPARTMENT OF CORRECTION, ET AL.<br> *Defendants* | :<br>:<br>:   AUGUST 26, 2005 |

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM AND**
**OFFER OF PROOF IN SUPPORT OF THEIR MOTION IN LIMINE**

  The defendants both object to evidence set forth in the plaintiff's offer of proof and will offer contrary evidence as set forth herein.

**OBJECTIONS REGARDING OTHER COMPLAINTS BY DOC EMPLOYEES**

  Throughout the plaintiff's offer of proof, she describes anticipated testimony that contradicts stipulated facts in what appears to be an attempt to litigate facts that have already been agreed to by the parties. For instance, the plaintiff has stipulated that in an urgent medical situation a correction officer can use the body alarm to call for help. (Part C, Stipulated facts, # 15, Joint Trial Memo). Similarly, the plaintiff admits that she never utilized the DOC internal complaint procedure for discrimination complaints. (Part C, Stipulated facts, # 66, Joint Trial Memo). On the issue of Lt. Sousa's conduct on March 9. 2001, the parties stipulate that the plaintiff's union did not consider Lt. Sousa's conduct to be intentional. (Part C, Stipulated facts, # 28, Joint Trial Memo). To the extent that the plaintiff seeks to offer evidence to controvert facts already stipulated to, the defendants object.

The plaintiff offers anticipated testimony by black correction officers Goodison, Smith, Denby, Channer, Evans and Porter that Lt. Sousa disproportionately reported black officers or treated them in a demeaning manner. However, no specific names or instances are provided in the offer of proof about Lt. Sousa's treatment of "**other black officers**" except for isolated incidents involving witnesses Smith, Goodison, Channer and Porter.  How then can the defendants respond to this vague and overly OPINION testimony about defendant Sousa's "general" treatment of black officers?  The defendants strenuously object to such improper opinion as lacking foundation and as unfairly prejudicial.   Defendants note that their records do not reflect that the opinions expressed on the plaintiff's offer of proof were disclosed in discovery.  The first time that the defendants learned of the  "opinions" of these witnesses was in the plaintiff's summary judgment submission. (See Exhibit A, plaintiff's answers to interrogatories).   In addition, Plaintiff's answers to defendants' interrogatories did not disclose Elwood Evans or Bruce Denby as witnesses in response to a question that asked the plaintiff to identify all complaints of discrimination brought against defendant Sousa.  Accordingly, the defendants object to them as witnesses in this case. (See Exhibit A).

The plaintiff's argument for the "opinions" of plaintiff's co-workers is apparently based simply their individual experiences and observations.  However, this overly vague standard, <u>without specific instances in fact that are similar to the present facts</u>, opens the door for speculation of various sorts.  What is conspicuously absent from the plaintiff's offer of proof is specific facts that form the basis of the proposed opinions from these lay witnesses. In <u>Nester v. BIC Corp</u>.,  225 F.3d 178 (2d Cir. 2000)(jury award vacated

because co-workers' testimony that a supervisor's treatment of employee was race based was naked speculation, not admissible lay testimony).

So for instance, does Eunice Smith base her opinions on observed instances of conduct by Lt. Sousa that she observed? Is she basing her opinions simply on the number of grievances filed by black employees? How many instances? When did they occur? What issues did they involve? These are the questions that the court should resolve *through an evidentiary hearing* so the court can properly rule on the admissibility of such opinions.

Defendants also remind the court that the admission of raw data in the form of witness opinions about their personal statistical speculation regarding Lt. Sousa is inadmissible. It is established law in this circuit that statistical evidence in a discrimination case is generally admissible ONLY if the requisite foundation is established. Hollander v. American Cyanamid Co., 172 F. 3d 192, 202 (2d Cir. 1999). However, before such statistical evidence is admissible the offering party must establish the reliability of any inferences to be drawn from the statistical evidence. Id. at 203.

In the Hollander case, the plaintiff brought an age discrimination claim for wrongful termination. In support of his case, the plaintiff sought to offer the statistical reports of an expert who had analyzed the terminations at the defendant's plant and was prepared to opine within a high degree of statistical certainty that age was a determining factor in the plaintiff's termination. Finding the expert's opinion based on raw statistics to be unreliable, the trial court excluded the experts' testimony. On appeal, the Second Circuit Court of Appeals affirmed the trial court ruling. Acknowledging the unreliability of raw statistics, the Court of Appeals stated the following:

3

> However, the Report's inference of discrimination **solely on the basis of the raw numbers is impermissible in the absence of any attempt to account for other causes of the . . . anomaly.** . . . Highlighting Gaudard's failure to account for explanations other than discrimination is the fact that both 60-69 and 70-79 level 9+ workforce increased moderately over the course of those years.  In short, data presented by Gaudard's in this part of the report does not make it any more or less likely that Cyanamid is liable for age discrimination.  (Emphasis added).

