## UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **BRENDA J. LEWIS,** | : | **CIVIL ACTION CASE NO.** |
| *Plaintiff*, | : | |
| v. | : | 302 CV 2304 (MRK) |
| **STATE OF CONNECTICUT,** | : | |
| **DEPARTMENT OF CORRECTION** | : | |
| *et al.*, | : | |
| *Defendants* | : | **SEPTEMBER 6, 2005** |

### WRITTEN STIPULATIONS OF UNCONTESTED FACT
### OFFERED JOINTLY AS TRIAL EXHIBIT "A"

1. Plaintiff Brenda Lewis was hired as a Correction Officer ("**C/O**") on August 18, 1989, by the Department of Correction ("DOC") and was assigned to the third shift, 12:00 a.m. to 8:00 a.m. at the Hartford Correctional Center ("**HCC**") during all times relevant to her complaint.

2. C/O is a non-management, unionized position within the DOC.

3. She transferred to the DOC restricted unit of John Dempsey Hospital at the UCONN Health Center in Farmington, CT on Nov. 29, 2002.

4. Defendant Erik Sousa was a Lieutenant at HCC from May 21, 1999, through June 1, 2003, at which time he transferred to Webster Correctional Institute in Cheshire, CT.

5. During all times relevant to this complaint, Lt. Sousa primarily worked the first or second shift at HCC. When the second shift was 8 hours long, it went from 4 p.m. to 12 a.m.. When the second shift was 10 hours long, he was assigned to work 3 p.m. to 1:00 a.m.

6. Peter Murphy was hired on Sept. 6, 1985, by the Department of Correction. He was employed at the HCC as Warden from Feb. 14, 2000, through June 27, 2002, at which time he transferred to the Enfield facility. Nelvin Lester, a black male, replaced Peter Murphy as Warden at Hartford CC on June 28, 2002.

7. Warden is a non-unionized, management position within the DOC. As the HCC "Unit Administrator," Warden Murphy was in a supervisory capacity to both C/O Lewis and Lt. Sousa during the period of his tenure at HCC.

8. On the night of March 8 and into the morning of March 9, 2001, Lt. Sousa worked the second shift, which was supposed to end for him at 1:00 a.m.

9. C/O Lewis's third shift duties were to commence at 12:00 a.m. on March 9, 2001, and to conclude at 8:00 a.m. that date.

10. On March 9, 2001, C/O Lewis was assigned to the duty position of Dormitory No. 2, along with C/O Morelli.

11. At approximately 12:04 a.m., only briefly after the beginning of her shift, C/O Lewis called the Lieutenant's office and spoke with Lt. Sousa by an internal telephone call to request relief.

12. Lt. Sousa called Center Control and directed C/O Robinson to provide a relief officer for C/O Lewis.

13. Lt. Anna Dorozko was working on the third shift (midnight to 8:00 a.m.) at HCC on March 9, 2001.

14. At approximately 12:25 a.m. on March 9, 2001, C/O Lewis called Lt. Dorozko and stated that she was not feeling well and had previously requested relief, but that it had not yet arrived.

15. In an urgent medical situation, a C/O is able to call 911, an internal number code from her telephone, use her radio to call a color code indicating that "staff needs assistance," and a different color code indicating "medical situation" or use her body alarm, as set forth in department directives. The relevant Administrative Directive does not limit the use of these codes in relation to inmates' health or conduct.

16. C/O Lewis was aware of the use of a color code for medical emergencies as it had been part of her training and she had used it in the past.

17. C/O Lewis informed her partner, C/O Morelli, that she did not feel well, that she was a little warm and a little sweaty.

18. C/O Morelli waited with C/O Lewis 90-95 % of the time between 12 a.m. and 1 a.m., when he was done doing his count of inmates and tour of the Dorm.

19. C/O Hebert was the relief officer who arrived at Dorm 2 to provide relief for C/O Lewis at approximately 1:00 a.m. on March 9, 2001.

20. C/O Hebert was hired by DOC in 1999 and assigned to Hartford CC on the third shift.

21. C/O Lewis left Dormitory 2 to go to the medical unit of HCC, but stopped in the lobby area en route at which time she received medical attention.

22. C/O Lewis was transported from HCC to the St. Francis Hospital and Medical Center where it was determined she had suffered acute myocardial infarction (heart attack).

23. Chief Union Steward C/O Farrar delivered workers' compensation papers from the DOC to the hospital for C/O Lewis and was expected to bring them back from C/O Lewis to DOC. There was a delay in the return of these papers.