Id. at 203.  See also, Delgado v. Achieve Global, 2000 Conn. Super LEXIS 3184 (November 15, 2000, Melville J).

In the present case, the plaintiff's offer of proof includes the unfounded opinions by Eunice Smith, Harris Porter, Errol Goodison, Bruce Denby, Ossie Channer and Elwood Evans that Lt. Sousa exhibited a discriminatory motive towards black C/O's because, in their experience, he reported more black officers for disciplinary infractions than white correction officers.[1]  There are a multitude of reasons for black officers being reported for rule violations, i.e., tardiness, etc. that have nothing to do with race.  For instance, the plaintiff offers no statistical count of disciplinary reports, racial make up at Hartford Correctional Center ("HCC"), racial make up on defendant Sousa's shift, etc. The plaintiff admits in her deposition that defendant Sousa was not her regular supervisor and could not recall a single incident between herself and Lt. Sousa before March 9, 2001.  (Exhibit B, Lewis Deposition, p. 46:14-24, p. 47:9-13).  The court should be circumspect to permit this type of evidence especially given the court's perception that this case should NOT be a series of mini-trials that unduly extend the case.

---

[1]  Defendants are still at a loss to understand how such information by these witnesses regarding incident reports initiated by Lt. Sousa is material to a case in which the plaintiff was not disciplined by the agency or Lt. Sousa for any infraction of DOC policies after March 9, 2001.  Moreover, Lewis was only asked by Lt. Sousa to file an incident report with regard to the August 2002 buzzer delay incident to which she has admitted in her deposition was a reasonable request in light of her explanation that there was a malfunction.  (Part C, Stipulated facts # 56, Joint Trial Memorandum).  Defendants strenuously object to this improper opinion testimony that goes to character evidence of prior bad acts under Rule 404.

Similarly, the plaintiff's offer of proof includes testimony from all of the union stewards to the effect that defendant Sousa frequently changed the assignment roster with the result that a "disproportionately high number of black officers were assigned to positions with inmate contact (considered more potentially dangerous and less desirable positions) . . ." NO SUCH claim has been alleged in this case by the plaintiff that she was assigned to more dangerous or less desirable positions. In fact, the plaintiff concedes that she was assigned to non-inmate contact recuperative posts upon her return to work in May 2001 based on her medical limitations. (Part C, Stipulated Facts # 30-33, Joint Trial Memo). What the plaintiff alleges is that she was assigned to a non-inmate contact recuperative post for which she claims that she was not <u>properly</u> <u>trained.</u> The above testimony from these other correctional officers is another attempt by the plaintiff to unfairly and inappropriately offer irrelevant and speculative opinion testimony by black union stewards Eunice Smith, Errol Goodison, et al., to taint or stigmatize defendant Sousa. Even if such evidence was relevant, there must be sufficient foundation in FACT establishing a valid statistical inference of discrimination. Opinions by Eunice Smith and other black stewards about post assignments for black corrections officers is not admissible because of a lack of foundation and its probative value is outweighed by its prejudicial effect. It is precisely this type of conjectural testimony that will force this case into a mini-trial on allegations by black union stewards that the court expressly told counsel it will not permit.

The defendants also object to the plaintiff's offer of proof regarding complaints by other DOC employees as it relates to the defendants' affirmative defense under <u>Ellerth/Faragher</u>. The federal law on the issue of the affirmative defense requires as one

prong of the defense that the defendants prove that the plaintiff unreasonably failed to utilize the employer's complaint procedure. Faragher v. City of Boca Raton, 524 U.S. 775, 807-808 (1998). During the preliminary hearing on the defendants' Motion in Limine, the court suggested that complaints by other employees to the DOC could be material to the plaintiff's response to the second prong of the Faragher test. The defendants submit that the plaintiff may not rely on complaints from other employees to excuse her own failure to follow through on procedures established by DOC to address allegations of racial harassment. The defendants' position is consistent with a ruling by a federal court in Virginia. In Barrett v. Applied Radiant Energy Corp., 70 F. Supp. 2d 644 (W.D. Va. 1999), the plaintiff brought a sexual harassment complaint against her employer. The defendant asserted an affirmative defense based upon Ellerth and Faragher. In response to summary judgment in the Barrett case, the plaintiff explained that her failure to utilize the employer's complaint procedure was based in part on her belief that it would have been futile to do so because the employer was aware of prior complaints and did nothing about them. In rejecting this argument the court stated:

> Barrett also argues that alleged prior incidents of sexual harassment by two of the company's executives including Lawrence Barrett, led her to believe that management would be unresponsive to her complaints. Unfortunately, viewing the evidence in the light most favorable to Barrett and drawing all reasonable inferences in favor does not advance this argument. **Neither actual prior incidents of harassment nor well founded belief that prior incidents of harassment took place can justify a failure to report due to concerns about unresponsiveness. . . . . . The court concludes that speculative concerns about management inaction are insufficient to justify a failure to report. If the preventative purpose of Title VII is to be effective, harassment victims must step forward and at least give management an opportunity to provide a remedy.**

Id at. 653 (emphasis added). See also, Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 295 (2d Cir. 1999)(plaintiff's hesitancy to report and use employer's process insufficient to preclude summary judgment).