24. Lt. Barnette, an African American, was charged with the responsibility of completing an incident report regarding the March 9, 2001 incident. He forwarded the incident report to the Major, in accordance with standard procedure. The Major initially held onto the report waiting for plaintiff's return so that she could fill out page one. However, due to plaintiff's lengthy absence, Lt. Barnette finally completed page one of the incident report. Warden Murphy received the incident report on or about May 10, 2001.

25. C/O Lewis authored a memo to Warden Murphy dated April 5, 2001, in which she complained regarding a delay in processing of paper work.

26. On April 20, 2001, the union, on behalf of C/O Lewis who was out on medical leave, filed a labor grievance in regard to the delay in receiving relief on March 9, 2001.

27. On or about May 26, 2001, C/O Lewis asked C/O Morelli and C/O Hebert to write a statement regarding the incident of 3/9/01.

28. During the Step III grievance meeting, the union representative, Art Rodriguez, stated that the union did not believe the delay in providing relief was intentional, but that the union was bringing the grievance because it involved health and safety issues.

29. On October 18, 2001 John Nord of the Office of Labor Relations denied the grievance at the Step III level, finding that there had been a miscommunication. The union did not pursue this grievance to arbitration.

30. Upon her return to work, C/O Lewis was assigned to a recuperative post position.

31. Recuperative post assignments are utilized by DOC for 90 days to assist employees in facilitating a speedy return from injury or illness to full employment because they do not involve inmate contact and do not involve physically demanding work. Recuperative post assignments fall within the normal job duties for Correction Officers.

32. Recuperative post assignments include the following Control Center Posts: Lobby Control, Center Control and Dorm Control.

33. Nora Ryan was the Human Resource officer who received approval from C/O Lewis' physician, Doctor Cohen, for her to return to work from medical leave as of May 12, 2001, to a recuperative post assignment.

34. Captain Madden was the Acting Shift Commander on the third shift for June 20, 2001. It was part of his job responsibilities to make post assignments and he was the person who initiated assigning and approving C/O Lewis to the recuperative post in the Lobby Control for June 20, 2001.

35. C/O Lewis was assigned to the Lobby Control Post position as her recuperative post.

36. Recuperative post assignments are utilized by DOC for 90 days to assist all employees, in facilitating a speedy return from injury or illness to full employment because they do not involve contact and do not involve physically demanding work. Recuperative post assignments fall within the normal job duties for Correction Officers. Thus, the employees' title, rank, position, and pay remain the same. Thus, these assignments are not considered transfers. Recuperative post assignments at HCC include the following Control Center Posts: Lobby Control, Center Control, Dorm Control.

37. Nora Ryan was the Human Resource officer who received approval from Brenda Lewis' physician, Doctor Cohen, for her to return to work from medical leave as of May 12, 2001 to a recuperative post assignment. The recuperative post assignment for Brenda Lewis was approved by her physician after he reviewed the physical and cognitive tasks, which are related to all Control Center Post assignments. A letter, dated May 11, 2001, was presented to Brenda Lewis notifying her of her doctor's approval of her recuperative post assignment.

38. On or about June 20, 2001, when Warden Murphy entered the lobby, C/O Lewis approached him to complain about not being qualified for her recent assignment to the recuperative post of Lobby Control. Murphy called Captain Michael Madden and related this information to him. Captain Madden told Warden Murphy that he was aware of C/O Lewis' complaints and that she was a seasoned veteran who should know how to work on that post and that he would get someone to train her on the assignment. Captain Madden told Warden Murphy that C/O Trainor would conduct training of C/O Lewis on that post. Warden Murphy saw C/O Trainor sitting with C/O Lewis training her on that post.

39. Consistent with Administrative Directive 6.2 Post Orders and Logs and the Warden's instructions, it is part of a Lieutenant's duties to make inquiry as to whether Correction Officers

have signed the logbooks in their duty station. Logbooks are to be signed upon assuming a new post and whenever a new logbook is put in place.

40. Warden Murphy had given clear directions to supervisors and department heads at numerous monthly staff meetings to check that staff were signing the back of logbooks, which signature acknowledges that they have read and understood post orders. Post orders delineate duty of posts. The policy of signing post orders is uniform throughout all DOC facilities.

41. On April 22, 2002, Lt. Sousa did a tour of the South Block Unit and asked C/O Lewis about a mental health inmate who was being escorted somewhere without a supervisor. At that time, a supervisor was required to accompany an officer escorting a level 5 mental health inmate.

42. During the course of this conversation, C/O Lewis started to discuss the March 9, 2001 incident with Lt. Sousa.

43. C/O Lewis accused Lt. Sousa of lying at the "Step III" hearing of the grievance she filed against him regarding this incident. A verbal altercation ensued.