The above reasoning is directly applicable to the instant case because the nexus between alleged factually distinguishable and unsubstantiated complaints from other DOC employees and the plaintiff's failure to report any racial harassment makes any legal inference so weak as to be unfairly prejudicial. The defendants remind the court the first alleged complaint against defendant Sousa made by DOC employee Porter occurred in May 2001, several months <u>after</u> the March 9, 2001 incident involving the plaintiff's need for relief.

The defendants renew their position that permitting witnesses to testify that they complained about Lt. Sousa and that alone suffices to meet the plaintiff's burden to refute the second prong of the <u>Faragher</u> defense is a misapplication of the law.

## **OFFER OF PROOF**

If the court permits the factual testimony of all of the plaintiff witnesses regarding complaints against defendant Sousa and character evidence in the form of opinions about an alleged racial animus, then the defendants will be forced to call several witnesses to refute any inference that Sousa was racially motivated.

**Salvatore Pitruzzello**: This witness is a 14-year veteran of the DOC and a white male former union steward who worked at HCC with witnesses Smith, Porter, Goodison, Denby, et al. He will testify that in 2001 he was subjected to reverse discrimination by these black union stewards at DOC when he voiced his objection to their conduct towards Lt. Sousa. He will further state that he represented the plaintiff in a grievance involving the March 9, 2001 incident regarding relief from her post and concluded that Lt. Sousa had not acted with a racial animus towards the plaintiff. After expressing such an opinion, he was targeted by the black union stewards that included false charges being filed

7

against him with the union. He will also testify that in 2001, Harris Porter made verbal comments about targeting Lt. Sousa because he was white and the black union stewards did not like Sousa's firm management style. This witness will also state that he was assaulted by Harris Porter while at DOC, that he filed a complaint, and no discipline was given to Porter, a black union steward.

**Eric Wolliston**, is a black correctional officer at the HCC. Officer Wolliston is expected to testify that he has worked with Lt. Sousa at HCC and based on his observations and experience, Lt. Sousa treated both black and white correctional officers fairly and equally.

**Noel Brown**, is a black lieutenant at the HCC. Lt. Brown is expected to testify that he worked directly with Lt. Sousa at HCC and that based on his observation and experience, Lt. Sousa treated both black and white correctional officers fairly and equally.

**Gerald Wood**, is a black lieutenant at the HCC. Mr. Wood is expected to testify that he worked as a corrections officer under Lt. Sousa while at HCC and that in his experience Lt. Sousa treated both black and white correctional officers fairly and equally.

**Donald Kruk, Peter Murphy** and **Nora Ryan** will testify to the racial makeup at HCC in 2001-02. They will state that over 50 percent of the Lieutenants at HCC were black and that minority corrections officers made up over 50 percent of the employees at HCC. These witnesses will also testify to the extensive disciplinary history of witnesses Denby, Smith, Porter, Goodison, Evans, and Channer, which include being reported for rule violations by black, white and Hispanic lieutenants. This information is offered to show that supervisors of different races reported these witnesses for rule violations, not

8

just defendant Sousa.  Further, these witness will testify about the complaints they were made aware of regarding Lt. Sousa, and those complaints referenced by plaintiff's witnesses that were either never reported or were not reported as a claim of racial harassment. Specifically:

| | | |
|---|---|---|
| Ossie Channer: | 10/20/01 | denied overtime |
| Errol Goodison: | 11/20/01 | stepped out in threatening manner |
| Eunice Smith | 02/03/02 | late/missed shift change |
| Bruce Denby | 03/18/02 | retaliation claim against Lt. Gilbert |
| Bruce Denby | 07/19/02 | leaving post |

These witnesses will also testify that the filing of a union grievance (i.e. regarding an overtime, discipline, work rule violations, etc.) does not automatically prompt an inquiry of race discrimination.

These witnesses will also testify that C/O Porter never responded to an inquiry requesting specific names of black officers that he claims were discriminated against by Lt. Sousa in 2001.  Furthermore, these witnesses will testify to the stipulated facts that the plaintiff was aware of the DOC internal procedure for filing a complaint of discrimination and did not do so. Instead she filed a CHRO complaint in 2003.  (See Part C, Stipulated Facts # 66, Joint Trial Memo).