44. Lt. Sousa later filed an internal incident report and called the State Police with a report to the effect that, upon exiting the Officer's Control ("bubble") area, C/O Lewis slammed a door with sufficient force so that it hit his back and injuries resulted.

45. Lt. Sousa's incident report relating to the April 22, 2002, incident was investigated as a workplace violence incident by the Central Intelligence Unit under the direction of Captain Stuart Mendelson.

46. DOC's investigative report, dated June 12, 2002, determined that, due to the lack of witnesses and evidence, the investigator was unable to prove or disprove the claims made by Lt. Sousa.

47. C/O Lewis filed a grievance to the effect that Lt. Sousa falsely accused her of assault.

48. Lt. Sousa and C/O Lewis each received a verbal counseling with regard to the April 22, 2002, South Block incident. C/O Lewis received counseling on August 22, 2002 by Major M. Torres. Lt. Sousa received counseling on Sept. 3, 2002.

49. Verbal counseling is not considered discipline and any written memorialization of it is not placed in the employee's personnel file.

50. Regarding the April 22, 2002 incident, the union did not pursue the grievance after the investigative report issued.

51. C/O Lewis filed a grievance complaining that she was overlooked for an opportunity to work an overtime shift on July 24, 2002.

52. On January 15, 2003, Officer of Labor Relations Hearing Officer Phil Margeson denied this grievance at Step III, finding that she had not updated her telephone number in the call list.

53. Article 15 of the applicable collective bargaining agreement provides for annual equalization of overtime opportunities for DOC employees in case some employees have inadvertently received more overtime opportunities.

54. As of August 13, 2002, one of C/O Lewis' duties in the 3 and 4 Control Center was to "buzz" people into the HCC facility.

55. On that date, Lt. Sousa and C/O Medina pressed the buzzer to come in, but C/O Lewis did not let them in for about 5 minutes.

56. Lt. Sousa claimed that her failure to admit him was deliberate. C/O Lewis claimed that her failure to admit Lt. Sousa immediately was due to an equipment malfunction. Lt. Sousa directed her to write up an incident report. C/O Lewis agrees that it was appropriate for Lt. Sousa to direct her to write an incident report.

57. Warden Levester tried to mediate the August 13, 2002 buzzer delay incident between Lt. Sousa and C/O Lewis. Warden Levester requested Lt. Sousa to forego submitting the incident

report. Lt. Sousa stated that he wanted a working relationship with Brenda Lewis. Brenda Lewis told Warden Levester that she could not overlook the incident and could not work with Lt. Sousa.

58. The plaintiff suffered no discipline, nor any tangible employment action, as the result of any conduct attributed to Lt. Sousa or in regard to any of her allegations in this lawsuit.

59. Lt. Sousa had no authority to hire, fire, demote, promote, transfer, determine or impose discipline over employees, including Brenda Lewis.

60. Lt. Sousa never had the responsibility to write an evaluation of C/O Brenda Lewis.

61. Generally, Shift Commandeers on the third shift would make assignments for Correction Officers on the third shift.

62. DOC has had an anti-harassment and nondiscrimination policy and procedure in place for all times relevant to the plaintiff's federal complaint.

63. New employees hired are introduced to the anti-harassment and nondiscrimination policy and procedure as part of their orientation package and it is posted at every facility on employee informational bulletin boards. Employees are reminded of this policy annually by way of notice issued with a paycheck.

64. Donald Kruk was hired on March 10, 1978 by the Department of Correction. He worked at DOC's Central Office in Wethersfield, CT as Acting Director, then Director of the Affirmative Action Unit from October 1996 through August 31, 2002. On Sept. 1, 2002, he was reassigned to External Affairs.

65. In his capacity as Acting Director, then Director of the Affirmative Action Unit of DOC, Donald Kruk oversaw and administered the anti-harassment and nondiscrimination policy and procedure for DOC.

66. C/O Lewis never reported a claim of race or color discrimination based on the incidents alleged in this lawsuit to the Affirmative Action Office of DOC or other DOC personnel.

67. C/O Lewis filed a CHRO complaint limited to the March 9, 2001 incident on November 30, 2001. On September 30, 2002, Plaintiff filed an Amended EEOC charge, which included additional acts set forth in this lawsuit and requested a right to sue notice. Also on September 30, 2002, EEOC issued a Notice of Right to Sue. On Oct. 1, 2002, EEOC informed DOC that it did not have to file an answer at that time.

68. The plaintiff seeks no injunctive relief.

69. The plaintiff did not see a doctor with regard to any claim of emotional distress.

70. Defendant Erik Sousa was not aware that the plaintiff was suffering from a heart attack on the early morning of March 9, 2001.