**OBJECTION TO MEDICAL INCIDENTS**

The defendants submit that the entire issue of medical relief relating to other instances involving different DOC employees is a red herring that is not material to this case.  The defendants do not dispute that correction officers are not routinely permitted to use their body alarm for medical issues, but may do so if a medical emergency exists. The plaintiff has stipulated to this fact. (See Joint Trial Memo Section C, fact # 15).

9

Furthermore, while there is a dispute regarding what exactly the plaintiff told defendant Sousa on March 9, 2001 about her condition and his understanding of the plaintiff's situation, there is no dispute that if Lt. Sousa understood the situation to be a medical emergency, relief needed to be provided promptly.[2]  Moreover, there is no dispute that neither Brenda Lewis nor her co-worker present with her on her post realized that her health condition required emergency treatment.  (Exhibit B, Lewis Deposition, pp. 39:4-40:1; Exhibit C, Morelli Deposition, p. 13:5-8, pp. 40:20-41:3).

The parties have stipulated to the following facts in Pact C of the joint trial memorandum:

> In an urgent medical situation, a C/O is able to call 911, an internal number code from her telephone, use her radio to call a color code indicating that "staff needs assistance," and a different color code indicating "medical situation" **or use her body alarm**, as set forth in department directives.  The relevant Administrative Directive does not limit the use of these codes in relation to inmates' health or conduct.
>
> C/O Lewis  was aware of the use of a color code for medical emergencies as it had been part of her training and she had used it in the past.
>
> On April 20, 2001, the union, on behalf of C/O Lewis, who was out on medical leave, filed a labor grievance in regard to the delay in receiving relief on March 9, 2001.
>
> On or about May 26, 2001, C/O Lewis asked C/O Morelli and C/O Hebert to write a statement regarding the incident of 3/9/01.
>
> During the Step III grievance meeting, the union representative, Art Rodriguez, stated that the union **did not believe the delay in providing relief was intentional**, but that the union was bringing the grievance because it involved health and safety issues.
>
> On October 18, 2001 John Nord of the Office of Labor Relations denied the grievance at the Step III level, finding that there had been a miscommunication.  The union did not pursue this grievance to arbitration.
>
> Upon her return to work, C/O Lewis was assigned to a recuperative post position.

Having stipulated to facts showing that the delay in providing the plaintiff with relief on March 9, 2001 was not, in the opinion of the union, an intentional act.  Therefore, the evidence of other non-similarly situated employees who received medical

---

[2]  Defendant Sousa maintains that he asked the plaintiff if she needed to go to medical and she said no. Sousa also disputes the plaintiff's assertion that she told him she was having trouble breathing.

relief is irrelevant.  None of the evidence offered on this issue in the plaintiff's offer of proof goes to the issue of a <u>racially</u> hostile work environment.  The plaintiff has already stipulated to facts stating the various ways that medical relief can be summoned if a perceived emergency exists.  Exhibit 32, offered by the plaintiff as part of its offer of proof, is not only factually distinguishable from the plaintiff's situation, but did NOT involve defendant Sousa.  Accordingly, the court should reject the plaintiff's offer of proof on this issue.

### **OFFER OF PROOF**

Defendants' offer of proof on the issue of medical relief will consist of the relevant stipulated facts, testimony of the plaintiff who acknowledged the various methods for summoning medical assistance, and the testimony of **Peter Murphy, and Erik Sousa.**  Defendants expect that these witnesses will confirm the stipulated facts and, if necessary, clarify when the body alarm may be used to summon help.

The defendants are not trying to avoid responsibility by claiming that the plaintiff should have utilized codes, as perceived by plaintiff.  Rather, the defendants are simply recognizing that no one involved in the medical delay incident knew of the urgency of the situation, and if Lewis had, she could have used the codes or body alarms.  Furthermore, per the instructions in the court's order on the parties' drafting of the Joint Trial Memorandum, the existence of stipulations obviates the need for any testimony on the issue.  Therefore, because the stipulations set forth what the emergency protocol was and that Lewis knew of it and had used it in the past, there is no need to have further testimony or exhibits on the topic.

The defendants renew their request for an evidentiary hearing regarding the testimony of witnesses Goodison, Smith, Evans, Denby, Porter and Channer.

DEFENDANTS,

RICHARD BLUMENTHAL
ATTORNEY GENERAL

BY: _____
Joseph A. Jordano
Assistant Attorney General
Federal Bar # ct21487
55 Elm Street, P.O. Box 120
Hartford, CT 06141-0120
Tel: 860-808-5340
Fax: 860-808-5383
email: Joseph.Jordano@po.state.ct.us

## CERTIFICATION

The undersigned hereby certifies that on the 26th day of August, 2005, a true and accurate copy of the foregoing was sent by United States mail, first class postage prepaid, to the following:

Lowell Peterson, Esq.
Community Law Practice, LLC
2065-A Main Street
Hartford, CT 06102

_____
Joseph A. Jordano
Assistant Attorney General